UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
           :

NEW YORK WHEEL OWNER LLC,      :

           :

        Plaintiff,     :

           :      **COMPLAINT**

    v.          :

           :      **JURY TRIAL DEMANDED**

MAMMOET-STARNETH LLC,      :

           :

        Defendant.    :

           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff*

Plaintiff New York Wheel Owner LLC ("NYW"), by and through its attorneys, alleges as follows:

## NATURE OF THE PROCEEDING

1.     This case concerns Defendant Mammoet-Starneth LLC's breach of a $165 million Design Build Agreement for the construction of the western hemisphere's largest observation wheel, the "New York Wheel," a highly anticipated tourist attraction that is the centerpiece of New York City's economic revitalization plan for the Staten Island waterfront.  After more than two years of self-inflicted delays and extortionate attempts to extract additional payments totaling more than 50% of the agreed contract price, Mammoet-Starneth formally suspended performance under the Agreement on May 26, 2017, and has threatened to withdraw entirely from it.  Plaintiff New York Wheel Owner LLC ("NYW"), as the "Developer" under this Agreement, now seeks injunctive relief to invalidate Mammoet-Starneth's unlawful suspension and to prevent its unlawful termination, a declaration that Mammoet-Starneth must abide by the terms of the Agreement and continue to perform the work to completion, and money damages to compensate for the millions of dollars of harm that have been caused by Mammoet-Starneth's intransigent refusal to "diligently prosecute the Work."

2.     Developer hired Mammoet-Starneth as the "Design Build Team" (or "DBT") for the Wheel in 2014, agreeing to pay $145 million for a "turn-key" Wheel that would be designed, built, and made ready for commercial operation by the DBT by October 2016.  Developer's only obligations were to build the Pad upon which the Wheel would sit—an obligation that would commence only upon receipt of the DBT's initial engineering drawings for the project—and to make milestone payments and progress payments to the DBT.

3.     Almost immediately, the Wheel project ("the Project") fell behind schedule as the DBT struggled to develop engineering drawings, submit documentation in support of the required permits, and meet the City's fabrication standards.  Despite these delays of its own making, the DBT turned to Developer and demanded additional money, even as it became clear that the DBT's compounding delays would cause Developer to lose out on revenues from the 2017 tourism seasons and beyond and delay this critical element of Staten Island's revitalization. Twice, despite having no obligation to do so, Developer amended the Agreement to provide the DBT with increased financial incentives, and twice the DBT came back looking for more—even though the DBT remained months away from commencing its contractually required "Work" on the construction site (the "Site") and had still not even provided a full set of engineering drawings.

4.     In order to secure these additional financial concessions from Developer, the DBT falsely claimed, twice, that it was mere weeks away from delivering these critical drawings.  In December 2014 and May 2015, the DBT induced Developer to increase the Contract Sum by a total of $20 million by representing that delivery of these plans was imminent.  In fact, it took the DBT until April 2016, more than 17 months past the original deadline, to deliver even the minimum amount of paperwork necessary to obtain a Building Permit.

5.     The DBT has also trumped up claims for so-called "delay" damages, even though any "delays" are of the DBT's own making and Developer met the only deadline imposed on it by the Agreement—design and construction of the Pad and turnover of the Site—with weeks to spare.

6.     In these interim negotiations and in the day-to-day management of the Project, the DBT has repeatedly sought more money by leveraging its unique qualifications and experience

as a designer and builder of massive observation wheels and Developer's dependence, and contractual duty to rely, on the DBT alone to complete the Project.  But the Agreement is a fixed-price contract; it does not provide for continual increases in the price.  Absent genuine changes in the scope of the required Work, or delays that are the fault of Developer alone, the DBT is not entitled to increases in the price of the Wheel.  Instead, the DBT is contractually obligated to complete construction of the Wheel at the parties' agreed-upon price.

7.     The DBT's latest charade has been to manufacture a payments dispute by refusing to submit the basic cost documentation required for Developer to make progress payments under the Agreement.  Under the Agreement, unless and until the DBT provides this documentation, Developer is under no obligation to make the payments that derive from it.  The DBT nonetheless claims that Developer is in default.

8.     To the contrary, Developer has gone above and beyond its own obligations to break this contrived impasse.  In April 2017, Developer generated a proposed final Application for Payment ("AFP") using the limited information the DBT had made available to date, asking only that the DBT formally submit the document to release payment.  The DBT never responded to this offer.  In May 2017, Developer supplemented its offer of payment by repeating the process for all outstanding payment periods, generating a proposed total amount payable of $7,227,705, which the DBT has again chosen not to accept despite no prejudice to its rights.

9.     In refusing to submit the cost documentation required by the Agreement or to accept payment for its own claimed progress, the DBT has boxed itself in and made its intentions clear:  it simply does not want to perform the Agreement any longer unless it receives far more money than the contract price, even though—by its own account—it is the only entity who can perform this Agreement.

10.     Developer is committed to completing the Wheel.  Besides taking on the DBT's financial accounting responsibilities, Developer literally did $16 million of the DBT's actual work for it—including construction of the Wheel embeds at a cost of more than $8.25 million. The DBT has responded to these gestures with a spurious claim for more than $20 million in delay damages, above and beyond its overstated claims for "Progress Payments," for a delay that was entirely of the DBT's own making.  In short, the DBT has tried every maneuver it can dream up to increase the amount it will be paid for its work.

11.     Apparently out of ideas, and unable to perform any Work on Site due to self-imposed delays, the DBT now has resorted to "suspension" of the Agreement, setting up a withdrawal as early as May 31, 2017.  To do so would be disastrous for both parties—each is a single-purpose entity created solely to develop the Wheel—as well as for the City of New York, which has pinned its hopes for revitalizing the Staten Island waterfront on this unique, world-class attraction, and the hundreds of investors who have backed the Project.

12.     This Court should enjoin and restrain the DBT from destroying the parties' Agreement, declare the DBT in remediable breach, compensate Developer for its losses suffered in connection with the DBT's gamesmanship, and order the DBT to resume performance of its obligations.  Only then can both parties and the City get what they bargained for.

## PARTIES

13.     Plaintiff New York Wheel Owner LLC is a Delaware limited liability company whose members are citizens of New York and New Jersey.

14.     Defendant Mammoet-Starneth LLC is a Delaware limited liability company whose members are citizens of the Netherlands, Delaware, Florida, and California.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because this is an action between citizens of different states and the amount in controversy is in excess of $75,000.

16.     This Court has subject matter jurisdiction over Plaintiff's declaratory judgment claims pursuant to 28 U.S.C. § 2201(a), because there is a substantial, live, and justiciable controversy between the parties and Plaintiff seeks a declaration as to the parties' respective rights and obligations.

17.     This Court has personal jurisdiction over the DBT because the DBT consented to the jurisdiction of the Southern District of New York in Section 19.2.6 of Agreement.

18.     Venue is proper because NYW and the DBT agreed to venue in the Southern District of New York for all litigation arising out of the Agreement.  Pursuant to Section 19.2.6 of the Agreement, "[t]he venue in any action shall be the United States District Court for the Southern District of New York ('SDNY'), wherein exclusive jurisdiction and venue shall lie."

19.     Under Section 19.2.6 of the Agreement, NYW is entitled to proceed in this Court because the value of NYW's claims exceeds $15 million.

## STATEMENT OF FACTS

**A.     The New York Wheel Is Planned As One of the Largest Attractions of Its Kind in the World.**

20.     In July 2012, the New York City Economic Development Corporation ("NYCEDC") appointed NYW's predecessor, New York Wheel, LLC, to undertake commercial development of a portion of the Staten Island Waterfront.

21.     To further this plan, on December 24, 2013, NYCEDC leased to New York Wheel, LLC prime waterfront real estate in St. George, Staten Island, on the New York Harbor.

22.     New York Wheel, LLC proposed the construction of a 625-foot high observation wheel with 36 pods or capsules (the "Wheel") on the Site.  Each pod of the Wheel would be designed to hold 40 people, and each rotation of the Wheel would transport up to 1,440 people.



*Artist's rendering of New York Wheel viewed from the South*



*Artist's rendering of New York Wheel viewed from the North*

23.     The Wheel, with its accompanying Terminal Building and waterfront park, is expected to attract more than 3.5 million visitors per year, and will be even larger than the world-famous "London Eye."

24.     At the time of the proposal, the Wheel was slated to be the world's largest observation wheel—measuring 190.5 meters tall.

25.     The Wheel also will feature millions of dollars of LED lighting, enhancing this unique aspect of the New York City skyline.

26.     As the centerpiece of a larger waterfront development on the north shore of St. George, Staten Island, the Wheel is expected to boost the economic prospects of the local area, creating approximately 350 union construction jobs and 600 permanent jobs upon completion.

27.     Upon its announcement, the Wheel was heralded by The New York Times as part of "Staten Island's Turning Point."

**B.     Developer Hires the Design Build Team to Design and Build the Wheel by 2016.**

28.     In 2013, representatives of NYW's predecessor company, including Richard Marin and Andrew Ratner, began talks with Chiel Smits of Starneth LLC regarding a potential observation wheel to be built on the Staten Island waterfront.

29.     During these talks, Mr. Smits held Starneth out as the designer behind the world-famous "London Eye" observation wheel.

30.     Mr. Smits promised to identify a building contractor that Starneth could partner with to deliver the proposed New York Wheel.

31.     Eventually, Starneth entered into negotiations with Mammoet, a Dutch company renowned for its expertise in constructing, lifting, and moving large steel structures, to construct the Wheel.

32.     Mammoet's U.S. subsidiary, Mammoet USA North, Inc., and Starneth formed a single-purpose entity known as Mammoet-Starneth LLC.

33.     Together, the DBT possesses unique experience and expertise in the design, engineering, procurement, on-site construction, installation, and testing of giant observation wheels.

34.     After approximately 15 months of negotiation, on March 5, 2014, New York Wheel, LLC (as "Developer") and Mammoet-Starneth LLC (as the "Design Build Team" or the "DBT") entered into a "turn-key" Design Build Agreement (the "Agreement"), pursuant to which the DBT would design and construct the Wheel on the city land leased to New York Wheel, LLC by the NYCEDC for this specific purpose.

35.     Under the Agreement, the DBT would be solely responsible for all aspects of the Wheel design, engineering, fabrication, and construction, including the management of all subcontracts for the Wheel components and all erection activities ("Contracts" under the Agreement).

36.     The DBT's primary responsibilities under the Agreement are to

> design and build the Project and to perform, and cause to be performed or provided through Contractors . . . all design, engineering, labor, material, equipment, tools, temporary utilities, supervision and management services required for the timely, lien-free, completion of the Project . . . in accordance with the Design Build Documents . . . in consideration of the Contract Sum.

37.     Under Section 1.2 of the Agreement, the DBT is responsible for "complet[ing] the design of the Wheel and prepar[ing] Construction Documents consistent with the Project Criteria."

38.     Besides making payments, Developer's primary responsibilities under the Agreement are "the design and construction of the Pad, Terminal Building and the Balance of the Development," *e.g.*, parking facilities and other amenities at the Site.

39.     Upon completion by the DBT, the Agreement requires that the Wheel be commissioned and ready for its intended use.

40.     The parties agreed to a fixed Contract Sum of $145 million, subject only to equitable adjustments as provided in the Agreement.

41.     Developer required the DBT to submit a fixed Contract Sum for Developer's benefit, given the DBT's unique, specialized ability to estimate all of the costs of design, engineering, fabrication, and construction for this unique asset.

**C.     In the Design Build Agreement, the DBT Agrees to Progress Payments Based on Actual Work Completed.**

42.     The parties further agreed that the DBT would be paid on a monthly basis for the actual progress it made on the Work ("Progress Payments").

43.     Under the Agreement, these Progress Payments are limited to undisputed amounts corresponding to satisfactorily completed Work within the scope of the parties' agreed Schedule of Values, which identifies the line-items that make up the Work.

44.     The Schedule of Values provides the amount of money the DBT is to be paid for Work on each aspect of the Wheel:

| Description | Amount |
|---|---|
| **A.   Wheel Structure** | **$79,793,820** |
|     1.   Fabrication of Steel Structure | |
|     2.   Erection of Steel Structure | |
|     3.   Cable Work | |
|     4.   Electrical Work | |
| **B.   Capsules** | **$24,336,180** |
|     1.   Frame work (Steel work / Polyester parts) | |
|     2.   Mechanical & Control | |
|     3.   Capsule interior (Ceiling, Floor, Glass, Door, Bench) | |
|     4.   Packing and Transportation | |
| **C.   Drive & Control System** | **$11,600,000** |
|     1.   Drive & control system | |
|     2.   Restraint system | |
|     3.   Driving system supporting tower | |
| **D.   LED** | **$7,120,000** |
|     1.   Rim, Capsule, Spoke LED | |
| **E.   Plinth** | **$970,000** |
| **F.   O&M Manual** | **$500,000** |
| **G.   Test & Commissioning** | **$1,500,000** |
| **H.   Design & Engineering** | **$11,680,000** |
| **I.   Health & Safety** | **$1,000,000** |
| **J.   Project Management** | **$6,500,000** |
| **Wheel Total** | **$145,000,000** |

*Abbreviated Initial Schedule of Values*

11

45.     Section 10.1 of the Agreement required the DBT to submit to Developer "an initial schedule of values," which "shall be used as a basis for reviewing the Design Build Team's Applications for Payment," and provides that "[t]he schedule of values shall be updated in accordance with this Article."

46.     Under the Agreement, the DBT must provide Developer an updated Schedule of Values whenever a change to the Contract Sum is approved through a Change Order.

47.     A Change Order, pursuant to Section 9.2.1 of the Agreement, is:

> a written instrument prepared by the Design Build Team and signed by Developer and the Design Build Team, stating their agreement upon all of the following:  (1) The scope and details of a change in the Work; (2) The amount of the adjustment, if any, in the Contract Sum; and (3) The extent of the adjustment, if any, to the Contract Time.

48.     The Agreement creates a reconciliation process to protect Developer from overstatements of progress and liability for costs in excess of the agreed Contract Sum.

49.     This process protects the DBT by requiring Developer to immediately identify any disputed charges by reference to the payment documentation submitted by the DBT.

50.     The process is designed to measure the DBT's economic progress on the Work, by comparing the amount of money spent to perform line-items on the current Schedule of Values with the total costs the DBT expects to incur on each such item based on its contracts with subcontractors and vendors.

51.     For any given line-item, the DBT's expected total costs can be greater or less than the scheduled value in the Schedule of Values.  For example, the DBT may be unjustifiably over-budget on a particular line-item and not eligible for a corresponding increase in the Contract Sum.

52.     Section 10.7.1 of the Agreement requires the DBT to calculate these Progress Payments by "multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the most recent Schedule of Values." Therefore, for a given period, the DBT is entitled to a Progress Payment on each line-item that is equal to the DBT's percentage completion for that line-item multiplied by the Contract Sum allocated to that line-item on the latest Schedule of Values, subject to any contractually mandated required retainage and payment deferrals.

53.     To permit accurate measurement of the DBT's economic progress and confirmation of the amounts owed, during the reconciliation process the DBT must provide information about its total expected costs for each line-item on the Schedule of Values.

54.     First, under Section 10.2 of the Agreement, the DBT must submit a "pencil copy" Application for Payment ("AFP") that is "based upon the most recent Schedule of Values reasonably approved by Developer, setting forth in detail operations completed and measured against the current schedule of values," and a projection for the costs to be incurred through the end of the monthly period.

55.     Second, within seven days of receiving a pencil copy and corresponding backup documentation, including the invoices and information demonstrating the DBT's total expected costs for each line-item, Developer is required to review and evaluate the pencil copy.

56.     Under Section 10.7.10 of the Agreement, Developer can require amounts to be excluded from an AFP insofar as "the Work has not reached the stage indicated in the Application for Payment" or "subsequently discovered evidence may nullify in whole or in part an Application previously approved."

57.     Third, after the DBT's pencil copy has been submitted and fully reviewed by Developer in accordance with Article X, the DBT must respond to any Developer comments regarding amounts in dispute.

58.     The reconciliation process continues until only those amounts not in dispute remain in the AFP.

59.     Fourth, after all items in dispute have been removed from the AFP, the DBT must "finalize the Application for Payment and submit it to Developer."

60.     The finalized AFP therefore includes only those charges that remain undisputed at the end of this reconciliation process.

61.     Under Section 10.7.10 of the Agreement, amounts that remain in dispute can be "properly requisitioned" through an AFP only after Developer's "reasons for withholding payment are removed" through a Change Order or the conclusion of dispute resolution.

62.     Under Section 19.2.1 of the Agreement, if any disputes valued at less than $15 million arise regarding "cost or any changes in the Work," *e.g.*, the value of the Progress Payments owed to the DBT, the DBT must bring an arbitration pursuant to the rules of the American Arbitration Association.

63.     The DBT has never invoked the dispute resolution procedures set forth in Article XIX to resolve any disputed amounts or other claims for Progress Payments.

**D.     The DBT Fails to Meet Critical Early Deadlines, Creating Compounding Delays.**

64.     Almost immediately, the Project was beset by delays caused by the DBT.

65.     Exhibit H to the Agreement set forth a specific timeline for the Project.

66.     Under Exhibit H to the Agreement, the DBT was required to provide engineering drawings for the Project by November 28, 2014.

67.     Wheel erection was to begin on May 1, 2015 and conclude by August 2, 2016.

68. The parties set the Substantial Completion Date, the deadline by which the DBT was expected to complete its Work, as October 1, 2016.

69. The DBT failed to timely provide the engineering drawings and plans required for construction of the Wheel and the Pad upon which it will sit.

70. The DBT's delay in providing the engineering drawings prevented Developer from designing and constructing the Pad.

71. This delay also forced Developer to assume the DBT's responsibility for several aspects of the Work, so as not to further delay the Project's timeline, including but not limited to the embeds that will link the Wheel to the Pad.

72. NYW has spent more than $8.25 million to construct these embeds, which were and remain the DBT's responsibility under the Agreement.

73. Because of these delays in the DBT's delivery of the engineering drawings, completion of the Wheel was delayed and Developer suffered the loss of at least one year and millions of dollars in revenues.

74. The DBT also repeatedly failed to meet New York City Department of Buildings ("DOB") permitting requirements.

75. Section 3.4.1 of the Agreement requires the DBT to support the acquisition of all required permits by "cooperat[ing] and coordinat[ing] with Developer in obtaining and maintaining in good standing such licenses and permits."

76. Section 3.4.1(b) of the Agreement requires the DBT to "procure all certifications as required by Applicable Law for the performance of the Work," and Section 3.4.1(j) specifies that the DBT must "obtain all necessary licenses and permits required for the performance of the Work."

77.     The DBT failed to obtain "approved fabricator" status from the DOB, which was necessary to obtain other timely approvals for the Work.

78.     The DBT's failure to satisfy its permitting obligations has imposed substantial costs on Developer and resulted in further Project delays.

79.     Sections 2.1, 3.4.1(i), and 5.2(d) of the Agreement, and Appendix A to the first amendment to the Agreement, require the DBT to pay for and perform various types of inspections and testing which could have been avoided if the DBT had obtained "approved fabricator" status.

80.     Due to the DBT's failures here, Developer has spent more than $2 million for inspections and testing that are explicitly the responsibility of the DBT, and expects to spend at least $3 million more.

81.     The DBT has also failed to satisfy other contractual obligations, shifting other costs of design and construction to Developer in violation of the Agreement.

82.     In its attempt to keep the Project on track, Developer was forced to construct a temporary construction dock to receive components at the Site, install lightning protection at the Site for the Wheel, pay the full on-Site utilities bill instead of the half it had negotiated to pay, pay for special inspections of the Work in progress, perform the engineering load analysis for installation of the DBT's preferred cranes, and incur additional management and overhead expenses for all this Work.

**E.     In an Attempt to Get the Project Back on Track, Developer Twice Agrees to Amend the Agreement and Pay the DBT More Money.**

83.     Almost immediately upon signing the Agreement, the DBT began to clamor for additional compensation to design and build the Wheel, despite having agreed to a fixed-price contract.

16

84.     On numerous occasions, the DBT has expressed its position that the initial Schedule of Values is a mere "budget," as opposed to what it really is:  an all-in, fully negotiated, lump-sum price for a "turn-key" attraction.

85.     Due to the unique nature of the Project and the DBT's experience and expertise, Developer had little choice but to accede to some of the DBT's unreasonable demands.

86.     In an attempt to get the project back on track and incentivize the DBT to deliver the Wheel, on December 11, 2014, Developer and the DBT executed the First Amendment to the Agreement ("CAR 1").

87.     CAR 1 specified a timeline and set deadlines for completion of the DBT's Phase II obligations, which included the finalization of design documents and the satisfaction of the DOB's permitting process.

88.     Under CAR 1, the DBT was required to provide Developer with a "permit-ready" set of documents just three weeks later, on December 31, 2014, and a "100% construction-ready set of documents" on or before March 2, 2015.

89.     CAR 1 also re-set the deadline for delivery of the Pad to January 4, 2016 and the Substantial Completion Date of the Wheel to January 2, 2017.

90.     To ensure the DBT's commitment to the parties' new agreed timeline for the project, Developer agreed to a $13.5 million increase of the Contract Sum payable to the DBT—almost 10% of the original asking price—bringing the Contract Sum to $158.5 million.

91.     During these negotiations, the DBT represented to Developer that the DBT was close to finally completing the engineering drawings that were initially due by November 2014.

92.     At the time the DBT entered into CAR 1, on December 11, 2014, the DBT knew or should have known that it could not actually deliver the required engineering drawings to Developer on or before December 31, 2014, just three weeks away.

93.     The DBT nonetheless entered into CAR 1, knowing that its promise to deliver these drawings by December 31, 2014 was a material inducement to the increased Contract Sum promised by Developer.

94.     The DBT did not provide Developer with a "permit-ready" set of documents by December 31, 2014 or a "100% construction-ready set of documents" by March 2, 2015.

95.     Because of these delays in the DBT's performance of its design and performance obligations, Developer suffered lost profits and incurred increased management and financing costs for the Project.

96.     It also became necessary to push out the Substantial Completion Date yet again.

97.     Due to further delays, the parties soon began negotiating the Second Amendment to the Agreement ("CAR 2").

98.     As it had during the CAR 1 negotiations, the DBT represented that it would soon be ready to provide engineering drawings.

99.     During the CAR 2 negotiations, the DBT represented to Developer that the DBT was close to finally completing the engineering drawings that were initially due by November 2014.

100.    On May 18, 2015, Developer and the DBT executed CAR 2.

101.    In CAR 2, the DBT agreed to deliver to Developer all engineering drawings and other documents required to allow Developer to procure the Building Permit on or before July 1, 2015.

102.     Section 5.2(i) of the Agreement as amended requires the DBT to provide Developer "fully coordinated engineering drawings required for the application of the Building Permit" by July 1, 2015.

103.     CAR 2 also set an Outside Site Turnover Date of March 15, 2016, creating an 8.5-month window for Developer to complete work on the Pad and make room at the Staten Island waterfront Site for the DBT, which would then commence on-site Wheel construction activities.

104.     The DBT's promised delivery of the engineering drawings on or before July 1, 2015, and the passage of 8.5 months to allow NYW to complete its own work on-site, were conditions precedent to the Outside Site Turnover Date.

105.     CAR 2 also re-set the Substantial Completion Date of the Wheel from January 2, 2017 to May 15, 2017.

106.     Once again, to ensure that the DBT would remain committed to the project, Developer agreed to further increase the Contract Sum, this time by $6.5 million, bringing the new Contract Sum to $165 million exclusive of Change Orders.

107.     At the time the DBT entered into CAR 2 on May 15, 2015, the DBT knew or should have known that it could not actually deliver the required engineering drawings to Developer on or before July 1, 2015, just six weeks away.

108.     The DBT nonetheless entered into CAR 2, knowing that its promise to deliver these drawings by July 1, 2015 was a material inducement to the increased Contract Sum promised by Developer and a condition precedent to Outside Site Turnover by March 15, 2016.

109.     The current Contract Sum under the Agreement is approximately $170 million, which includes $20 million in price increases wrongfully obtained through the DBT's willful

misrepresentations leading to CAR 1 and CAR 2 and approximately $5 million of agreed-upon Change Orders.

110.    This Contract Sum is not fully payable to the DBT, however, because the DBT wrongfully induced Developer to increase the Contract Sum and Developer has performed certain of the DBT's obligations for it in order to avoid further delay or increased costs.

111.    Following the execution of CAR 2, Plaintiff NYW succeeded to New York Wheel, LLC's rights and obligations under the Agreement and became the "Developer" under the Agreement for all intents and purposes.

112.    Plaintiff NYW owns any fraud or tort claims arising out of Agreement negotiations, including CAR 1 and CAR 2 negotiations.

113.    Beyond agreeing to amend the Agreement to increase the Contract Sum, Developer made other concessions to satisfy the DBT's demands for more money.

114.    Under Section 10.7.8, the DBT shall be paid a Performance Payment of $13.5 million within 30 days of Substantial Completion.

115.    Upon discovering that it had overpaid the DBT by about $5.4 million by prematurely releasing installments of the Performance Payment in connection with Progress Payments, Developer notified the DBT of this error but elected not to recapture these payments during the reconciliation process.

116.    Instead, Developer allowed the DBT to keep this $5.4 million as a cash advance to alleviate its self-proclaimed cash-flow insufficiencies.

**F.    After Two Rounds of Price Increases, the DBT Fails to Justify Its Demands for Even More Money.**

117.    The DBT cannot unilaterally increase the Contract Sum, or individual line-items on the Schedule of Values, absent Developer's express agreement.

118.    The Agreement explicitly addresses the types of changes that may arise during the construction of the Wheel and provides a mechanism for compensating the DBT for such changes.

119.    Section 9.6.1 of Agreement provides that:

> If the Design Build Team wishes to make a claim for an increase in the Contract Sum or an extension of the Contract Time, the Design Build Team shall give Developer written notice thereof within twenty one (21) days after the Design Build Team became aware, or should have become aware, of the occurrence of the event or circumstances giving rise to such claim, failing which, Design Build Team shall waive such claim. . . .  Any change or extension to the Contract Sum and/or Contract Time (including any adjustment of Substantial Completion Date) resulting from such claim shall be authorized by Developer's execution of a Change Order.

120.    Under Section 7.1 of the Agreement, Change Orders must be submitted by the DBT and "shall be reasonably approved, modified or rejected in writing by Developer promptly upon submission by the Design Build Team (and in no event later than twenty one (21) days after Developer's receipt of same), failing which the change in the Work *shall not proceed* . . . ." (Emphasis added.)

121.    To date, the DBT has submitted nine Change Orders to Developer for amounts totaling $6,920,367.  Developer has approved more than half of these Change Orders, for a total of approximately $5,000,000.

122.    If the DBT had wanted to increase the Contract Sum beyond its current total, the DBT was obligated to make Change Order requests under Article IX of the Agreement.

123.    For many of the additional expenses the DBT now seeks to recoup, the time period for making a valid claim under Section 7.1 has passed.

124.    Likewise, the DBT cannot demand additional compensation for construction delays of its own making.

125.    Under the Agreement, the DBT cannot claim an increase in the Contract Sum for any delays attributable to the DBT's own delays in performance.

126.    Under Section 5.3 of the Agreement,

> To the extent that any Unavoidable Delay [*i.e.*, a delay for which the DBT is not at fault] coincides with and overlaps the occurrence of any other delay which is not an Unavoidable Delay (*i.e.* one for which the Design Build Team is responsible), there shall be a [C]oncurrent [D]elay. . . .  To the extent of any Concurrent Delay, the Design Build Team shall be entitled only to an extension of the Contract Time equal to the demonstrable impact to the Schedule critical path of the Concurrent Delay, and the adjustment of Contract Sum may be decided by mutual agreement between the Design Build Team and Developer, ***it being recognized that to the extent a delay is caused by both unavoidable and avoidable causes, an adjustment to Contract Time only is an equitable remedy***.

(Emphasis added.)

127.    In March of 2016, in a final attempt to obtain the Wheel it bargained for, Developer and the DBT began discussing a potential third amendment to the Agreement

128.    This amendment would have once again increased the Contract Sum to be paid to the DBT, established revised delivery milestones, and created a dispute review board for each party to assert any unresolved delay claims after the completion of the Wheel.

129.    Even though this proposed amendment would have increased the amount payable to the DBT by more than ***50 percent***, the DBT still would not agree to it.

130.    On information and belief, the DBT declined to enter the third amendment to the Agreement because the DBT knew it would not have been able to meet the scheduling milestones the parties had negotiated.

**G.    The DBT, Behind on Progress and Unprepared to Commence Erection Work, Asserts Frivolous Claims for Developer Delay.**

131.    The DBT breached the Agreement on December 31, 2014, March 2, 2015, and July 1, 2015, by failing to deliver the required engineering drawings necessary to obtain the Building Permit.

132.    On July 7, 2015, the DBT wrote to Developer to confirm that the DBT "did not meet the required delivery date of July 1st 2015 for the update of the Permit Package Documentation."

133.    Under the Agreement and pursuant to CAR 2, the DBT's admitted failure to deliver the necessary drawings postponed the Outside Site Turnover Date day-for-day until their actual delivery.

134.    The engineering drawings were finally delivered on April 29, 2016, giving Developer until approximately January 13, 2017 to complete the Pad and turn over the Site.

135.    Developer subsequently tendered Site Turnover on November 2, 2016, and again on January 9, 2017.

136.    Nonetheless, in July 2016, about four months after the ostensible Outside Site Turnover Date and three months after the DBT delivered the drawings, the DBT began making claims that it was entitled to damages for Developer's alleged delay in turning over the Site.

137.    Developer was under no obligation to turn the Site over in July 2016 because it had only just received the engineering drawings necessary for design and construction of the Pad.

138.    In any event, the DBT's claim for delay damages was untimely under the Agreement and therefore was waived.

139.    On August 15, 2016, in violation of the Agreement, the DBT demanded more than $1.77 million in delay damages as a line-item on its AFP for that period, AFP 11.

140.    The Agreement does not permit inclusion of disputed claims for delay damages on an AFP, because such damages have not been agreed to in a Change Order and thus are not payable as Progress Payments.

141.    During the reconciliation process for AFP 11, the DBT properly removed its claim for delay damages.

142.    After the DBT removed its unjustified claim for delay damages, Developer duly paid the DBT its actual Progress Payment owed for payment period 11 pursuant to a final, agreed-upon AFP that did not include the DBT's baseless claim for delay damages.

143.    Following the resolution of AFP 11, the DBT did not invoke the arbitration provision of the Agreement or submit a Change Order request for these damages, thereby waiving its claim to the extent not already waived.

144.    Developer therefore does not owe any damages for Site Turnover delay.

145.    Even if Developer were subject to a timely claim for delay damages, such damages would not be owed under the Agreement.

146.    Although CAR 2 purports to provide a penalty for each week that Site Turnover is delayed, the DBT is not entitled any penalty or other damages in this case because this delay was entirely the DBT's fault.

147.    Moreover, the DBT's 10-month delay in providing the required engineering drawings was a failure of a condition precedent to Site Turnover, tolling the time for Site Turnover until after the time Developer actually tendered Site Turnover.

148.    In fact, once the DBT delivered the plans, Developer completed the Pad and effected Site Turnover in less than the 8.5 months provided by the Agreement.

149.    Even if Developer were responsible for some "delay" in Site Turnover, the DBT's claim for penalties under Section 5.2(c) is unenforceable as applied here, because the DBT has suffered no harm as a result of this alleged delay.

150.    The DBT is a single-purpose entity whose sole function is to perform the Work, but it has failed to proceed at the Site for reasons having nothing to do with access to the Site or Site Turnover.

151.    Therefore, any claimed damages are grossly disproportionate to the reasonably expected harm, and Section 5.2(c) imposes an unenforceable penalty contrary to public policy.

152.    Delay damages are also not available because, for several reasons, the DBT was in prior breach of the Agreement for failure to "diligently prosecute" the Work on Site.

153.    Starting before, and continuing throughout the alleged delay period, the DBT was unable or unwilling to perform Work on Site.

154.    First, the DBT failed to commence Work on Site even though it had clearance to begin installing load spreaders.

155.    Second, despite the DBT's failure to deliver a full set of engineering drawings to secure a Building Permit, Developer nonetheless facilitated the DBT obtaining a partial Building Permit to allow the DBT to begin assembling and erecting its cranes on Site.

156.    The DBT only recently completed assembly and erection of its cranes on Site.

157.    Third, the DBT failed to complete the work and submit the information necessary for Developer to timely obtain the permits necessary to commence erection Work.

158.    To obtain a permit to raise the legs of the Wheel on Site, the DBT's engineer of record must provide the DOB with information requested by the DOB during inspections.

159.    The DBT has still not provided all of this information to the DOB.

160.    Section 3.4.1 of the Agreement provides that

the Design Build Team, with respect to the Wheel and as part of the Work, shall perform the following services[]: . . . (b) procure all certifications required by Applicable Law for the performance of the Work . . . ; (j) obtain all necessary licenses and permits required for the performance of the Work . . . .

161.    Fourth, fabrication delays off-Site, which are solely the responsibility of the DBT, have prevented the DBT from being in a position to assemble the Wheel on Site.

162.    Moreover, even if the DBT were entitled to claim delay damages, the DBT's various demands grossly overstate any potential entitlement under the Agreement.

163.    First, the DBT failed to mitigate its per diem damages.

164.    The Agreement provides that after 8.5 months' notice of Site Turnover delay, the DBT will suffer no per diem damages at all:

Notwithstanding the above, in the event that *on or before August 1, 2015*, Developer provides written notice to the Design Build Team stating that the Developer elects to extend the Outside Site Turnover Date to a newly specified date, such extension *shall allow the Design Build Team to mitigate its damages*, and the Design Build Team shall be entitled only to the following:  (x) an equitable extension of the Contract Time and the Substantial Completion Date, and (y) a payment of One Hundred Twenty Five Thousand U.S. Dollars ($125,000) per week of delay of the Outside Site Turnover Date.

165.    Here, the DBT's own failures resulted in the engineering drawings not even being delivered until after August 1, 2015, making it clear by that time that Developer would need to extend the Outside Site Turnover Date.

166.    Second, the DBT admits that its approximately $14 million claim for "per diem" damages includes a 15% profit markup, which would apply only if this were actual Work performed and not compensation for out-of-pocket losses.

167.    Third, the DBT's purported "per diem" charges and assessed penalties extend beyond the date on which Developer first tendered Site Turnover, November 2, 2016.

## H.    To Release Itself From Its Obligations Under the Agreement, the DBT Attempts to Manufacture a Payments Dispute.

168.    As explained above, both an up-to-date, accurate Schedule of Values and visibility into the DBT's expected expenditures are essential to the accurate calculation of Progress Payments.

169.    Despite repeated requests by Developer, the DBT has failed to update and maintain an accurate Schedule of Values.

170.    Despite repeated requests by Developer, the DBT has also failed to provide information sufficient to determine the DBT's total expected costs for each line-item in the Schedule of Values.

171.    Nonetheless, for the first 12 monthly payment periods, the DBT substantially complied with the Agreement by submitting pencil copies, participating in the reconciliation process, providing adequate documentation of its expenses, and eventually submitting final AFPs reflecting amounts that Developer deemed undisputed.

172.    In response, Developer timely issued Certificates of Payment for AFPs 1 through 12, and caused timely payment to issue to the DBT.

173.    Since AFP 12 was finalized on October 28, 2016 and paid in November 2016, however, the DBT has failed to deliver a single finalized AFP, despite Developer's repeated

requests to move forward with the reconciliation process required by Article X of the Agreement, which point out time and again that without a final AFP, no payments can be made.

174.    Instead, in its pencil copies for payment periods 13 through 20, the DBT has consistently overstated its percentage completion for various line-items.

175.    Invoices submitted as backup for these pencil copies indicate that the DBT's total costs will exceed the scheduled value for several line-items, but the DBT has failed to provide the actual total cost for any of these line-items, making evaluation of the DBT's actual economic progress all but impossible.

176.    By refusing to provide the information that is necessary to evaluate the DBT's economic progress, and by refusing to acknowledge the extent of its cost overruns, the DBT has materially impaired Developer's ability to participate in the very reconciliation process to which the DBT agreed.

177.    By submitting pencil copies that do not fully account for the DBT's expected cost overruns, the DBT is effectively overstating its percentage completion and making claims for Progress Payments to which it is not entitled.

178.    To the extent that the DBT's pencil copy AFPs for periods 13 through 20 measure progress based on artificially low expected costs, the DBT is submitting false AFPs that overstate the Progress Payments due to the DBT.

179.    On information and belief, the DBT's submission of false AFPs is a deliberate measure designed to either obtain unauthorized advances of the Contract Sum and obtain full compensation before the Wheel is completed or generate refusals to pay that the DBT can point to as breaches of Developer's obligations under Article X of the Agreement.

180.     Solely as a result of the DBT's refusal to comply with its express and implied obligations to provide sufficient information, Developer has been unable to approve final AFPs for payment periods 13 through 20.

181.     Section 10.3 of the Agreement requires Developer, within seven days after receipt of a final AFP, to either issue a Certificate for Payment for the amount of the AFP or notify "the Design Build Team in writing of Developer Consultant's reasons for withholding certification in whole or in part."

182.     Because the DBT has not submitted a final AFP since AFP 12, no duty to issue a Certificate of Payment or to issue further reasons for withholding certification has arisen since then.

183.     In any event, Developer has satisfied its obligations to put the DBT on notice of the reasons why the DBT's outstanding AFPs cannot be accepted.

184.     Consideration of each AFP must take place in sequence, as prior progress informs the amount of Work that is left to be done in subsequent periods.

185.     Accordingly, no more Certificates of Payment can issue until the DBT finalizes AFP 13 in accordance with Article X of the Agreement.

**I.      Developer Repeatedly Attempts to Remedy the DBT's Billing Misconduct.**

186.     Developer has repeatedly implored the DBT to resume participation in the reconciliation process and to provide the information necessary to generate final AFPs.

187.     On several occasions, Developer has informed the DBT that the DBT's failure to submit finalized AFPs and an updated Schedule of Values pursuant to the Agreement has precluded Developer from accurately calculating and certifying Progress Payments.

188.    In each of payment periods 13 through 20, Developer has so "notified" the DBT as to why its pencil copies overstate the amount owed, responded promptly to the DBT's questions, and formally requested the removal of disputed amounts from the AFPs.

189.    On April 14, 2017, in an extraordinary effort to break this logjam of the DBT's own making, Developer sent the DBT a "Proposed Final AFP 13" that Developer assembled itself using the incomplete invoices provided by the DBT.

190.    Proposed Final AFP 13 would compensate the DBT for its progress, to the extent that such progress can be determined from the insufficient documentation provided by the DBT, and begin the process of correcting Developer's previous overpayments of the Performance Payment.

191.    Developer offered to issue a Certificate of Payment for Proposed Final AFP 13 if the DBT would simply sign and return the document.

192.    The DBT did not respond to this offer.

193.    Nor did the DBT provide additional information that could be used to more accurately measure the DBT's economic progress for that period.

194.    Instead, since the issuance of Proposed Final AFP 13, the DBT has issued another pencil copy for subsequent period 20, even though subsequent pencil copies cannot be evaluated until the actual amount of progress for period 13 is established.

**J.    Despite Having No Basis to Do So, the DBT Threatens to Suspend Performance and Withdraw From the Agreement.**

195.    On May 10, 2017, despite its own performance delays and willful disregard of its obligations under the Agreement, including its obligation to participate in the payments reconciliation process, the DBT threatened to suspend performance and withdraw from the Agreement based on Developer's alleged failure to pay.

196.    In its May 10, 2017 notice to Developer, the DBT purported to "exercise its right to invoke an immediate suspension of work in accordance with Section 13.3(a) of the [Agreement]."

197.    The DBT is not entitled to suspend or terminate under Section 13.3(a) of the Agreement.

198.    Under Section 13.3(a) of the Agreement, the DBT is permitted to suspend performance only if:

> (i) Developer has not issued a Certificate of Payment in respect of any application for Payment pursuant to Section 10.3 and has not notified the Design Build Team of the permitted reason for withholding certification as provided in this Agreement, or (ii) Developer has failed without cause to pay the Design Build Team for the Work for a period of fifteen (15) days after the date due under this Agreement, or (iii) Developer violates any of Developer's material obligations under the Design Build Documents and does not cure such violation within thirty (30) days following written notice of such violation from the Design Build Team to Developer, or (iv) the Work or the Project, in whole or substantial part, is stopped for a period of sixty (60) consecutive days through no act or fault of the Design Build Team because Developer has failed to fulfill any of Developer's material obligations under this Agreement or Developer has violated Applicable Law . . . .

199.    None of these conditions applies here:

> i.   Developer has issued Certificates of Payment to the DBT with respect to all final AFPs that the DBT has submitted.  The DBT has failed to issue a final AFP since AFP 12.
>
> ii.  Developer has paid the DBT all amounts due on final AFPs pursuant to Sections 10.2 and 10.3 of the Agreement.  Any additional payments that the DBT seeks are not due under the Agreement.  NYW is ready and willing to pay the DBT all amounts owed to it as soon as the DBT submits final AFPs for those amounts.
>
> iii. Developer has not violated any of its material obligations under the Design Build Documents.

      iv.  Construction of the Wheel and progress of the Project has not been halted for a period of 60 consecutive days.  In addition, any stoppage in the Work is by the DBT and attributable to the DBT's threatened suspension of performance.

200.    On May 26, 2017, the DBT confirmed by letter that it was suspending performance under the Agreement.

201.    On May 26, 2017, the DBT lowered a crane at the Site, rendering it unusable for Work.

202.    By suspending performance on May 26, 2017 under a false claim of right and threatening to withdraw permanently, the DBT has materially breached the Agreement.

203.    Section 13.4 of the Agreement provides that Developer may, after a cure period, "terminate the employment" of the DBT, if the DBT "abandon[s] the Work for more than seven consecutive days (except as permitted by Section 10.3) . . . or fail[s] . . . to promptly and diligently prosecute the Work," or otherwise violates any material provision of the Design Build Documents, including the Agreement itself.

204.    Although no payment to the DBT is due at this time, on May 29, 2017, NYW offered the DBT a way to effect a cure, get paid for recent work, and eliminate the DBT's frivolous claims of default.

205.    On May 29, 2017, NYW sent the DBT proposed final AFPs for periods 14 through 20, offering the same resolution it had for AFP 13:  simply endorse and return the documents to get paid.

206.    The total value of Proposed Final AFPs 13 through 20, prior to correction for contractually required retainage and recovery of the erroneously released Performance Payment, is $15,122,663.

207.    Less retainage and the portion of the Performance Payment that Developer is entitled to recover through this reconciliation process, under Proposed Final AFPs 13 through 20 the DBT would be entitled to immediate payments totaling $7,227,705.

208.    NYW is ready, willing and able to pay this amount, and all further amounts that may come properly due and owing, if the DBT elects to comply with the Article X payments process.

209.    On May 30, 2017, NYW provided the DBT written notice of the DBT's various breaches under the Agreement, reiterating previous notices on these various breaches.

**K.    The DBT Promised to Employ Its Unique Expertise to Deliver a One-of-a-Kind Attraction by 2017.**

210.    Throughout the bidding process and subsequent Agreement negotiations, the DBT promised to dedicate its unique expertise, highly skilled employees, and unparalleled ability to reduce costs and risk to ensure timely and satisfactory completion of the project.

211.    The DBT has the unique skills and experience, and now the extensive knowledge of the Project, needed to design, engineer, fabricate, and construct the Wheel.

212.    The DBT's parent company, Mammoet, holds itself out on its website as being "known for the unique capability of our state-of-the-art equipment," and highlighted its ability to "professionally move deadlines forward, improve uptime, and reduce cost."

213.    Similarly, the DBT's other parent Starneth boasts that it "possesses the unique capability to offer a Giant Observation Wheel on a ***lump sum, turnkey basis***" and that it "know[s] of no other company able to offer this advantage and the expertise to minimize risk, cost and schedule resulting in a financeable project."  (Emphasis added.)

214.    After the project was underway, the DBT continued to tout and profit from its own unique ability to get this job done, issuing press releases claiming that "[t]he New York

Wheel will be yet another example of Mammoet's work on iconic city structures across the globe" and that the Wheel "will change the iconic skyline of the 'city that never sleeps.'"

215.    Even as the DBT's performance under the contract began to slip due to its failures to adequately manage Project deadlines, the DBT continued to hold itself out as uniquely capable of completing the Project.

**L.    The DBT's Suspension and Withdrawal Threaten to Destroy NYW, the Wheel, and the City's Staten Island Revitalization Project.**

216.    Money damages are insufficient to fully compensate NYW for the DBT's wrongdoing, which has deprived NYW of a unique asset that is its sole reason for being.

217.    If the Wheel is not completed, NYW will be put out of business entirely.

218.    The Wheel's failure would have substantial negative repercussions for the public as well, as the purpose of the Project was to revitalize Staten Island and the New York Harbor through the construction and operation of the Wheel.

219.    The Project has hundreds of investors, including more than 400 EB-5 investors seeking immigration status based on their promise to invest in jobs-creating American development work.

**COUNT 1**
**(UNAUTHORIZED SUSPENSION OF PERFORMANCE / WITHDRAWAL)**

220.    NYW repeats the allegations contained in Paragraphs 1 through 219 above as if fully set forth herein.

221.    The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

222.    Because the conditions that would permit the DBT to suspend Work or withdraw from the Agreement do not apply, the DBT has breached or will imminently breach its

obligations to not "abandon the Work for more than seven (7) consecutive days," to "promptly and diligently prosecute the Work [and] . . . supply enough properly skilled workmen or proper materials for the Work," and to not "otherwise violate[] any material provision of the Design Build Documents."

223.    Section 13.4 of the Agreement allows NYW to terminate the Agreement for cause if the DBT "abandon[s] the Work for more than seven (7) consecutive days," "fail[s] . . . to promptly and diligently prosecute the Work or to supply enough properly skilled workmen or proper materials for the Work," or "otherwise violates any material provision of the Design Build Documents."

224.    An actual, present and existing controversy has arisen between NYW and the DBT regarding the DBT's suspension of performance.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement.

225.    Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the DBT is in material breach of the Agreement and that NYW is entitled to terminate the employment of the DBT pursuant to Section 13.4 of the Agreement.

226.    In addition, as a direct and proximate result of the DBT's impermissible suspension and withdrawal, NYW has suffered damages in an amount to be proven at trial.

## COUNT 2
## (SUBMISSION OF FALSE APPLICATIONS FOR PAYMENT)

227.    NYW repeats the allegations contained in Paragraphs 1 through 226 above as if fully set forth herein.

228.    The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

229.    By submitting false AFPs that overstate the DBT's percentage completion on the Work, the DBT has breached its obligations to not "submit an Application for Payment, sworn statement or waiver of Lien, affidavit or document of any nature whatsoever which intentionally is falsified in any material respect" and to not "otherwise violate[] any material provision of the Design Build Documents."

230.    Section 13.4 of the Agreement allows NYW to terminate the Agreement for cause if the DBT "submit[s] an Application for Payment, sworn statement or waiver of Lien, affidavit or document of any nature whatsoever which intentionally is falsified in any material respect" or "otherwise violates any material provision of the Design Build Documents."

231.    An actual, present and existing controversy has arisen between NYW and the DBT regarding the DBT's submission of false AFPs.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement.

232.    Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the DBT is in material breach of the Agreement, that NYW owes no payments under AFPs 13 through 20, and that NYW is entitled to terminate the employment of the DBT pursuant to Section 13.4 of the Agreement.

233.    In addition, as a direct and proximate result of the DBT's impermissible suspension, NYW has suffered damages in an amount to be proven at trial.

## COUNT 3
### (FAILURE TO MEET SUBSTANTIAL COMPLETION DATE)

234.    NYW repeats the allegations contained in Paragraphs 1 through 233 above as if fully set forth herein.

235.    The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

236.    Because the DBT failed to achieve Substantial Completion of the Wheel by May 15, 2017, as prescribed by Section 5.2.1 of the Agreement, the DBT is in breach of its obligations under the Agreement.

237.    As a result of its failure to meet the Substantial Completion Date, and pursuant to Exhibit J, paragraph 2 of the Agreement, the DBT is liable for damages of $50,000 per day for each day of delay in the completion of the Work beyond May 15, 2017.

## COUNT 4
### (FAILURE TO DELIVER TIMELY ENGINEERING DRAWINGS)

238.    NYW repeats the allegations contained in Paragraphs 1 through 237 above as if fully set forth herein.

239.    The Agreement is an enforceable contract between NYW and the DBT that contains an implied covenant of good faith and fair dealing.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

240.    To avoid its performance obligations under the Agreement and to generate a false claim for Site Turnover delay damages, the DBT intentionally delayed its delivery of the

engineering drawings, temporarily preventing NYW from completing the Pad and turning over the Site.

241.    By intentionally delaying delivery of the engineering drawings for more than nine months, the DBT breached its duty of good faith and fair dealing.

242.    As a direct and proximate result of the DBT's breach, NYW has suffered damages in an amount to be proven at trial.

243.    An actual, present and existing controversy has arisen between NYW and the DBT regarding the DBT's claim for Site Turnover delay damages.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement.

244.    Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the DBT is not entitled to damages for any delay in Site Turnover.

**<u>COUNT 5</u>**
**(NO LIABILITY FOR SITE TURNOVER DELAY)**

245.    NYW repeats the allegations contained in Paragraphs 1 through 244 above as if fully set forth herein.

246.    Section 5.2(c) of the Agreement provides for delay damages and penalties in the event that NYW does not turn over the Site by March 15, 2016 (the "Site Turnover Outside Date").

247.    To avoid its performance obligations under the Agreement and to generate a false claim for Site Turnover delay damages, the DBT intentionally delayed its delivery of the engineering drawings, temporarily preventing NYW from completing the Pad and turning over the Site.

248.     Delivery of these engineering drawings, and the subsequent allowance of 8.5 months for Pad completion and Site Turnover, are conditions precedent to the Agreement's Site Turnover Outside Date.

249.     As a result of the DBT's refusal to deliver these engineering drawings before April 29, 2016, any liability for failure to turn over the Site was postponed until approximately January 13, 2017.

250.     NYW turned over the Site prior to January 13, 2017.

251.     Even if NYW had failed to turn over the Site for some period of time beyond January 13, 2017, the DBT has been in material breach of the Agreement since before that delay and has not suffered any harm from such delay.

252.     Moreover, the DBT's quantification of damages and penalties is unsupported by the Agreement.

253.     An actual, present and existing controversy has arisen between NYW and the DBT regarding the DBT's claim for delay damages and penalties under Section 5.2(c).  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement.

254.     Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the DBT is not entitled to any damages or penalties for Site Turnover delay.

**COUNT 6**
**(FAILURE TO UPDATE SCHEDULE OF VALUES AND PROVIDE AFP BACKUP)**

255.     NYW repeats the allegations contained in Paragraphs 1 through 254 above as if fully set forth herein.

256.     The Agreement is an enforceable contract between NYW and the DBT that contains an implied covenant of good faith and fair dealing.  NYW has performed all of its

material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

257. Under Sections 3.4, 5.2(j), 10.1, 10.6, and 10.10.2 of the Agreement, the DBT is required to deliver to NYW updates and revisions to the Schedule of Values throughout the duration of the Work.

258. The DBT has intentionally refused to update and revise the Schedule of Values, frustrating NYW's contractual right to evaluate AFPs and issue appropriate Progress Payments, in breach of its obligations under Sections 3.4, 5.2(j), 10.1, 10.6, and 10.10.2.

259. Under Sections 10.2 and 10.3 of the Agreement, the DBT is required to submit pencil copies and final AFPs and to participate in a reconciliation process in order to obtain Progress Payments and complete its Work on the Project.

260. Implied in these obligations is the duty to provide adequate, truthful backup documentation to enable NYW to evaluate the DBT's claims of economic progress.

261. The DBT has intentionally refused to provide adequate backup documentation to allow NYW to evaluate the DBT's claims, in violation of the implied covenant of good faith and fair dealing.

262. As a direct and proximate result of the DBT's breaches, NYW has suffered damages in an amount to be proven at trial.

263. An actual, present and existing controversy has arisen between NYW and the DBT regarding the adequacy of the DBT's Article X submissions for AFPs 13 through 20. A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement.

264.     Accordingly, NYW respectfully requests that the Court enter an order of judgment declaring that the DBT's refusal to submit an updated Schedule of Values and finalized AFPs with adequate backup documentation is a violation of Article X of the Agreement and the covenant of good faith and fair dealing, and declaring that the DBT must substantiate its percentage completion using documentation of its total expected costs for each line-item on the Schedule of Values.

**COUNT 7**
**(FAILURE TO PERFORM CONTRACTED WORK)**

265.     NYW repeats the allegations contained in Paragraphs 1 through 264 above as if fully set forth herein.

266.     The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

267.     The DBT has failed to perform several of its Work obligations, which have since been taken up and performed by NYW at substantial expense to NYW, including construction of the embeds that link the Wheel to the Pad at a cost of more than $8.25 million.  NYW also constructed a temporary construction dock to receive components at the Site, installed lightning protection at the Site for the Wheel, paid the full on-Site utilities bill, paid for special inspections of the Work in progress, performed the load analysis for installation of the DBT's cranes, and incurred additional management and overhead expenses for all this Work.  As a direct and proximate result of the DBT's breaches, NYW has suffered damages in an amount to be proven at trial, but no less than $16,621,753, the amounts incurred or expected to be incurred to date as a result of the DBT's refusal to perform the following obligations:

- Construction of embeds integral to the Wheel construction (at least $8,248,067);

- Construction of a dock to receive components at the Site (at least $1,000,000);

- Installation of lightning protection at the Site (at least $402,670);

- One-half of on-Site utilities charges (at least $650,000);

- Special inspections of the Work (at least $5,000,000);

- Load analysis for crane Work (at least $1,121,016); and

- Management and general conditions costs for Work assumed by NYW (at least $200,000).

**COUNT 8**
**(FRAUDULENT INDUCEMENT)**

268.     NYW repeats the allegations contained in Paragraphs 1 through 267 above as if fully set forth herein.

269.     Following the execution of CAR 2, NYW succeeded to all of New York Wheel, LLC's rights and claims arising from the Agreement and its negotiation.

270.     The DBT fraudulently induced Developer to enter CAR 1 by knowingly and falsely representing that it would provide the necessary engineering drawings by December 31, 2014 and March 2, 2015.

271.     In fact, the DBT knew that it could not or would not deliver these engineering drawings until much later.

272.     The DBT also knew that promising to deliver these engineering drawings by December 31, 2014 and March 2, 2015 would induce Developer to agree to increase the Contract Sum in CAR 1.

273.     Based on the DBT's representation that the drawings would be provided by December 31, 2014 and March 2, 2015, enabling the parties to continue Work on the Project, Developer agreed in CAR 1 to pay the DBT an additional $13.5 million for the Work.

274.    The DBT fraudulently induced Developer to enter CAR 2 by knowingly and falsely representing that it would provide the engineering drawings needed to build the Pad and Wheel by July 1, 2015.

275.    In fact, the DBT knew that it could not or would not deliver these engineering drawings until much later.

276.    The DBT also knew that falsely promising to deliver these engineering drawings by July 1, 2015 would induce Developer to agree to increase the Contract Sum in CAR 2.

277.    Based on the DBT's representation that the drawings would be provided by July 1, 2015, enabling the parties to continue Work on the Project, Developer agreed in CAR 2 to pay the DBT an additional $6.5 million for the Work.

278.    The DBT actually submitted the engineering drawings in April 2016, more than nine months past the CAR 2 extended deadline, delaying the Wheel's completion and causing NYW lost profits.

279.    As a direct and proximate result of the DBT's breach of the contract and its duty to act in good faith, NYW has suffered lost profits and other damages in an amount to be proven at trial, but no less than $20 million.

280.    In the alternative, NYW is entitled to rescind CAR 1 and CAR 2 to the extent necessary to afford complete relief.

**COUNT 9**
**(NO BREACH)**

281.    NYW repeats the allegations contained in Paragraphs 1 through 280 above as if fully set forth herein.

282.    The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

283.    An actual, present and existing controversy has arisen between NYW and the DBT regarding whether NYW is in breach of its obligations under the Agreement.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement.

284.    Accordingly, NYW respectfully requests that the Court enter an order of judgment declaring that NYW is not in breach of its obligations under the Agreement.

**COUNT 10**
**(LICENSE TO INSTRUMENTS OF SERVICE)**

285.    NYW repeats the allegations contained in Paragraphs 1 through 284 above as if fully set forth herein.

286.    The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

287.    Under Section 1.6(b) of the Agreement, "Upon payment in full for Phase II of the Project," which occurred in or around May 2015, NYW was granted "a nonexclusive, nontransferable, irrevocable (except in accordance with this Section 1.6), perpetual, royalty-free license to use the Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and operating the Project."

288.    Under Section 1.6(a) of the Agreement, the Instruments of Service include all "Drawings, the Specifications . . . , all drafts and preliminary versions thereof, all refinements and changes thereto and all plans, opinions, reports, calculations and other work product."

289.    This license remains in force under Section 1.6, because NYW has not "fail[ed] to make any payment in full to Design Build Team which is properly due and payable under this Agreement," NYW has not "terminate[d] Design Build Team's employment under the Agreement for its convenience," and the DBT has not "withdraw[n] from this Agreement under Section 13.2 or 13.6."

290.    The DBT has, nonetheless, suspended performance under the Agreement, and threatens to withdraw without cause.  Therefore, an actual, present and existing controversy has arisen between NYW and the DBT regarding whether NYW is in breach of its obligations under the Agreement.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement.

291.    Accordingly, NYW respectfully requests that the Court enter an order of judgment declaring that NYW has an irrevocable, perpetual, royalty-free license to use the Instruments of Service for purposes of constructing, using, maintaining, altering and operating the Project.

## COUNT 11
### (UNJUST ENRICHMENT)

292.    NYW repeats the allegations contained in Paragraphs 1 through 291 above as if fully set forth herein.

293.    The DBT's AFPs contain overstatements of progress and therefore seek payments in excess of what the DBT is entitled to under the Agreement.

294.    The DBT has benefitted or will benefit substantially from its submission of overstated AFPs in the form of unauthorized cash advances.

295.    This benefit has come at the expense of NYW, which has paid or will pay money not due and owing under the Agreement without receiving a commensurate amount of progress on the Work.

296.    It would defy equity and good conscience to allow the DBT to retain these cash advances against Work not yet performed.

297.    As a direct and proximate result of the DBT's unjust enrichment, NYW has suffered damages in an amount to be proven at trial.

298.    An actual, present and existing controversy has arisen between NYW and the DBT regarding the accuracy of the DBT's AFPs.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement.

299.    Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the DBT must substantiate its percentage completion using documentation of its total expected costs on each line-item on the Schedule of Values.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in

Plaintiff's favor and against Defendant, consisting of:

    a)  A declaration that NYW is currently entitled to terminate the employment of the DBT pursuant to Section 13.4 of the Agreement;

    b)  A declaration that NYW does not owe damages for Site Turnover delay;

    c)  A declaration that NYW does not currently owe any Progress Payments;

    d)  A declaration that the DBT is in breach of the payment provisions of Article X of the Agreement and the covenant of good faith and fair dealing;

    e)  A declaration that NYW is not in breach of the Agreement;

    f)  A declaration that NYW has a license to the Instruments of Service;

    g)  An order enjoining and restraining the DBT from suspending performance or withdrawing from the Agreement;

    h)  An order enjoining and directing the DBT to deliver to NYW a copy of all Instruments of Service;

    i)  An award of money damages, together with interest thereon, to compensate NYW for the DBT's breaches of the Agreement and the covenant of good faith and fair dealing, its failures to perform the Work, its fraudulent inducements, and its unjust enrichment at NYW's expense;

    j)  An award of NYW's costs; and

    k)  Such other and further relief as this Court deems fit and proper.

## JURY TRIAL DEMANDED

Dated:   New York, New York
         May 30, 2016

GIBSON, DUNN & CRUTCHER LLP


By:   _____
      Randy M. Mastro
      Anne Champion
      Paul J. Kremer

200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035