UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NEW YORK WHEEL OWNER LLC,

                Plaintiff,

      v.

MAMMOET-STARNETH LLC, MAMMOET
USA NORTH INC., STARNETH LLC,
MAMMOET USA HOLDING, INC., MAMMOET
HOLDING B.V., and STARNETH B.V.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

MAMMOET-STARNETH LLC,

                Third-Party Plaintiff,

      v.

THE CITY OF NEW YORK,

                Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 1:17-cv-04026-JMF

**SECOND AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff*

Plaintiff New York Wheel Owner LLC ("NYW"), by and through its attorneys, alleges as follows:

## NATURE OF THE PROCEEDING

1.      NYW brings this action to save a project of critical public importance—nothing less than a future New York City landmark, and the centerpiece of the economic revitalization of the North Shore of Staten Island.  This case concerns Defendant Mammoet-Starneth LLC's breach of a $165 million Design Build Agreement (the "Agreement") for the construction of the western hemisphere's largest observation wheel, the "New York Wheel," a highly anticipated tourist attraction that is the centerpiece of the City's economic revitalization plan for the Staten Island waterfront.  After more than two years of self-inflicted delays and extortionate attempts to extract additional payments totaling more than 50% of the agreed contract price, Mammoet-Starneth (as the "Design Build Team" or "DBT") "suspended" performance under the Agreement on May 26, 2017 and was terminated for cause by Plaintiff New York Wheel Owner LLC ("NYW" or "Developer") on July 21, 2017.  NYW, as the "Developer" under this Agreement, now seeks contractually authorized cover damages and injunctive relief requiring the DBT, its members Mammoet USA North Inc. ("Mammoet Member") and Starneth LLC ("Starneth Member") (together, the "Member Defendants"), and their parent companies Mammoet Holding B.V. ("Mammoet BV") and Starneth B.V. ("Starneth BV") (together, the "BV Defendants") to comply with the subcontractor transition procedures set forth in the Agreement.  Developer seeks further money damages to compensate it for the millions of dollars of harm that have been caused by Defendants' intransigent and dishonest refusal to "diligently prosecute the Work" required by the Agreement, and for the Member Defendants' tortious interference with that Agreement.  Developer also seeks a declaration (i) that it owes no further

2

amounts to the DBT under the Agreement; (ii) that it properly terminated the employment of the

DBT for cause pursuant to Section 13.4 of the Agreement, and is therefore not required to pay

the "termination fee" or other sums that the DBT baselessly claims it is owed under the

Agreement; (iii) that it has a license to the Instruments of Service; and (iv) that it is entitled to

full transparency in transitioning this project to a new group of contractors to replace the DBT's

integrated "design-build" functions, including the right to examine the DBT's books and records,

and all subcontracts and subcontractor-related records, as necessary to exercise its option to take

assignment of those subcontracts.  Finally, Developer seeks a declaration that the DBT breached

the Agreement, including the Agreement's assignment provisions, that the other Defendants

tortiously interfered with the Agreement, and that the Defendants are liable for the actions of the

DBT.

2.       Developer hired the DBT to design and construct the Wheel, agreeing in 2014 to

pay $145 million for a "turn-key" Wheel—which the Defendants bragged they were uniquely

qualified to provide—to be designed, built, and made ready for commercial operation by the

DBT no later than October 2016.  Developer's only obligations to the DBT were to build the Pad

upon which the Wheel would sit—an obligation that would commence only upon receipt of the

DBT's initial engineering drawings for the Wheel—and to make milestone payments and

progress payments to the DBT commensurate with its progress toward completion of the overall

Wheel project (the "Project").

3.       Almost immediately, the DBT fell behind schedule as it struggled to live up to its

own hype and was unable to develop engineering drawings, submit documentation in support of

the required permits, and select fabricators meeting the City's standards.  Despite these delays of

its own making, the DBT, and its members and parent companies, turned to Developer and

demanded additional money, even as it became clear that the DBT's compounding delays would cause Developer and the Project's many other stakeholders to lose out on revenues from the 2017 tourism season and beyond and delay this critical element of Staten Island's revitalization. Twice, despite having no obligation to do so, Developer amended the Agreement to provide the DBT with increased financial incentives, in reliance on the DBT's knowingly false promises to commit to specific timelines for its deliverables, and twice the DBT came back looking for more. To this day, the Project is at best months away from being construction ready, due to the DBT's design, fabrication, and permitting delays, starkly exposing the falsity of the DBT's prior promises to deliver engineering drawings, commence construction, and substantially complete the Project on specific timeframes.

4.      Indeed, in order to secure these additional financial concessions from Developer, the DBT and its parents falsely claimed, twice, that the critical engineering drawings were nearly complete.  In December 2014 and May 2015, the DBT induced Developer to increase the Contract Sum by a total of $20 million by representing that these drawings were nearly complete. However, it took the DBT until April 2016, more than 17 months past the original deadline, to deliver even the minimum amount of paperwork necessary to obtain a Building Permit.

5.      The Defendants also falsely misrepresented the DBT's ability to meet critical construction milestones necessary to secure funding through Developer's loan agreement. During four months of loan negotiations, the Defendants repeatedly assured Developer that the DBT could meet the construction milestones and that they understood that the DBT's performance was tied directly to disbursement of the loan.  Developer relied on Defendants' assurances, and, in an effort to incentivize the DBT, even offered a $20 million bonus for completing the work on time.  Nevertheless, the DBT did not meet the required milestones.

6.      The DBT has also trumped up claims for so-called "delay" damages for Developer's purported "delays" in turning over the Site, a Site that the DBT was never ready to commence construction on, even though any "delays" were of the DBT's own making. Developer met the only deadline imposed on it by the Agreement—design and construction of the Pad and turnover of the Site—with weeks to spare.

7.      In these interim negotiations and in the day-to-day management of the Project, the Defendants have repeatedly sought more money by leveraging their unique qualifications and experience as a designer and builder of massive observation wheels and Developer's dependence, and contractual duty to rely on the DBT alone to complete the Project. But the Agreement is a fixed-price contract; it does not provide for continual increases in the price. Absent genuine changes in the scope of the required Work—as approved by Developer—or delays that are the fault of Developer alone, Defendants are not entitled to increases in the price of the Wheel. Instead, the DBT is contractually obligated to complete construction of the Wheel at the parties' agreed-upon price.

8.      In order to escape a contract that it knew it could not perform, starting in 2016 after walking away from contract renegotiations, Defendants began manufacturing a payment dispute by refusing to submit requests for payment in accordance with the contractually specified and industry-standard Application for Payment ("AFP") process. Although the DBT had essentially complied with this process for the first twelve AFPs under the Agreement, starting with AFP 13, the DBT began refusing to submit the basic cost documentation the Agreement requires, even though doing so would have resulted in additional payments to the DBT. But those payments could not be made, because the DBT's refusal to submit paperwork impaired Developer's ability to confirm the accuracy of the DBT's AFPs. The DBT also began billing for

amounts in excess of the percentage of Work actually completed, billing for performance under

unapproved Change Orders, disguising contractual claims for "delay" damages as approved

Change Orders, and billing for subcontractor work outside the scope of the Agreement.

Developer repeatedly informed the DBT of these deficiencies and false claims, which as a

practical matter made it impossible for Developer to identify and pay amounts genuinely not in

dispute.  But that was Defendants' plan all along:  on May 26, 2017, the DBT purported to

suspend performance under the Agreement for non-payment of amounts due and owing.

9.      The DBT's complete and utter refusal to continue performing was confirmed on

July 17, 2017, when the DBT rejected Developer's offer to cure the putative payment default by

committing $7.2 million for Work likely not in dispute—a calculation that Developer had to

painstakingly perform on its own, using best efforts, without the DBT's contractually required

cooperation.  By refusing to submit the cost documentation required by the Agreement or to

accept payments of undisputed amounts for its own claimed progress, the DBT boxed itself in

and made its intentions clear:  the DBT simply did not want to perform the Agreement unless it

received far more money than the fixed contract price.

10.     Developer is committed to completing the Wheel.  Besides taking on the DBT's

financial accounting responsibilities, Developer literally did more than $16 million of the DBT's

actual work for it—including construction of the Wheel embeds ("plinths") at a cost of more

than $8.25 million.  The DBT responded to these gestures with a spurious claim for more than

$28 million in delay damages, above and beyond its overstated claims for "Progress Payments,"

for a delay that was entirely of the DBT's own making.  Moreover, the DBT levied these charges

against Developer when Developer was performing the DBT's own work for them.  In short, the

DBT tried every maneuver it could dream up to increase the amount it would be paid for its work.

11.     Shortly after the DBT announced that it was suspending performance, in an attempt to save this unique, world-class attraction, which would revitalize the Staten Island waterfront and protect the hundreds of investors who have already backed the Project, Developer brought this action and sought a temporary restraining order and preliminary injunction to enjoin the DBT from suspending work.

12.     On July 11, 2017, after more than 45 days of unwarranted suspension of the Work by the DBT, Developer gave the DBT notice that it was being terminated for cause pursuant to Section 13.4 of the Agreement.  Despite giving Developer assurances that it would cooperate with the project transition procedures under the Agreement, the Defendants have failed to provide adequate access to books and records or provide basic information about the various "design professionals, consultants, trade contractors, suppliers, vendors or others (collectively "Contractors")" working on the Wheel, as required by Sections 3.2.1 and 17.2 of the Agreement. Access to these materials is critical to salvaging the Project from the morass created by the DBT.

13.     In addition, the Defendants have been changing the status quo by informing Contractors to stop work, refusing to allow access to inspectors, and moving components into storage.  Defendants have gone even further, instructing certain Contractors not to communicate with Developer and to withhold documents that Developer must review in order to exercise its option to assume responsibility for the subcontracts.

14.     The DBT has also denied Developer access to subcontracts entered into by the Member and BV Defendants.  The Agreement explicitly requires that the DBT enter into all subcontracts for the Project, and the DBT is now using Mammoet BV's complex web of entities

and affiliates to further frustrate Developer's efforts to salvage the Wheel and transition the Project away from the DBT.

15.     At all relevant times, the DBT, a single purpose entity, had no real or actual legal or independent significance and was a mere instrumentality of one or more of the other Defendants.  Through their ownership interests in, and formal and informal control of, the DBT, these Defendants completely controlled and dominated the DBT.  The DBT is a shell company that does not control its own assets.  Representatives of Mammoet BV and Starneth BV have been involved in nearly all negotiations binding the DBT.  All Mammoet company employees share the same email addresses and often rotate between the various Mammoet entities—including holding themselves out as representatives of the DBT.  Moreover, visits to Mammoet's offices have revealed that all of the entities share the same building.

16.     This Court should declare that the DBT materially breached the Agreement, that the DBT and other Defendants must assign to Developer all subcontracts, and that Developer: owes no further amounts to the DBT under the Agreement; properly terminated the DBT for cause; is not required to pay a termination fee; and is entitled to the Instruments of Service and to inspect the DBT's books and records.  The Court should also declare that the Defendants tortiously interfered with the Agreement (including the transition of the DBT's responsibilities thereunder to a replacement builder), that the Defendants misused the DBT's corporate form and acted as alter egos of the DBT, and that all Defendants should compensate Developer for its losses suffered in connection with the Defendants' various breaches, interferences, and nefarious gamesmanship.

## PARTIES

17.     Plaintiff New York Wheel Owner LLC ("NYW" or "Developer") is a Delaware limited liability company whose members are citizens of New York and New Jersey.

18.     Defendant Mammoet-Starneth LLC (the "Design Build Team" or "DBT") is a Delaware limited liability company whose members are citizens of the Netherlands, Delaware, Florida, and California.

19.     Defendant Starneth LLC ("Starneth Member") is a Delaware limited liability company whose members are citizens of Florida.  It is one of the two members comprising Mammoet-Starneth LLC.

20.     Defendant Mammoet USA North Inc. ("Mammoet Member") is a Delaware corporation with its principal offices in California.  Along with Starneth Member, it is one of the two members comprising Mammoet-Starneth LLC.

21.     Defendant Mammoet USA Holding, Inc. ("MUSA Holding") is a Delaware corporation with its principal offices in Rosharon, Texas.  It is wholly owned by Defendant Mammoet Holding B.V. and a parent of Mammoet Member, over which it retained full operational and financial control.

22.     Defendant Mammoet Holding B.V. ("Mammoet BV") is a Dutch limited liability company whose members are citizens of the Netherlands.  It is the parent company of Mammoet Member, over which it retained full operational and financial control.  Mammoet BV owns or controls a web of Mammoet-affiliated entities, including Mammoet Member, Mammoet Engineering B.V., and Mammoet Global Support, among others.

23.     Defendant Starneth B.V. ("Starneth BV") is a Dutch limited liability company whose members are citizens of the Netherlands.  It is the parent company of Starneth Member, over which it retained full operational and financial control.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because this is an action between citizens of different states and the amount in controversy is in excess of $75,000.

25.     This Court has subject matter jurisdiction over Plaintiff's declaratory judgment claims pursuant to 28 U.S.C. § 2201(a), because there is a substantial, live, and justiciable controversy between the parties and Plaintiff seeks a declaration as to the parties' respective rights and obligations.

26.     This Court has personal jurisdiction over the DBT because the DBT consented to the jurisdiction of the Southern District of New York in Section 19.2.6 of the Agreement.

27.     This Court also has personal jurisdiction over the DBT, Mammoet Member, Starneth Member, Mammoet BV, and Starneth BV pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(g), and 12(h)(1)(a).

28.     This Court has personal jurisdiction over Mammoet Member pursuant to CPLR 302(a)(2) because it committed tortious acts within the State of New York and because it waived objections to the jurisdiction of the Southern District of New York in subcontracts it entered into on behalf of the DBT.

29.     This Court has personal jurisdiction over Starneth Member pursuant to CPLR 302(a)(2) because it committed tortious acts within the State of New York and because it

consented to the jurisdiction of the Southern District of New York in the subcontracts it entered into on behalf of the DBT.

30.     This Court has personal jurisdiction over MUSA Holding pursuant to CPLR 301 and Fed. R. Civ. P. 4(k) because it conducts business throughout the United States, including in Manhattan and the State of New York with respect to this Project.

31.     This Court has specific jurisdiction over MUSA Holding pursuant to CPLR 302(a)(1) because it has transacted business within the State of New York and supplied goods and services in the State, including by entering into the Completion Guaranty.  This Court also has specific jurisdiction over MUSA Holding pursuant to CPLR 302(a)(2) and (a)(3) because it has committed a tort both within and without the State that has affected Developer.

32.     This Court has personal jurisdiction pursuant to CPLR 301 and Fed. R. Civ. P. 4(k) over Mammoet BV because, in its role as the parent entity of the DBT and Mammoet Member, it has exercised significant control over both entities and has in essence treated both the DBT and Mammoet Member as its own departments as opposed to independent subsidiary entities.  In practice, Mammoet BV is indistinguishable from the DBT and Mammoet Member.

33.     This Court has personal jurisdiction over Mammoet BV pursuant to CPLR 301 and Fed. R. Civ. P. 4(k) because it has repeatedly conducted business throughout the United States, including in Manhattan and the State of New York, for at least the past 15 years.  For example, just recently, in May 2017, Mammoet BV acquired the George Young Company, now renamed George Young Mammoet, a Pennsylvania corporation licensed to do business in the State of New York, further evincing Mammoet's intent to maintain contacts with the State.

34.     Mammoet BV has also advertised its extensive contact with Manhattan and the State of New York in press releases and on its own website.  For instance, at

http://www.mammoet.com/en/cases/LS-Power/, Mammoet BV notes that it "brought first-hand knowledge of the plant [that it moved from New York to Texas], as they were the ones who had originally delivered all of this cargo to New York several years beforehand."

35.     This Court has specific jurisdiction over Mammoet BV pursuant to CPLR 302(a)(1) because it has transacted business within the state of New York and supplied goods and services in the state.  This Court also has specific jurisdiction over Mammoet BV pursuant to CPLR 302(a)(2) and (a)(3) because it has committed a tort both within and without the state that has affected Developer.

36.     This Court has personal jurisdiction over Starneth BV pursuant to CPLR 301 and Fed. R. Civ. P. 4(k) because it has conducted extensive business in the United States, including in Manhattan and the State of New York, in connection with the design of the Wheel.

37.     This Court has specific jurisdiction over Starneth BV pursuant to CPLR 302(a)(1) because it has transacted business within the state of New York and supplied goods and services in the state.  This Court also has specific jurisdiction over Starneth BV pursuant to CPLR 302(a)(2) and (a)(3) because it has committed a tort both within and without the state that has affected Developer.

38.     Starneth BV's website has an entire page dedicated to "New York"— http://www.starneth.com/new-york—where it links to multiple of its social media posts regarding the Wheel.  Site visitors can "See the construction of the New York Wheel" by clicking into a live stream.  The "Contact" section of this website lists the corporate office as "7545 PP Enschede, The Netherlands."

39.     Independent news outlets have also noted that "Starneth B.V." is involved in the rendering and construction of the Wheel.  *See* http://newyorkyimby.com/category/starneth-b-v.

40.     Venue is proper because the parties agreed to venue in the Southern District of New York for all litigation arising out of the Agreement.  Pursuant to Section 19.2.6 of the Agreement, "[t]he venue in any action shall be the United States District Court for the Southern District of New York ('SDNY'), wherein exclusive jurisdiction and venue shall lie."

41.     In addition, Venue is proper under 28 U.S.C, § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims discussed herein occurred in this judicial district.

42.     Under Section 19.2.6 of the Agreement, NYW is entitled to proceed in this Court because the value of NYW's claims exceeds $15 million.

## STATEMENT OF FACTS

**A.      The New York Wheel Is Planned as One of the Largest Attractions of Its Kind in the World.**

43.     In July 2012, the New York City Economic Development Corporation ("NYCEDC") appointed NYW's predecessor, New York Wheel, LLC, to undertake commercial development of a portion of the Staten Island Waterfront.

44.     To further this plan, on December 24, 2013, NYCEDC leased to New York Wheel, LLC prime waterfront real estate in St. George, Staten Island, on the New York Harbor.

45.     New York Wheel, LLC proposed the construction of a 625-foot high observation wheel with 36 pods or capsules (the "Wheel") on the Site.  Each pod of the Wheel would be designed to hold 40 people, and each rotation of the Wheel would transport up to 1,440 people.



*Artist's rendering of New York Wheel viewed from the South*



*Artist's rendering of New York Wheel viewed from the North*

46.     The Wheel, with its accompanying Terminal Building and waterfront park, is expected to attract more than 3.5 million visitors per year, and will be even larger than the world-famous "London Eye."

47.     At the time of the proposal, the Wheel was slated to be the world's largest observation wheel—measuring 190.5 meters tall.

48.     The Wheel also will feature millions of dollars of LED lighting, enhancing this unique aspect of the New York City skyline.

49.     As the centerpiece of a larger waterfront development on the North Shore of St. George, Staten Island, the Wheel is expected to boost the economic prospects of the local area, creating approximately 350 union construction jobs and 600 permanent jobs upon completion.

50.     Upon its announcement, the Wheel was heralded by *The New York Times* as part of "Staten Island's Turning Point."

**B.     Developer Hired the Design Build Team to Design and Build the Wheel by 2016.**

51.     In 2013, representatives of NYW's predecessor company, including Andrew Ratner, began talks with Chiel Smits, Chief Executive Officer of the engineering design firm Starneth BV, regarding a potential observation wheel to be built on the Staten Island waterfront.

52.     During these talks, Mr. Smits held Starneth BV out as the designer behind the world-famous "London Eye" observation wheel.

53.     Mr. Smits promised to identify a building contractor that Starneth BV could partner with to deliver the proposed New York Wheel.

54.     Eventually, Starneth BV entered into negotiations with Mammoet BV, a Dutch company renowned for its expertise in constructing, lifting, and moving large steel structures, to construct the Wheel.

55.     Mammoet BV and Starneth BV and their subsidiaries formed a single-purpose entity, the Design Build Team, known as Mammoet-Starneth LLC.

56.     The DBT is a joint venture between Mammoet Member and Starneth Member, entities controlled by Mammoet BV and Starneth BV.

57.     Together, the DBT possesses unique experience and expertise in the design, engineering, procurement, on-site construction, installation, and testing of giant observation wheels.

58.     After approximately 15 months of negotiation, on March 5, 2014, New York Wheel, LLC (as "Developer") and the DBT entered into a "turn-key" Design Build Agreement (the "Agreement"), pursuant to which the DBT would design and construct the Wheel on the city land leased to New York Wheel, LLC by the NYCEDC for construction of the Wheel and related development.

59.     Under the Agreement, the DBT would be solely responsible for all aspects of the Wheel design, engineering, procurement, fabrication, and construction, including the management of all subcontracts for the Wheel components and all erection activities ("Contracts" under the Agreement).

60.     The DBT's primary responsibilities under the Agreement were to

> design and build the Project and to perform, and cause to be performed or provided through Contractors . . . all design, engineering, labor, material, equipment, tools, temporary utilities, supervision and management services required for the timely, lien-free, completion of the Project . . . in accordance with the Design Build Documents . . . in consideration of the Contract Sum.

61.     Under Section 1.2 of the Agreement, the DBT was responsible for "complet[ing] the design of the Wheel and prepar[ing] Construction Documents consistent with the Project Criteria."

62.     In practice, Starneth entities were primarily responsible for the DBT's design obligations, including the completion of the design and engineering drawings for the Wheel.

63.     Starneth entities were integrally involved in creating the original design plans for the Wheel, and have been the primary point of contact for the Project's design-related activity, including through subcontracts.

64.     In practice, Mammoet entities were primarily responsible for the DBT's procurement, fabrication, manufacturing and erection obligations, including the fabrication of the Wheel components and ancillary equipment required to build the Wheel.  Mammoet entities also played a controlling role on design, even placing an employee in the offices of the engineer of record, Mendenhall Smith, to oversee production.  Moreover, the erection engineering was also controlled by yet another Mammoet entity, Mammoet Global Engineering.

65.     Besides making payments, Developer's primary responsibilities under the Agreement were "the design and construction of the Pad, Terminal Building and the Balance of the Development," e.g., parking facilities and other amenities at the Site.

66.     The Agreement also required that the  DBT commission the Wheel for its intended use.

67.     The parties agreed to a fixed Contract Sum of $145 million, subject only to equitable adjustments as provided in the Agreement.

68.     Developer required the DBT to submit a fixed Contract Sum for Developer's benefit, given the DBT's unique, specialized ability to estimate all of the costs of design, engineering, fabrication, and construction for this unique asset.

**C.      The Non-DBT Defendants Dominated the DBT, Depriving It of Assets and Causing It to Secretly Breach the Agreement.**

69.      Throughout the DBT's involvement on the Project, non-DBT Defendants provided all the employees used by the DBT.

70.      These employees served the interests of their respective non-DBT Defendants rather than the interests of the DBT.

71.      For example, Section 2.2 of the Agreement required the DBT to "cause to be performed and provided through Contractors or its own forces all labor, materials, equipment, tools and services necessary for the Work," in exchange for Progress Payments tied to the amount of Work completed by the DBT and its Contractors each billing cycle.

72.      Throughout the Project, the DBT sent countless notices to NYW, consistently copying MUSA Holding, Mammoet Member, Mammoet BV, Starneth Member, and Starneth BV.

73.      Unbeknownst to NYW, the DBT did not enter into all of the Contracts required for the Work.

74.      While NYW does not know the full extent of Defendants' conduct, at a minimum, the Member Defendants and/or the BV Defendants caused Mammoet Global Engineering B.V. (another Mammoet BV-controlled entity), Starneth BV, and Starneth Member to enter and control several critical Contracts for the Work.

75.      Huisman Equipment B.V.'s Work on the Wheel, which included fabrication of the spokes, has been performed under a Contract between Huisman and Mammoet Engineering B.V.

76.      Mendenhall Smith, the engineer of record for the Project, has performed engineering services for the Wheel under a Contract with Starneth Member.

77.     Pagnotta Engineering, Inc., the subcontractor responsible for engineering the capsules in which passengers will ride the Wheel, performed its Work under a Contract with Starneth Member.

78.     There are other at least twenty-five other Contracts to which Starneth Member, Mammoet Global Engineering, or Mammoet Global Support—and not the DBT—are parties; these Contracts are for structural engineering for the Wheel, capsule engineering, fire alarm and life safety, and the control systems, as well as a variety of temporary works associate with the Project..

79.     The DBT claims that because it is not a party to these Contracts, it cannot control them.

80.     Over the course of the Agreement, money that Developer paid to the DBT for Work was siphoned off by the Member Defendants and/or the BV Defendants to pay subcontractors under various Contracts to which the DBT was not a party.

81.     By entering, controlling, and administering various Contracts for the Work, it was the Member Defendants and/or the BV Defendants, not only the DBT, performing the DBT's obligations under the Agreement.

82.     By entering, controlling, and administering various Contracts for the Work themselves, the Member Defendants and/or the BV Defendants sought to exploit what they perceive to be an ambiguity in the Agreement, which they contend allows them to refuse to assign those Contracts to Developer even in the event of a material breach by the DBT.

83.     Under Section 3.2.1 of the Agreement, if the DBT is terminated for cause, the DBT must tender each Contract for the Work to Developer so Developer can exercise an option to take assignments of them.

84. Defendants contend that this provision does not apply to the Contracts to which the DBT is not a party.

85. On August 16, 2017, following the termination of the DBT for cause, counsel for the Defendants told Developer that Defendants were under no obligation to assign certain Contracts, even if Developer was justified in terminating the DBT, because "even if NYW had such assignment rights, they are limited to DBT subcontracts and not those held by Mammoet or Starneth. The [Mendenhall Smith] subcontract is between [Mendenhall Smith] and Starneth, while certain [purchase orders] have recently been assigned to the DBT. Any assignment of [Mendenhall Smith] contracts, therefore, requires the written consent of both [Mendenhall Smith] and its counterparty—Starneth or the DBT."

86. The Member Defendants and/or the BV Defendants unfairly benefitted under the Agreement by secretly obtaining compensation meant for the DBT, while depriving Developer of the benefit of its bargain, *i.e.*, its unconditional right to a lump-sum, "turn-key" Wheel (via a conditional right to take prompt assignments of all Contracts for the Work in the event of the DBT's breach).

87. Developer also had a right to be free from the transaction costs of entering new contracts for Work for which the DBT was required to negotiate and maintain Contracts.

88. The Member Defendants and/or the BV Defendants also deprived the DBT of a revenue-generating asset, *i.e.*, Contracts for the Work, thus limiting the DBT's ability to perform Work for Developer in exchange for Progress Payments.

**D.      Under the Agreement, the DBT Agreed to Progress Payments Based on Actual Work Completed.**

89. The Agreement structured the Project into three phases, each of which had a different compensation structure. Phases I and II, which covered the design and engineering of

20

the Wheel, required lump sum payments to the DBT, each of which Developer paid in full by 2015.

90.     In Phase III—fabrication and construction—the DBT was compensated in monthly "Progress Payments" based on the percentage of completion for specific line items on the Schedule of Values ("SOV"), each of which had a corresponding dollar amount.  Generally speaking, the DBT was required to bill for Progress Payments by documenting (and ultimately certifying) its percentage completion for the line items on the SOV on specific forms (described in more detail below), the Progress Payments were then calculated by taking the appropriate percentage of that value of that line item, minus withholding for "Performance Payment" to be paid out only on substantial completion, and other retainages.  *See* DBA § 10.7.

91.     The SOV provided the amount of money the DBT was to be paid for the fabrication and construction aspects of the Work, and when the Work was complete, 100% of the SOV would have been paid out, exhausting the Base Contract Sum.  Similarly, if the DBT completed 50% of a specific line item, like the Wheel's capsules, Developer would owe the DBT 50% of the total value for that line item as agreed upon in the SOV, less the contractually required and prescribed retainages.  Moreover, the SOV cannot be adjusted except through specific mechanisms set forth in the Agreement, specifically, Change Orders, which may be initiated by either Developer or the DBT and must be approved by the Developer.  *See* DBA § 9.2.1.

92.     Phase III payments, as defined in the Agreement, were thus not designed to compensate the DBT for any and all out-of-pocket expenses it incurred in excess of the Base Contract Sum unless those costs were incorporated into the Base Contract Sum through an approved Change Order request.  In other words, the DBA is a lump sum agreement, not a "time

21

and materials" contract.  As a result, any cost overages that Developer does not agree to pay pursuant to a properly requested Change Order are the DBT's responsibility.

93.     For purposes of illustration, below is an abbreviated version of the initial SOV:

| Description | Amount |
|---|---|
| **A.  Wheel Structure** | **$79,793,820** |
| 1.   Fabrication of Steel Structure | |
| 2.   Erection of Steel Structure | |
| 3.   Cable Work | |
| 4.   Electrical Work | |
| **B.  Capsules** | **$24,336,180** |
| 1.   Frame work (Steel work / Polyester parts) | |
| 2.   Mechanical & Control | |
| 3.   Capsule interior (Ceiling, Floor, Glass, Door, Bench) | |
| 4.   Packing and Transportation | |
| **C.  Drive & Control System** | **$11,600,000** |
| 1.   Drive & control system | |
| 2.   Restraint system | |
| 3.   Driving system supporting tower | |
| **D.  LED** | **$7,120,000** |
| 1.   Rim, Capsule, Spoke LED | |
| **E.  Plinth** | **$970,000** |
| **F.  O&M Manual** | **$500,000** |
| **G.  Test & Commissioning** | **$1,500,000** |
| **H.  Design & Engineering** | **$11,680,000** |
| **I.  Health & Safety** | **$1,000,000** |
| **J.  Project Management** | **$6,500,000** |
| **Wheel Total** | **$145,000,000** |

*Abbreviated Initial Schedule of Values*

94.     Fixed priced contracts that rely on SOVs to allocate payments as progress is made on the project are standard in the industry, giving construction companies like the DBT an incentive to manage their costs and enter into subcontracts so that out-of-pocket expenses do not exceed the amounts listed on the SOV.

95.     Thus, Section 10.1 of the Agreement required the DBT to submit to Developer "an initial schedule of values," which "***shall be used*** as a basis for reviewing the Design Build

22

Team's Applications for Payment," and provided that "[t]he schedule of values **shall be updated** [by the DBT] in accordance with this Article" (emphasis added).

96.     The DBT, however, never updated the SOV as required by the Agreement and despite Developer's repeated requests, forcing Developer to piece together estimates of the DBT's progress based on what information it could glean from a smattering of subcontractor invoices.

97.     During Phase III, Article X and Section 10.7.1 of the Agreement required the DBT to submit to Developer monthly AFPs, calculating the Progress Payment due by "[t]ak[ing] that portion of the Base Contract Sum properly allocable to completed work as determined by multiplying the percentage completion of each portion of the work by the share of the Base Contract Sum allocated to that portion of the work in the most recent Schedule of Values."

98.     Pursuant to Section 10.1.1, Developer and the DBT agreed to use the American Institute of Architects' ("AIA") forms G-702 and G-703 for the AFP process.  These forms require every line item to be tied to the SOV or an approved Change Order if a payment is to be made.  They further require the DBT to certify the amounts claimed, and that "to the best of the DBT's knowledge, information and belief the Services covered by this Application for Payment ha[ve] been completed in accordance with the Contract Documents, that all amounts have been paid by the DBT for Services which previous Applications for Payment were issued and payment received from the Owner, and that current payment shown herein is now due."

99.     The forms also required Developer's Consultant, Arup, to certify that the amounts claimed were based on accurate measures of the percentage completion of the Work:  "In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Owner's Consultant's knowledge, information and belief the Work is

in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED."

100.    The amount requested by the DBT became "not negotiable" (*i.e.*, payable) only upon mutual certification of the amount requested in that Application for Payment.

101.    Sections 10.1.1 and 10.2 of the Agreement thus include a reconciliation process to protect Developer from the DBT's overstatements of progress and liability for costs in excess of the agreed Base Contract Sum.

102.    This process also protected the DBT by requiring Developer to identify any disputed charges by reference to the payment documentation submitted by the DBT.

103.    Pursuant to Section 10.2 of the Agreement, the reconciliation process began with the DBT submitting an initial "pencil-copy" AFP "based upon the most recent Schedule of Values reasonably approved by Developer, setting forth in detail operations completed and measured against the current Schedule of Values," and a projection for the costs to be incurred through the end of the monthly period.  *See* DBA § 10.2.

104.    After receiving the pencil copy and corresponding backup documentation, including the invoices and information demonstrating the DBT's total expected costs for each line-item, Developer was required to review and evaluate the pencil copy, provide comments, and identify any disputed or unsubstantiated amounts.  *See* DBA § 10.2.

105.    To achieve this, both Developer and Developer's Consultant, Arup, independently reviewed the pencil copy.  Arup made site visits to various subcontractors to verify whether or not the DBT's claimed percentage completion comported with the actual work performed.

106.    Next, after the DBT's pencil copy was submitted and fully reviewed by Developer and Arup in accordance with Article X, the DBT could finalize the Application, or if

it disputed Developer's comments, could provide additional documentation or information, and the process could be repeated in order to ensure that all proven amounts became payable.

107.    The finalized AFPs therefore included only those charges that remained undisputed at the end of this reconciliation process, and certified on the AIA Form G-702 by the DBT and Arup.

108.    Developer then issued a Certificate of Payment to the DBT, and wired the DBT the agreed upon amount.

109.    Even after the DBT submitted a final, certified AFP, under Section 10.7.10 of the Agreement, Developer could still "withhold payment . . . to the extent reasonably necessary to protect Developer because the Work has not reached the stage indicated in the Application for Payment, or because subsequently discovered evidence may nullify in whole or in part an Application previously approved."

110.    Under Section 10.7.10 of the Agreement, amounts that remained in dispute could be "properly requisitioned" through an AFP only after Developer's "reasons for withholding payment are removed" through a Change Order or the conclusion of dispute resolution.

111.    Under Section 19.2.1 of the Agreement, if any disputes valued at less than $15 million arose regarding "cost or any changes in the Work," *e.g.*, the value of the Progress Payments owed to the DBT, the DBT was required to bring an arbitration pursuant to the rules of the American Arbitration Association, and above that cap, a litigation before this Court.

112.    The DBT never invoked the dispute resolution procedures set forth in Article XIX to resolve any disputed amounts or other claims for Progress Payments.

**E.    The DBT Failed to Meet Critical Early Deadlines, Creating Compounding Delays.**

113.    Almost immediately, the Project was beset by delays caused by the DBT.

114.    Exhibit H to the Agreement set forth a specific timeline for the Project.

115.    Under Exhibit H to the Agreement, the DBT was required to provide engineering drawings for the Project by November 28, 2014.

116.    Wheel erection was to begin on May 1, 2015 and conclude by August 2, 2016.

117.    The parties set the Substantial Completion Date, the deadline by which the DBT was expected to complete its Work, as October 1, 2016.

118.    The DBT failed to timely provide the engineering drawings and plans required for construction of the Wheel and the Pad upon which it will sit.

119.    The DBT's delay in providing the engineering drawings prevented Developer from designing and constructing the Pad.

120.    This delay also forced Developer to assume the DBT's responsibilities for several aspects of the Work, in an effort to avoid further costly delays in the Project's timeline, including but not limited to the plinths that will link the Wheel to the Pad.

121.    NYW has spent more than $8.25 million to construct these embeds ("plinths"), which were and remain the DBT's responsibility under the Agreement.

122.    The original SOV demonstrates that the DBT was financially responsible for the plinths as part of the original $145 million contract price.

123.    Because of these delays in the DBT's delivery of the engineering drawings, completion of the Wheel was delayed and Developer suffered the loss of at least one year and millions of dollars in revenues.

124.    The DBT also repeatedly failed to meet New York City Department of Buildings' ("DOB") permitting requirements.  Under no circumstance would Developer have been able to "obtain" the Building Permit without the DBT meeting its contractual permitting obligations.

125.    Section 3.4.1 of the Agreement requires the DBT to support the acquisition of all required permits by "cooperat[ing] and coordinat[ing] with Developer in obtaining and maintaining in good standing such licenses and permits."

126.    Section 3.4.1(b) of the Agreement requires the DBT to "procure all certifications as required by Applicable Law for the performance of the Work."

127.    Section 3.4.1(j) specifies that the DBT must "obtain all necessary licenses and permits required for the performance of the Work."

128.    The DBT failed to obtain "approved fabricator" status from the DOB, which was necessary to obtain other timely approvals for the Work.

129.    The DBT's failure to satisfy its permitting obligations has imposed substantial costs on Developer and resulted in further Project delays.

130.    Sections 2.1, 3.4.1(i), and 5.2(d) of the Agreement, and Appendix A to the first amendment to the Agreement ("CAR 1"), required the DBT to pay for and perform various types of inspections and testing, which would have required substantially less work, time, cost, and effort had the DBT obtained "approved fabricator" status.

131.    Due to the DBT's failures in this regard, Developer has spent approximately $2 million for inspections and testing that are explicitly the responsibility of the DBT, and expects to spend at least $5 million more.

132.    The DBT has also failed to satisfy other contractual obligations, thereby shifting other costs of design and construction to Developer in violation of the Agreement.

133.    In its attempt to keep the Project on track, Developer was also forced to construct a construction dock to receive components at the Site, install lightning protection at the Site for the Wheel, pay the full on-Site utilities bill instead of the half it had negotiated to pay, pay for

special inspections of the Work in progress, perform the engineering load analysis for installation of the DBT's preferred cranes, install the plinths, and incur additional management and overhead expenses for all this Work.

134.     Under the Agreement, Developer was only responsible for building the Pad, not including embedded components of the Wheel itself.  *See* DBA § 1.2.

**F.     In an Attempt to Get the Project Back on Track, Developer Twice Agreed to Amend the Agreement and Pay the DBT More Money.**

135.     Almost immediately upon signing the Agreement, the DBT began to clamor for additional compensation to design and build the Wheel, despite having agreed to a fixed-price contract.

136.     On numerous occasions, the DBT treated the SOV—and by extension the Contract Sum—as a mere "budget," as opposed to a lump-sum price for a "turn-key" attraction. In an attempt to get the project back on track and incentivize the DBT to deliver the Wheel, on December 11, 2014, Developer and the DBT executed the First Amendment to the Agreement ("CAR 1").

137.     CAR 1 specified a timeline and set deadlines for completion of the DBT's Phase II obligations, which included the finalization of design documents and the satisfaction of the DOB's permitting process.

138.     Under CAR 1, the DBT was required to provide Developer with a "permit-ready" set of documents just three weeks later, on December 31, 2014, and a "100% construction-ready set of documents" on or before March 2, 2015.

139.     CAR 1 also re-set the deadline for delivery of the Pad to January 4, 2016 and the Substantial Completion Date of the Wheel to January 2, 2017.

140.    To ensure the DBT's commitment to the parties' new agreed timeline for the project, Developer agreed to a $13.5 million increase of the Contract Sum payable to the DBT—almost 10% of the original asking price—bringing the Contract Sum to $158.5 million.

141.    During these negotiations, the DBT represented to Developer that the DBT was close to finally completing the engineering drawings that were initially due by November 2014.

142.    Specifically, over the course of many in-person negotiations held on the days leading up to the December 11, 2014 execution of CAR 1, Jelmar de Vries, the project executive and Managing Director of Mammoet Member, Pierre ten Holter, the engineering manager and an employee of Mammoet Solutions, and Hermann Smit, the Chief Operating Officer of Mammoet BV, represented to Andrew Ratner, Todd Herbst, Richard Marin, Rachel Suna, Christopher Deluca, and others affiliated with the Developer that the engineering drawings were nearly complete, representations on which Developer and individuals associated with Developer, including the above, relied.

143.    When Mr. de Vries, Mr. ten Holter, and Mr. Smit made these representations during the days leading up to CAR 1's execution, they knew or should have known that they were untrue.

144.    At the time the DBT entered into CAR 1, on December 11, 2014, Defendants knew or should have known that the engineering drawings were not nearly complete and that the DBT could not actually deliver the required engineering drawings to Developer on or before December 31, 2014, just three weeks away, even though the DBT represented during negotiations that the drawings were close to completion.

145.    The DBT nonetheless entered into CAR 1, knowing that its representation during negotiations that the engineering drawings were nearly complete was a material inducement to

and actually relied upon Developer in agreeing to the increased Contract Sum promised by
Developer.

146.    Developer's decision to execute CAR 1 was made in reliance upon Mr. de Vries,
Mr. ten Holter, and Mr. Smit's representation that the engineering drawings were nearly
complete.

147.    The DBT did not provide Developer with a "permit-ready" set of documents by
December 31, 2014, or a "100% construction-ready set of documents" by March 2, 2015.

148.    Instead, the permit-ready set was not delivered until April 29, 2016, and the 100%
construction-ready drawings for all trades have still not been delivered to Developer.

149.    Because of these delays in the DBT's performance of its design and performance
obligations, Developer suffered lost profits and incurred increased management and financing
costs for the Project.

150.    It also became necessary to push out the Substantial Completion Date yet again.

151.    Due to further delays, the parties soon began negotiating the Second Amendment
to the Agreement ("CAR 2").

152.    During the CAR 2 negotiations, the DBT represented to Developer that the DBT
was close to completing the engineering drawings that were initially due by November 2014.

153.    Specifically, over the course of many in-person negotiations held on the days
leading up to the May 18, 2015 execution of CAR 2, Jelmar de Vries, the project executive and
Managing Director of Mammoet Member, Pierre ten Holter, the engineering manager and an
employee of Mammoet Solutions, and Hermann Smit, the Chief Operating Officer of Mammoet
BV, represented to Andrew Ratner, Richard Marin, Rachel Suna, and Christopher Deluca of
Developer and Todd Herbst, Developer's attorney, and others affiliated with Developer, that the

engineering drawings were nearly complete, representations on which Developer and individuals associated with Developer, including the above, relied.

154.    When Mr. de Vries, Mr. Holter, and Mr. Smit made these representations during the days leading up to CAR 2's execution, they knew or should have known that they were untrue.

155.    On May 18, 2015, Developer and the DBT executed CAR 2.

156.    Developer's decision to execute CAR 2 was made in reliance upon Mr. de Vries, Mr. Holter, and Mr. Smit's representations that the engineering drawings were nearly complete.

157.    In CAR 2, the DBT agreed to deliver to Developer all engineering drawings and other documents required to allow Developer to procure the Building Permit on or before July 1, 2015.

158.    Section 5.2(i) of the Agreement as amended required the DBT to provide Developer "fully coordinated engineering drawings required for the application of the Building Permit" by July 1, 2015.

159.    CAR 2 also set an Outside Site Turnover Date of March 15, 2016, creating an 8.5-month window for Developer to complete work on the Pad and provide access to the Staten Island waterfront Site to the DBT so that it could commence on-site Wheel construction activities.

160.    The DBT's delivery of the engineering drawings on or before July 1, 2015, and the passage of 8.5 months to allow NYW to complete its own work on-site, were conditions precedent to the Outside Site Turnover Date.

161.    CAR 2 also re-set the Substantial Completion Date of the Wheel from January 2, 2017 to May 15, 2017.

162.    Once again, to ensure that the DBT would remain committed to the project, Developer agreed to further increase the Contract Sum, this time by $6.5 million, bringing the new Contract Sum to $165 million exclusive of Change Orders.

163.    At the time the DBT entered into CAR 2 on May 15, 2015, the DBT, via the employees of the Member and BV Defendants, knew or should have known that its representation during negotiations that the engineering drawings were nearly complete was false and that the DBT could not actually deliver the required engineering drawings to Developer on or before July 1, 2015, just six weeks away.

164.    The DBT nonetheless entered into CAR 2, knowing that its representations during negotiations that the engineering drawings were nearly complete were false and were a material inducement to the increased Contract Sum promised by Developer, and furthermore, that delivery of the drawings by July 1, 2015 was a condition precedent to Outside Site Turnover by March 15, 2016.

165.    The final Contract Sum under the Agreement was approximately $171 million, which included $20 million in price increases wrongfully obtained through the DBT's willful misrepresentations leading to CAR 1 and CAR 2, and approximately $5 million of agreed-upon Change Orders.

166.    Following the execution of CAR 2, NYW succeeded to New York Wheel, LLC's rights and obligations under the Agreement and became the "Developer" under the Agreement for all intents and purposes.

167.    Plaintiff NYW owns any fraud or tort claims arising out of Agreement negotiations, including CAR 1 and CAR 2 negotiations.

168.     Beyond agreeing to twice amend the Agreement to increase the Contract Sum, Developer made other concessions to satisfy the DBT's demands for more money.

169.     Under Section 10.7.8, the DBT was to be paid a Performance Payment of $13.5 million within 30 days of Substantial Completion.  This Performance Payment is not in addition to the Contract Sum of $145 million, but part of it, and therefore was an incentive to be withheld from the Progress Payments until Substantial Completion.  *See* DBA § 6.1.

170.     Upon discovering that it had overpaid the DBT by about $5.4 million by failing to retain the Performance Payment from amounts paid to the DBT as Progress Payments, Developer notified the DBT of the error but did not start recapturing those payments, as it is permitted to do under Section 10.7.10 of the Agreement, until a later date.

171.     One cause for the erroneous release of the Performance Payment was that the DBT mistakenly billed for Progress Payments against the full Contract Sum (which includes the Performance Payment), instead of the Base Contract Sum (which does not include the Performance Payment), resulting in prepayment of the Performance Payment.

172.     If not corrected, this error would have led to the DBT receiving payment of the full Contract Sum before the work was complete, or receiving the Performance Payment before Substantial Completion occurred, in violation of Sections 6.1 and 10.7.8 of the Agreement.

**G.     In Exchange for the Price Increase in CAR 2, MUSA Holding and Starneth BV Provided a Completion Guaranty.**

173.     As a condition to CAR 2, on May 18, 2015, MUSA Holding and Starneth BV entered into a Completion Guaranty.

174.     Among other things, the Completion Guaranty required MUSA Holding and Starneth BV to complete the Wheel for the remainder of the fixed Contract Sum in the event that the DBT abandoned the Work without justification.

33

175.    On information and belief, based on conversations that Developer's representatives had with the DBT's representatives, the DBT desired to stop Work in 2016 to limit its losses under the Agreement.

176.    On information and belief, stopping Work would have benefitted the DBT by avoiding further payments to subcontractors for Work that the Defendants had underbid in the Schedule of Values.

177.    Stopping Work without justification in 2016 would have increased the risk that the beneficiaries of the Completion Guaranty would require MUSA Holding and Starneth BV to complete the Project at a loss.

178.    Because the Completion Guaranty would have obligated MUSA Holding and Starneth BV to perform Work at a loss in the event of a DBT default, Defendants had an incentive to contrive a prior material breach by Developer.

**H.    After Two Rounds of Price Increases, the DBT Demanded Even More Money, But Refused to Take Responsibility for Completing the Work.**

179.    The DBT could not unilaterally increase the Contract Sum, or individual line-items on the SOV, absent Developer's express agreement through a Change Order.

180.    The Agreement explicitly addressed the types of changes that may arise during the construction of the Wheel and provided a mechanism for compensating the DBT for such changes.

181.    Section 9.6.1 of Agreement provided that:

> If the Design Build Team wishes to make a claim for an increase in the Contract Sum or an extension of the Contract Time, the Design Build Team shall give Developer written notice thereof within twenty one (21) days after the Design Build Team became aware, or should have become aware, of the occurrence of the event or circumstances giving rise to such claim, failing which, Design Build Team shall waive such claim. . . .   Any change or extension to the Contract Sum and/or Contract Time (including any adjustment of

34

Substantial Completion Date) resulting from such claim shall be authorized by Developer's execution of a Change Order.

182.    Under Section 7.1 of the Agreement, Change Orders were to be submitted by the DBT and "shall be reasonably approved, modified or rejected in writing by Developer promptly upon submission by the Design Build Team (and in no event later than twenty one (21) days after Developer's receipt of same), failing which the change in the Work ***shall not proceed*** . . . ." (Emphasis added.)

183.    To date, the DBT has submitted nine Change Orders to Developer for amounts totaling $6,920,367.  Developer has approved more than half of these Change Orders, for a total of approximately $5,000,000.

184.    If the DBT had wanted to increase the Contract Sum beyond its current total, the DBT was obligated to make Change Order requests under Article IX of the Agreement.

185.    For many of the additional expenses the DBT now seeks to recoup, the time period for making a valid claim under Section 7.1 has passed.

186.    Likewise, the DBT cannot demand additional compensation for construction delays of its own making.

187.    Under the Agreement, the DBT cannot claim an increase in the Contract Sum for any delays attributable to the DBT's own delays in performance.

188.    Under Section 5.3 of the Agreement:

> To the extent that any Unavoidable Delay [*i.e.*, a delay for which the DBT is not at fault] coincides with and overlaps the occurrence of any other delay which is not an Unavoidable Delay (*i.e.* one for which the Design Build Team is responsible), there shall be a [C]oncurrent [D]elay. . . .  To the extent of any Concurrent Delay, the Design Build Team shall be entitled only to an extension of the Contract Time equal to the demonstrable impact to the Schedule critical path of the Concurrent Delay, and the adjustment of Contract Sum may be decided by mutual agreement between the Design Build Team and Developer, ***it being recognized that to the extent a***

> *delay is caused by both unavoidable and avoidable causes, an*
> *adjustment to Contract Time only is an equitable remedy*.

(Emphasis added.)

189.    In December of 2015, in a final attempt to obtain the Wheel it bargained for, Developer representatives Jay Anderson, Andrew Ratner, Christopher DeLuca, Rachel Suna, and Todd Herbst began discussing a potential third amendment to the Agreement with Jelmar de Vries, the project executive and Managing Director of Mammoet Member, and Pierre ten Holter, the engineering manager and an employee of Mammoet.

190.    The parties continued those discussions for much of 2016, discussing terms that would have once again increased the Contract Sum to be paid to the DBT, established revised delivery milestones, and created a dispute review board for each party to assert any unresolved delay claims after the completion of the Wheel.

191.    During these in-person negotiations, Mr. de Vries represented that the "Mammoet" "board," not the DBT or its Members, was dictating the DBT's negotiating position with respect to the third amendment to the Agreement.

192.    Additionally, individuals purportedly representing the DBT provided business cards from various non-DBT Mammoet entities, including Mammoet BV, Mammoet Global Support B.V., Mammoet Solutions, Mammoet USA South, Inc., and Mammoet Canada Eastern Ltd., notwithstanding the fact that other DBT employees, such as Pieter de Ritter, possessed and provided business cards declaring his Starneth-Mammoet LLC affiliation.

193.    On September 10, 2016, Andrew Ratner of NYW met with Jan Kleijn, the Chief Executive Officer of Mammoet BV, and Jelmar de Vries at Developer's offices in New York City to discuss terms of the potential third amendment.

194.    At the conclusion of this meeting, Mr. Kleijn acknowledged NYW's offer, but noted that he needed to discuss with the DBT whether and under what conditions Site turnover would be possible by the proposed date before responding to NYW.

195.    On November 22, 2016, Mammoet BV's new Chief Operating Officer Victor Aquina met with Andrew Ratner in person to discuss the best path forward for the negotiations. Mr. Aquina proposed a subsequent meeting between Andrew Ratner and a Mammoet team, including Gerard Bastiaansen, on December 15 or 16, and a follow-up conference call on December 19 to address key open issues.

196.    By December 2016, NYW believed it had reached an agreement in principle with the DBT, which had been represented in negotiations by Mr. de Vries, a Mammoet employee.

197.    Mr. de Vries expressed his intent to bind the DBT to a proposed third amendment to the Agreement that would set delivery milestones while increasing the amount payable to the DBT.

198.    However, by this point in time Member Defendants and/or BV Defendants had decided to prevent the DBT from fulfilling its agreed commitments to NYW or incurring further expenses on the Project.

199.    On or around December 5, 2016, Jan Kleijn, Chief Executive Officer of Mammoet BV, notified Developer that Mr. de Vries, who had been leading the Project and negotiating on the DBT's behalf, was terminated—without advance notice to NYW and in violation of the Agreement.  Mr. Kleijn also informed NYW that Gerard Bastiaansen would replace Mr. de Vries as project director and that Victor Aquina, who had joined Mammoet BV's executive board effective September 1, 2016, had been transferred decision-making authority and asked to oversee the Project.

200.    Based on the abrupt nature of Mr. de Vries's departures, the DBT's failure to provide advance notice of this staffing change, and the identities of the replacement negotiators, NYW believes that Mammoet BV directed these staffing changes without authorization under the DBT's governing documents.

201.    Even though the proposed amendment, on which the parties had agreed in principle, would have increased the amount payable to the DBT by more than *50%*, the DBT formally pulled out of negotiations on or around January 10, 2017, although informal discussions continued for a period after.

202.    On information and belief, the DBT's replacement negotiators declined to enter the third amendment to the Agreement in part because they believed that the Member Defendants and/or BV Defendants would take a loss on their respective Contracts if they continued to perform them; in part because the DBT would not have been able to meet the delivery milestones that Developer and the DBT had negotiated, exposing the DBT, the Member Defendants, and MUSA Holding to liability under the Agreement and the Completion Guaranty; and in part because committing to finish the Project by a date certain and for a new fixed price would more rapidly expose the Member and BV Defendants' scheme to extract unwarranted additional payments from Developer.

203.    By replacing the DBT's management team with individuals they employed directly, Mammoet Member and/or Mammoet BV impaired the DBT's ability to continue performing Work in exchange for future payments from NYW, depriving NYW of the benefit of the DBT's continued performance under the Agreement.

204.    The Member Defendants and/or BV Defendants also undermined the DBT's ability to keep working in exchange for Progress Payments.

**I.     Developer Relied on the DBT's Misrepresentations as to Its Completion Date Estimates When Entering Into Other Critical Project Contracts.**

205.   During negotiations with the DBT in 2016 regarding a possible third amendment to the Agreement, Developer was also negotiating with a lender to secure more funding for the Project.

206.   In 2015, Developer had entered into a loan and security agreement (the "Loan Agreement") with Highbridge Principal Strategies LLC ("Highbridge").

207.   By 2016, in light of the various Project delays and the increased costs created by CAR 1 and CAR 2, it became necessary to renegotiate the original Loan Agreement with Highbridge (the "Amended Loan Agreement").

208.   The Amended Loan Agreement became effective as of November 7, 2016.

209.    Section 12.1(v) of the Amended Loan Agreement required Developer to meet certain construction milestones (known as "Critical Path Items") throughout the course of the Project.

210.   The Critical Path Items, as stated in Exhibit I to the Amended Loan Agreement, were: commencing leg erection by February 1, 2017, commencing the A-Frames braces erection by August 1, 2017, completing the rim build by January 15, 2018, and commencing capsule installation by March 30, 2018.

211.   Failure to meet any of these Critical Path Items would result in default of the Amended Loan Agreement and grant Highbridge the right to terminate Developer's agreement and funding.

212.   The DBT knew about the existence of both the Loan Agreement and the Amended Loan Agreement.

213.    During the negotiation of the Amended Loan Agreement in 2016, the DBT assisted Developer in setting the dates for each Critical Path Item.

214.    Eager to ensure that the Amended Loan Agreement laid out feasible and realistic deadlines for the completion of the Critical Path Items and thereby minimized the likelihood of default, Developer approached Defendants and asked them to identify a set of dates to include in the Amended Loan Agreement.

215.    Developer, via its representatives Jay Anderson, Andrew Ratner, Christopher DeLuca, Rachel Suna, and its attorney Todd Herbst, notified the DBT that meeting the deadline for these Critical Path Items was, in fact, critical to secure the Project's funding.

216.    Because the DBT and Developer were already in the midst of negotiating the third amendment to the Agreement, Developer offered to include a bonus provision in the amendment in order to emphasize the importance of meeting the Critical Path Items.

217.    As an incentive, Developer suggested a bonus of $20 million—nearly 12% of the Agreement's now inflated price—for successfully meeting all Critical Path Item deadlines, and a bonus of $12.5 million for successfully meeting only some of the Critical Path Item deadlines.

218.    Throughout negotiations for the third amendment, for over four months, Developer repeatedly emphasized the importance of meeting the Critical Path Item deadlines and made clear to the DBT that the Project funding depended on it.

219.    In response, Jelmar de Vries, the project executive and Managing Director of Mammoet Member, Pierre ten Holter, the engineering manager and an employee of Mammoet, and Hermann Smit, Victor Aquina's predecessor as Chief Operating Officer of Mammoet BV, repeatedly assured Developer that the Critical Path Items would be met.

220.    However, the DBT knew by that time that it would not be able to meet the Critical Path Item deadlines.  After Developer and the DBT had agreed in principle to amend the Agreement a third time, and after Developer had relied on the DBT's representations in negotiating the Critical Path Items in the Amended Loan Agreement with Highbridge, Jelmar de Vries, who had been leading the project and negotiating on the DBT's behalf, was suspiciously terminated and replaced by Jan Kleijn, the Chief Executive Officer of Mammoet, and Victor Aquina, the new Chief Operating Officer of Mammoet BV, replaced Hermann Smit on or around December 5, 2016.  On information and belief, Mammoet Member and Mammoet BV, as a member and parent to the Member Defendants, directed these staffing changes.

221.    The deadlines for the first two Critical Path Items, commencing leg erection by February 1, 2017, and commencing the A-Frames braces erection by August 1, 2017, have now come and gone without being met because of the DBT's delays in finalizing the design, obtaining a building permit, and completing fabrication—indeed, according to the DBT's own schedules, the A-Frame will not arrive in the United States until late fall of 2017.  Meanwhile, the legs remain at the Brooklyn Marine Terminal, where they await the completion of remediation by the DBT.

222.    As a result of the DBT's failure to meet the Critical Path Items, Developer became in default of its obligations under the Amended Loan Agreement.

223.    Highbridge did not disburse any loan money to Developer.

224.    Nevertheless, Developer had paid almost $40 million to Highbridge for consulting and legal fees related to the Loan Agreement and Amended Loan Agreement.

225.    These fees were paid for naught because the funding was never actually disbursed.

**J.      The DBT, Behind on Progress and Unprepared to Commence Erection Work, Asserted Frivolous Claims for Developer Delay.**

226.    The DBT breached the Agreement on December 31, 2014, March 2, 2015, and July 1, 2015, by failing to deliver the required engineering drawings necessary to obtain the Building Permit.

227.    On July 7, 2015, the DBT wrote to Developer to confirm that the DBT "did not meet the required delivery date of July 1, 2015 for the update of the Permit Package Documentation."

228.    Under the Agreement and pursuant to CAR 2, the DBT's admitted failure to deliver the necessary drawings postponed the Outside Site Turnover Date day-for-day until their actual delivery.

229.    The engineering drawings were finally delivered on April 29, 2016, giving Developer until approximately January 13, 2017 to complete the Pad and turn over the Site. Moreover, Developer took on the responsibility of fabricating and constructing the embedded parts of the Wheel incorporated into the Pad, work that should have been performed by the DBT under the Agreement.

230.    Developer nonetheless tendered Site Turnover on November 2, 2016, and again on January 9, 2017.  The DBT was not ready then—and is not ready now—to begin construction on the Site, and did not even have crane permits to allow it to conduct preparatory activities on the Site until *after* the Site was turned over.  The DBT did not obtain the required "approved for use" crane permits for on-Site construction—its sole responsibility—until January 10, 2017, after Developer had already turned over the Site.

231.    Nonetheless, despite suffering no actual damages due to any purported "delay" in Site Turnover, the DBT began claiming "delay damages" in July 2016, and on August 15, 2016,

in violation of the Agreement, demanded more than $1.77 million in delay damages as line-items 22 and 23 in its initial "pencil copy" AFP for that period, AFP 11.  But any claim for delay damages—even if it had merit—could not be billed on an AFP unless so-ordered by a court or arbitral panel, or unless subject to an approved Change Order.

232.    Developer was under no obligation to turn the Site over in July 2016 because it had only just received the engineering drawings necessary for design and construction of the Pad.

233.    In any event, the DBT's claim for delay damages was untimely under the Agreement and therefore was waived.

234.    The Agreement did not permit inclusion of disputed claims for delay damages on an AFP.  The contractually required AIA Form G-703 itself demonstrates that such unapproved costs have no place in AFPs, which are exclusively intended for agreed Progress Payments and Change Orders that have been either agreed to or so ordered by an arbitral panel or court.

235.    Because the AIA Form G-703 is not designed for, or meant to include, delay damages, the DBT had to add the claimed amounts beneath the "Base Contract Sum"—the ultimate total that progress payments are measured against—and included them in the "Change Order Sum" even though no formal Change Order was agreed upon at that time.

236.    During the reconciliation process for AFP 11, Developer informed the DBT that Items 22 ($874,459) and 23 ($904,802) "[s]hould not be invoiced on this requisition."

237.    In response, the DBT obliged, removed its claim for delay damages, and admitted that delay damages "are to be handled as a Change order."

238.    After the DBT removed its unjustified claim for delay damages, Developer duly paid the DBT its actual Progress Payment owed for payment period 11 pursuant to a final, certified, and agreed-upon AFP that did not include the DBT's baseless claim for delay damages.

239.    Following the resolution of AFP 11, the DBT did not invoke the arbitration provision of the Agreement or submit a Change Order request for these damages within the contractual time limit, thereby waiving its claim to the extent not already waived.

240.    The DBT's conduct regarding AFP 11 demonstrated that the DBT knew that AFPs were not the proper mechanism to request unapproved delay damages, that Developer informed the DBT of that, and that the DBT knew the correct procedure pursuant to the Agreement to seek delay damages was the Change Order process.

241.    The DBT's conduct in AFP 11 undermined its subsequent conduct with the remaining AFPs, and any alleged claims of good-faith mistake, where the DBT continued to knowingly and improperly pass along alleged delay damages as Progress Payments.

242.    Developer therefore does not owe any damages for Site Turnover delay.

243.    Even if Developer were subject to a timely claim for delay damages, such damages would not be owed under the Agreement.

244.    Although CAR 2 purported to provide a penalty for each week that Site Turnover was delayed, the DBT is not entitled any penalty or other damages in this case because it has suffered absolutely no damages as a result of any purported delay, and in any event, any delay is entirely the DBT's fault.

245.    The DBT's 10-month delay in providing the required engineering drawings was a failure of a condition precedent to Site Turnover, tolling the time for Site Turnover until after the time Developer actually tendered Site Turnover.

246.    In fact, once the DBT delivered the plans, Developer completed the Pad and effected Site Turnover in less than the 8.5 months provided by the Agreement.

247.    Even if Developer were responsible for some "delay" in Site Turnover, the DBT's claim for penalties under Section 5.2(c) is unenforceable as applied here, because the DBT has suffered no harm as a result of this alleged delay.

248.    The DBT is a single-purpose entity whose sole function is to perform the Work, but it has failed to proceed at the Site for reasons having nothing to do with access to the Site or Site Turnover.

249.    Therefore, any claimed damages are grossly disproportionate to the reasonably expected harm, and Section 5.2(c) imposes an unenforceable penalty contrary to public policy.

250.    Delay damages are also not available because, for several reasons, the DBT was in prior breach of the Agreement for failure to "diligently prosecute" the Work on Site. Starting before, and continuing throughout the alleged delay period, the DBT was unable or unwilling to perform Work on Site because it did not have the appropriate permits, due to its own delays.  The DBT still does not have a Building Permit due to its own delays in providing design documents to the DOB, its failure to use approved fabricators, and its failure to complete remediation of the legs.  And even if it had the permits, it still is not ready to start work because of its own fabrication delays – by the DBT's own concession, the A-Frame, which would need to be installed second, after the legs, will not arrive in the United States until late fall at the earliest.

251.    Moreover, even if the DBT were entitled to claim delay damages, its various demands grossly overstate any potential entitlement under the Agreement, including because to the extent it did actually incur the costs claimed, that is a result of its own failure to mitigate damages.

252.     The DBT even admits that its approximately $14 million claim for "per diem" damages includes a 15% profit markup, which would apply only if this were actual Work performed and not compensation for out-of-pocket losses.

253.     And the DBT's purported "per diem" charges and assessed penalties extend beyond the date on which Developer first tendered Site Turnover, November 2, 2016, and in some cases, before the date on which the DBT could actually have completed work on-site.

254.     For example, the DBT asserts that its delay damages per diem costs for both its cranes and crane operators from as far back as July 2016, when the cranes were first moved on-site by the DBT.  However—because of its own delays—the DBT did not even obtain its crane permit until January 10, 2017, and therefore could not have used its cranes prior to that date.  In addition, Developer only agreed to permit the DBT to deliver those cranes based on its misrepresentation that it was ready to begin work at the site.

255.     This delay damages request is therefore fraudulent, as the DBT knew full well that it could not recover delay damages for work that could not have proceeded anyway due to its own failure to secure the crane permits.

**K.     In an Attempt to Avoid Their Obligations Under the Agreement and the Completion Guaranty, the Defendants Manufactured a Payments Dispute.**

256.     In administering the Work, the Member Defendants and BV Defendants acted in their own interests and in the interests of MUSA Holding.

257.     In administering the Work, the Member Defendants and BV Defendants acted against the interests of the DBT.

258.     Rather than ensuring that the DBT properly performed under the Agreement, employees of the other Defendants forced the DBT to continue Work, but under the pretense of a false payment dispute, and without generating any Progress Payments for that Work.

259.     Even though the DBT easily could have brought itself into compliance with the Agreement's payment provisions and resumed earning payments for Work, the guarantors MUSA Holding and Starneth BV benefitted from the continued appearance of a payments dispute by reducing the risk that the beneficiaries would call in the Completion Guaranty.

260.     The non-DBT Defendants directed the DBT to maintain the appearance of a payments dispute, and refuse to certify its applications for payment, in order to generate a false claim of Developer default.

261.     The Defendants directed the creation of a payments dispute by refusing to participate in the payments reconciliation process laid out in the Agreement.

262.     Both an up-to-date, accurate SOV and visibility into the DBT's expected expenditures were essential to the accurate calculation of Progress Payments made pursuant to the AFP process in Phase III of the Project.

263.     Despite repeated requests by Developer, the DBT failed to update and maintain an accurate SOV, and failed to submit Change Orders when it should be have been clear to the DBT that they were necessary because its costs for line items on the SOV were going to exceed the allocated amount.

264.     Despite repeated requests by Developer, the DBT also failed to provide information sufficient to determine the DBT's total expected costs for each line-item in the SOV.

265.     For example, Developer requested that, when a particular line-item on the SOV contained multiple subcontracts, the DBT provide an overarching G-703 form listing out all of the subcontract work and values.

266.     Not only did the parties contract to use the AIA G-703 form, but the form would have helped all parties determine the proper allocation and percentage complete of a particular line item.

267.     For example, line-item 7a is Capsules.  Developer later learned that the DBT entered into at least seven different subcontracts for line-item 7a.

268.     But the DBT did not disclose this information to Developer, making it impossible for Developer to determine what line items in the SOV were connected to amounts the DBT was claiming in its "pencil copy" AFPs.  Moreover, because the DBT did not submit appropriate Change Orders, and the cost of many line items on the SOV was apparent going to exceed the SOV amount, it was impossible to determine percentage completion accurately.

269.     Nonetheless, the Phase III AFP process worked as it should for the first 12 AFPs.

270.     Although the DBT frequently overstated its progress, for the first 12 AFPs, the DBT nonetheless followed the contractual process, and submitted final, certified AFPs, in response to which Developer timely issued Certificates of Payment for AFPs 1 through 12, and caused timely payment to issue to the DBT.

271.     The below chart shows the amounts originally sought by the DBT in its initial "pencil copies," the amounts certified and paid, and the percentage difference.

| AFP No. | Pencil Copy Invoice Due | Certified Invoice Due | Amount Paid by Developer | Change |
|---|---|---|---|---|
| 1 | $3,395,732 | $2,264,462 | $2,264,462 | − 33.3% |
| 2 | $5,270,058 | $4,745,159 | $4,745,159 | − 10.0% |
| 3 | $4,537,500 | $4,607,555 | $4,607,555 | + 1.5% |
| 4 | $1,489,878 | $1,487,107 | $1,487,107 | − 0.1% |
| 5 | $7,575,829 | $7,639,696 | $7,639,696 | + 0.8% |
| 6 | $4,501,827 | $4,501,827 | $4,501,827 | No Change |
| 7 | $4,850,335 | $2,485,788 | $2,485,788 | − 48.8% |
| 8 | $3,674,954 | $1,342,005 | $1,342,005 | − 63.5% |
| 9 | $4,019,283 | $3,048,697 | $3,048,697 | − 24.1% |
| 10 | $2,683,815 | $2,595,729 | $2,595,729 | − 3.3% |
| 11 | $5,426,382 | $2,940,825 | $2,940,825 | − 45.8% |
| 12 | $6,044,011 | $1,175,736 | $1,175,736 | − 80.5% |
| **1 – 12** | **$53,469,604** | **$38,834,586** | **$38,834,586** | **− 27.4%** |

272.    The above chart also demonstrates that even when the process worked, the DBT's AFPs often did not initially comply with the Agreement, and the DBT knew this because Developer would share with the DBT, time and time again, the same types of comments.

273.    Thus, subsequent repetition of the same issues plaguing the DBT's AFPs cannot be explained away by good faith errors because the DBT was repeatedly notified of its misconduct.

274.    By way of example, AFP 11 provides a representative example of how the DBT viewed the AFP process before its radical shift with AFP 13, and reveals that the DBT knew that certain costs it would later habitually include in subsequent AFPs were outside the scope of the monthly progress payments.

275.    On August 15, 2016, Ewout Sloots of the DBT emailed Developer the preliminary "pencil copy" of AFP 11, seeking $5,426,382.

276.     Developer explained to the DBT that a number of the line items could not be accepted as calculated in the DBT's pencil AFP because they were not properly substantiated, and included costs that exceeded the percentage of work completed, were not clearly tied to items on the SOV, or did not comport with the contractual AFP process and SOV.

277.     But after multiple rounds of comments from Developer and the DBT, the parties agreed on the final AFP.  And on September 12, 2016, the DBT, via email, submitted an updated AFP and requested a Certificate of Payment.

278.     That same day, the DBT mailed developer an invoice, attaching a certified copy of AFP 11.

279.     On September 14, 2016, Developer approved the payment.

280.     In AFP 11, line-item 7a – Capsules, for example, demonstrated how the DBT's refusal to provide an overarching AIA G-703 form in the manner Developer requested made it nearly impossible for Developer to verify the individual subcontract amounts comprising an item in the SOV (not to mention how it provided cover to the DBT to slip in cost overages that should have gone through the Change Order process).

281.     The DBT requested $1,151,445, but Developer could not substantiate that number.  As a result, Developer initially requested missing backup documentation and asked that the DBT's requisition match the documentation it provided.

282.     After the DBT provided the requested documents, Developer noticed that the DBT was attempting to pass along approximately $160,000 in unaccounted costs related to one of the subcontracts.

283.    Developer responded, "after a review of the backup information, it appears that the $160k change order value is due to incomplete scope issues caused by [the] DBT & not the result of a design change by [Developer]. . . .  [The] costs [are] to be removed from requisition."

284.    For other items, Developer objected to the fact that the requisitioned amount exceeded the percentage of work actually performed.

285.    For instance, the DBT originally requested $113,000 for Item 4b – A Frame Braces, which exceeded the percentage actually completed based upon the approved SOV.

286.    Here, the DBT demanded that "Developer/Owner . . . fund the costs we've made instead of requesting [the] DBT to deduct [the cost] out of several AFP's [*sic*]."

287.    Developer eventually acquiesced "in order to facilitate continued progress on the project" even though Developer noted that because "the % complete exceeds the SOV . . . [Developer] is not required . . . to fund at this time."

288.    The same pattern occurred for line-item 13a – Wheel Erection Work, where overhead costs had "approached 30%" before any erection work commenced.  The DBT blamed the overhead costs on "a start [date] of Jan 15th, 2016" not occurring even though Developer pointed out that "Site turnover could not have occurred as the DBT was still working on the 100% drawings" which were "not delivered until 04/29/16."

289.    The DBT refused to remove the cost, but once again, Developer acquiesced "for the benefit of the overall project schedule & productivity" even though "the burn rate on this item against the Schedule of Values is very concerning."  Developer expressly noted that it "reserve[d] the right to continue conversations on this matter with the DBT before approval of the next requisition."

290.    Since AFP 12 was finalized on October 28, 2016 and paid in November 2016, however, the DBT has failed to deliver a single finalized—let alone a reconciled or certified—AFP, despite Developer's repeated requests to move forward with the reconciliation process required by Article X of the Agreement.  Instead, the DBT has unilaterally declared disputed, uncertified amounts due and owing under the Agreement, and even suspended work and purported to withdraw from the Agreement based on those AFPs.

291.    In its May 10, 2017 letter to Developer, beginning with AFP 13, the DBT adopted the position that, despite an entire year of conducting itself in accordance with the Agreement, the DBT now had the unilateral power to declare AFPs "final" and force Developer to pay whatever amount the DBT requested, whether or not they complied with the Agreement or were properly requisitioned.

292.    The DBT's pencil copies for payment periods 13 through 22, however, were anything but "final," and the DBT consistently overstated its percentage completion for various line-items, requisitioned cost overages that should have been requested in the formal Change Order process, and failed to substantiate line items.

293.    Moreover, starting with AFP 23, the DBT has also continued to submit AFPs for periods after Developer terminated the DBT for cause and after the DBT's purported "withdrawal."

294.    Invoices submitted as backup for its pencil copies indicated that the DBT's total costs were set to exceed the scheduled value for several line-items, but the DBT failed to provide the actual total cost for any of these line-items, or to submit Change Orders for these overruns, making evaluation of the DBT's actual economic progress all but impossible.

295.    By refusing to provide the information necessary to evaluate the DBT's economic progress, and by refusing to acknowledge the extent of its cost overruns, the DBT materially impaired Developer's ability to participate in the very reconciliation process to which the DBT agreed.

296.    By submitting pencil copies that did not fully account for the DBT's expected cost overruns, the DBT effectively overstated its percentage completion and made claims for Progress Payments to which it is not entitled.

297.    By way of example, in AFP 14, line-items 4d, 4e, 5a, 5b, 7a, 8, and 9 had invoices for amounts greater than the percentage complete based on the SOV.

298.    For instance, for line-item 4d (Rim parts), the SOV listed a value of $13,971,399. The DBT requested a progress payment of $918,353, which (including prior payments) would have put the progress complete at 72.7%.

299.    However, only 66% of the work had actually been completed.  Therefore, Developer had already overpaid the DBT, and by refusing to remove the requisitioned amount of $918,353, the DBT was in effect demanding that Developer accelerate even more progress payments related to the Item.

300.    In response, the DBT ignored Developer's concerns, and unilaterally determined that it had submitted its "final position and documents."  The same was true for Item 7a (Capsules).

301.    AFP 15 contained numerous instances where the amounts requested exceeded the allowable payment based on the percentage of work actually completed, including line-items 4b (Frame braces), 4e (Rim parts procurement coordination), 5 (Spoke cable components), 5d (Spoke parts procurement coordination), and 7a (Capsules).

302.    With regard to line-item 4d (Rim), site visits by Arup revealed that the rim was less than 50% complete, but the corresponding line item on the AFP showed a requisition for $600,751, which would have only been permissible if the rim were at least 77% finished.

303.    Instead of correcting its requests for this line-item and others, the DBT insisted that it be paid the amounts listed in the deficient, uncertified AFP.

304.    AFP 16 also contained many requisitions that exceeded the amount of work performed.

305.    For line-item 4d (Rim parts), approximately 50% of the work remained incomplete, yet line-item 4e (Procurement coordination / quality assurance / quality control (rim parts)), had only 1.8% of its scheduled value remaining.  Given the interconnectivity between these two components, 4d could not be 50% complete while 4e was 98.2% complete.  At most, a 10% to 15% difference would have made sense.

306.    Items 2, 4b, 4d, 4f, 7a, and 13a also exceeded the percentage of work completed.

307.    Similar scenarios occurred with respect to AFPs 17 through 23.

308.    Given the DBT's refusal to update the SOV, and given Developer's repeated notifications about requisitions exceeding the percentage of work actually completed, the DBT knew it was submitting false AFPs in violation of the Agreement.

309.    To the extent that the DBT's pencil copy AFPs for payment periods 13 through 21 measured progress based on artificially low expected costs, the DBT submitted false AFPs that overstated the Progress Payments due to the DBT.

310.    The DBT also repeatedly tried to pass along higher costs to Developer and increase the Base Contract Sum, either entirely in lieu of the formal Change Order process or for

overages contained in unapproved Change Orders, despite the fact that AFPs were contractually designed to be progress payments derived from the already agreed upon Base Contract Sum.

311.   The DBT only submitted nine Change Orders, an unimaginably low number for a project of this scale.

312.   For instance, in AFP 13, the DBT insisted that Developer pay the DBT $227,000 dollars above a subcontract for line-item 7a (Capsules).

313.   In response to Developer's comments, the DBT explained that "this is also the result of the changes to the LED lighting," but the DBT demanded on being paid rather than initiating a Change Order.

314.   In AFP 15, the DBT explained that the reason the requested amount for line-item 4d (Rim) exceeded the percentage of work completed—based on the SOV—was because of "new added scope to the contract with" a subcontractor.

315.   Item 8 in AFP 15 exceed the "maximum retainage" because of "additional work, contracted with Starneth LLC."

316.   The DBT never updated the SOV to account for these additional costs.

317.   The DBT also insisted on billing for unapproved Change Orders, particularly alleged delay damages.

318.    As initially seen in AFP 11, the DBT continued to include delay damages in AFPs 13 and 14 despite Developer's repeated instructions that delay damages were not part of the contractual progress payment process.

319.   In AFP 15, the DBT once more attempted to pass along these costs in line-items 30 and 31.  Developer yet again reminded the DBT to remove the costs because they were "part

of the ongoing MOU negotiations and not appropriate to be invoiced," but the DBT refused, stating that "Costs remain."

320.    The DBT also included the alleged delay costs in AFP 16 and insisted that they remain, despite the DBT's earlier conduct with AFP 11 (and overlooking the fact that there could not possibly be delay costs).

321.    Other examples included line-item 9 (LED show lighting (procurement)) in AFP 13.  There, the DBT attempted to bill for additional subcontracts that were not part of the SOV. As a result, the DBT admitted that it was requesting "$1,450,000 in total for additions to the LED Procurement" that Developer never approved in a Change Order.

322.    For line-item 2 (Project team / hotels / flights / site expenses) in AFP 16, the DBT's "request for payment [took] this item to nearly 100% complete with the project only just beginning."  This was the result of alleged "duration increases and costs" that the DBT claimed were "not acknowledged by [Developer] as per the Delay Notices."

323.    Similar scenarios occurred with respect to AFPs 17 through 23.

324.    On information and belief, the DBT's submission of false AFPs was a deliberate measure designed to obtain unauthorized advances of the Base Contract Sum before the Wheel was completed and to generate refusals to pay that the DBT could point to as breaches of Developer's obligations under Article X of the Agreement.

325.    Solely as a result of the DBT's refusal to comply with its express and implied obligations to provide sufficient information, Developer was unable to approve final AFPs for payment periods 13 through 23.

326.    Section 10.3 of the Agreement required Developer, within seven days after receipt of a final AFP, to either issue a Certificate for Payment for the amount of the AFP or notify "the

Design Build Team in writing of Developer Consultant's reasons for withholding certification in whole or in part."

327.    Because the DBT has not submitted a final AFP since AFP 12, let alone a certified AFP as required by the contractual AIA Form G-702, Developer had no duty to issue a Certificate of Payment or to issue further reasons for withholding certification.

328.    Although there was no outstanding payment obligation at the time of termination, even if there had been, because Developer terminated the DBT for cause, any such obligation ceased.  Section 13.4 of the Agreement provides that "the Design Build team shall not be entitled to receive any further payment for work performed by the Design Build Team through the date of termination."

329.    Moreover, because of that termination for cause, effective as of July 21, 2017, and because the DBT itself purported to "withdraw" from the Agreement on July 20, 2017, Developer has no obligation to respond to, much less pay any amount claimed in AFP 23, which was submitted on August 15, 2017.

330.    In any event, for each AFP, Developer satisfied its obligations to put the DBT on notice of the reasons why the DBT's outstanding AFPs could not be accepted.

331.    Consideration of each AFP needed to take place in sequence, as prior progress informed the amount of Work that is left to be done in subsequent periods.

332.    Accordingly, no more Certificates of Payment could issue until the DBT finalized AFP 13 in accordance with Article X of the Agreement.

**L.      Developer Repeatedly Attempted to Remedy the DBT's Billing Misconduct.**

333.    Developer repeatedly implored the DBT to resume participation in the reconciliation process and to provide the information necessary to generate final AFPs.

334.     On several occasions, Developer informed the DBT that the DBT's failure to submit finalized AFPs and an updated SOV pursuant to the Agreement precluded Developer from accurately calculating and certifying Progress Payments.

335.     In each of payment periods 13 through 21, Developer so "notified" the DBT as to why its pencil copies overstated the amount owed, responded promptly to the DBT's questions, and formally requested the removal of disputed amounts from the AFPs.  But the DBT merely continued as usual come the next AFP submission.

336.     On April 14, 2017, in an extraordinary effort to break this logjam of the DBT's own making, Developer sent the DBT a "Proposed Final AFP 13" that Developer assembled itself using the incomplete invoices provided by the DBT.

337.     Proposed Final AFP 13 would compensate the DBT for its progress, to the extent that such progress could be determined from the insufficient documentation provided by the DBT, and begin the process of correcting Developer's previous overpayments of the Performance Payment.

338.     Developer offered to issue a Certificate of Payment for Proposed Final AFP 13 if the DBT would simply certify, sign, and return the document.

339.     The DBT did not respond to this offer.

340.     Nor did the DBT provide additional information that could be used to more accurately measure the DBT's economic progress for that period.

341.     Instead, since the issuance of Proposed Final AFP 13, the DBT has issued pencil copies through period 23, even though subsequent pencil copies were plagued by the same issues and could not be evaluated until the actual amount of progress for period 13 is established.

342.     By manufacturing a payments dispute between the DBT and Developer starting in 2016, then serving notices of Developer's alleged defaults not only on Developer but also on Developer's lenders, the Defendants sought to prevent Developer's lenders from triggering the Completion Guaranty, which would have required MUSA Holding and Starneth BV to undertake performance of the Agreement and complete the Wheel.

**M.     Despite Having No Basis to Do So, the DBT Suspended Performance and Withdrew From the Agreement.**

343.     On May 10, 2017, despite its own performance delays and willful disregard of its obligations under the Agreement, including its obligation to participate in the payments reconciliation process, the DBT threatened to suspend performance and withdraw from the Agreement based on Developer's alleged failure to pay.

344.     In its May 10, 2017 notice to Developer, the DBT purported to "exercise its right to invoke an immediate suspension of work in accordance with Section 13.3(a) of the [Agreement]."

345.     The DBT was not entitled to suspend performance or withdraw from the Agreement under Section 13.3(a).

346.     Under Section 13.3(a) of the Agreement, the DBT was permitted to suspend performance, and later withdraw after an appropriate notice and cure period, only if:

> (i) Developer has not issued a Certificate of Payment in respect of any application for Payment pursuant to Section 10.3 and has not notified the Design Build Team of the permitted reason for withholding certification as provided in this Agreement, or (ii) Developer has failed without cause to pay the Design Build Team for the Work for a period of fifteen (15) days after the date due under this Agreement, or (iii) Developer violates any of Developer's material obligations under the Design Build Documents and does not cure such violation within thirty (30) days following written notice of such violation from the Design Build Team to Developer, or (iv) the Work or the Project, in whole or substantial part, is stopped for a period of sixty (60) consecutive days through no act or

fault of the Design Build Team because Developer has failed to fulfill any of Developer's material obligations under this Agreement or Developer has violated Applicable Law . . . .

347.     None of these conditions apply here:

    i.     Developer issued Certificates of Payment to the DBT with respect to all final and certified AFPs that the DBT has submitted.  The DBT has failed to issue a certified, final AFP since AFP 12.

    ii.    Developer paid the DBT all amounts due on final AFPs pursuant to Sections 10.2 and 10.3 of the Agreement.   In addition, Developer offered to pay and *paid* undisputed amounts for AFPs 13–20, despite the DBT's failure to adhere to the AFP process, thus curing any purported payment default.   Any additional payments that the DBT sought were not due under the Agreement.

    iii.   Developer did not violate any of its material obligations under the Design Build Documents.

    iv.    Any stoppage in the Work was entirely attributable to the DBT and its suspension of performance on May 26, 2017.  Developer reiterated, both in court filings and private discussions with the DBT, its commitment to completing the Wheel.

348.     On May 26, 2017, the DBT confirmed by letter that it was suspending performance under the Agreement.

349.     On May 26, 2017, the DBT lowered a crane at the Site, rendering it unusable for Work.

350.     By suspending performance on May 26, 2017 under a false claim of right and threatening to withdraw permanently, the DBT materially breached the Agreement.

351.     Section 13.4 of the Agreement provided that Developer may, after a cure period, "terminate the employment" of the DBT, if the DBT "abandon[s] the Work for more than seven consecutive days (except as permitted by Section 10.3) . . . or fail[s] . . . to promptly and

diligently prosecute the Work," or otherwise violates any material provision of the Design Build Documents, including the Agreement itself.

352.     Although no payment to the DBT was due at this time, on May 29, 2017, Developer offered the DBT a way to effect a cure, get paid for recent work, and eliminate the DBT's frivolous claims of default.

353.     On May 29, 2017, Developer supplemented its April 14, 2017 proposal and sent the DBT proposed final AFPs for payment periods 14 through 20, offering the same resolution it had for AFP 13:  simply certify, endorse, and return the documents to get paid.

354.     The total value of Proposed Final AFPs 13 through 20, prior to a contractually mandated correction for contractually required retainages and recovery of the erroneously released Performance Payment, was $15,122,663.

355.     Less retainages and the portion of the Performance Payment that Developer was entitled to recover through this reconciliation process, under Proposed Final AFPs 13 through 20 the DBT would have been entitled to immediate payments totaling $7,227,705, the undisputed amount.

356.     Moreover, Developer notified the DBT that if "the DBT . . . provide[d] the missing information required by the Agreement for each of these payment periods, including an updated and accurate SOV, adequate backup documentation, and pencil copies accurately measuring the DBT's percentage completion," Developer would "review each properly submitted pencil copy in accordance with Article X."

357.     Developer was ready, willing and able to pay this amount, and all further amounts that may come properly due and owing, but the DBT did not accept.

358.    On May 30, 2017, Developer provided the DBT written notice of the DBT's various breaches under the Agreement, reiterating previous notices on these various breaches, and filed the original Complaint in this Action.

359.    The DBT then admitted at a June 5, 2017 hearing before this Court that it would "have no right to terminate" should Developer "write a check for" the undisputed amount due.

360.    Developer attempted to pay the undisputed amount due to the DBT under AFPs 13-20 on May 29, 2017, but the DBT rejected the payment.

361.    More recently, on July, 11, 2017, Developer wired the undisputed amount of $7,277,705.58 for AFPs 13 through 20 to the DBT.  This is the amount that would have been owed under these AFPs had the DBT submitted properly certified and final AFPs.

362.    On July 17, 2017, however, the DBT rejected the payment, falsely claiming that Developer conditioned the DBT's acceptance of the payment upon the DBT waiving its claims against Developer.  The DBT returned those funds to Developer by check.

363.    Developer, however, made the payment without prejudice to either party's rights under the Agreement.

**N.    Developer Properly Terminated the DBT for Cause After Its Numerous Material Breaches of the Agreement, But the DBT Refused to Cooperate in the Post-Termination Transition.**

364.    On July 11, 2017, pursuant to Section 13.4 of the Agreement, Developer gave the DBT notice of its decision to terminate the DBT in light of the DBT's numerous material breaches of the Agreement.

365.    The termination officially went into effect on July 21, 2017 at the end of the 10 day notice period mandated by Section 13.4.

366.    Developer's termination of the DBT for cause was properly based on the DBT's numerous material breaches of the Agreement, including its improper suspension and withdrawal

from the Agreement, its failure to this day to deliver to Developer a complete set of the Instruments of Service, its improper termination of multiple "Key Personnel," its submission of multiple false AFPs, and its failure to meet the Substantial Completion date of May 15, 2017.

367.    The Agreement contains provisions pertaining to Project transition procedures that Developer may use to transition the Project away from the DBT.

368.    Although Developer terminated the DBT for cause, an ongoing relationship exists between Developer and the DBT.

369.    Despite giving Developer assurances that it would cooperate with the Project transition procedures under the Agreement, the DBT and the Member Defendants have used their leverage to delay and hinder the transition of the Project away from the DBT.

370.    On information and belief, the DBT has entered into design-related contracts for the Wheel through its member Starneth LLC, which thus, along with the DBT, has been and is currently the party in control and possession of the Instruments of Service and other drawings that Developer is entitled to under Section 1.6 of the Agreement.  Despite Developer's contractual entitlement to these design and engineering documents and the DBT's repeated assurances that it plans to assist with the post-termination transition, the DBT has refused to deliver to the drawings to Developer, thereby jeopardizing NYW's post-termination transition and the entire New York Wheel revitalization project.

371.    The DBT and the Member Defendants failed to provide adequate access to books and records or provide basic information about the various Contractors working on the Wheel, as required by Sections 17.2 and 3.2.1 of the Agreement.

372.    Under Section 17.2 of the Agreement, "On five (5) business days' prior written notice from Developer to the Design Build Team, Developer and its authorized representatives

shall be afforded full access to all the Design Build Team's Project-related records required to support an Application for Payment, Drawings, Specifications, Contracts (excluding economic terms), Change Orders, purchase orders (excluding economic terms), and other similar data, and shall have the right, at Developer's expense, to photocopy such books and records."

373.    Back on May 15, 2017, Developer requested that the DBT provide access to all "on-Site records" and "all the Design Build Team's Project related records," including the specific documents set forth in Section 17.2 of the Agreement.

374.    Further, Developer requested records reflecting "full and detailed accounts…with respect to disputed changes in the Work performance on a cost reimbursable basis pursuant to a Change Order, a Construction Change Directive or a field order" and "a log of all on-Site operations and staffing, minutes of regular progress meetings, and schedules."

375.    On May 19, 2017, Developer reiterated its request to "immediately inspect the books and records enumerated in [its] May 15 letter."

376.     In violation of its obligations under the Agreement, the DBT failed to comply with these requests and repeatedly denied Developer access to the books and records.

377.    The DBT's failure to perform its obligations under these provisions of the Agreement have impeded Developer's ability to assess the progress of work on-Site and slowed the orderly transition of contracts and subcontracts since the termination of the DBT for cause on July 21, 2017.

378.    Pursuant to Section 3.2.1 of the Agreement, upon termination for cause, the DBT is required, at Developer's request, to assign all Project subcontracts to NYW.

379.    Accordingly, on July 12, 2017, Developer emailed and sent letters to several subcontractors to inform them that the DBT had been terminated for cause and that Developer would be contacting them regarding the assignment of the subcontracts.

380.    The DBT and the Member Defendants, meanwhile, began suspending the work of the subcontractors, and discouraged them from communicating with Developer regarding the Project.  They even instructed certain Contractors to withhold documents that Developer must review in order to exercise its option to assume responsibility for the subcontracts.

381.    The DBT and the Member Defendants further altered the status quo by refusing to allow Developer access to inspectors, and moving components into storage.

382.    After termination, Developer learned that despite the clear requirements of the Agreement that the DBT enter into all contracts for the Work, the DBT had in fact contracted for much of that work through the Member Defendants—and other Mammoet entities—in violation of Section 2.2 of the Agreement.

383.    Instead of the DBT itself contracting with all of the subcontracts and consultants, the DBT and its Member Defendants have created an opaque web of entities, and these various entities have entered into the contracts.

384.     This web has made it impossible for Developer to assess the contracts with the subcontractors and consultants.  And neither the DBT nor its Member Defendants has provided sufficient transparency.

385.    For example, on information and belief, Starneth Member is a party to many of the design-related contracts, while Mammoet Member is a party to many of the fabrication and construction-related contracts.

386.     The DBT and the Member Defendants have further stalled the transition by claiming they are not required to assign the contracts to Developer under Section 3.2.1 if the DBT itself is not the contracting party, and that "written consent" is required from the subcontractor and whoever the contracting party is, before NYW can take an assignment of such subcontracts, written consent that the DBT obviously intends to withhold in order to extract more money from NYW.

387.     The DBT's and the Member Defendants' gamesmanship has made the transition process unnecessarily difficult, slow, and costly as Developer attempts to save this unique and important Project.

388.     On September 1, 2017, Developer filed an Amended Complaint in this Action, naming the Member Defendants and BV Defendants as additional defendants and alleging alter ego/misuse of the corporate form against the BV Defendants.

389.     On October 24, 2017, the Member Defendants and BV Defendants appeared in this Action by filing motions to dismiss certain counts of Developer's Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**O.     The DBT's Refusal to Cooperate Threatens to Destroy NYW, the Wheel, and the City's Staten Island Revitalization Project.**

390.     Money damages are insufficient to fully compensate Developer for the Defendants' wrongdoing, which has deprived Developer of a unique asset.

391.     Developer cannot continue the project without the Instruments of Service and or the subcontracts for all work related to the Wheel.

392.     For the time being, the DBT has wrongfully placed all subcontracts in suspension, so the Project is at a complete standstill.

393.    The Wheel's failure would have substantial negative repercussions for the public and in particular the City—which leased the land through NYCEDC, and the Borough of Staten Island, which is counting on it as the centerpiece of a massive redevelopment Project.

394.    If the Wheel is not ultimately completed, Developer will be put out of business entirely and many other stakeholders will be affected, including the Project's lenders and investors.

395.    The Project has hundreds of investors, including more than 400 EB-5 investors seeking immigration status based on their promise to invest in job-creating American development work.  That immigration status would be negatively affected by the failure of the Project.

396.    Moreover, Developer has already invested more than $400 million into this Project to build a unique green-roof public parking garage, a terminal building for the Wheel, and the Pad and plinths for the Wheel itself.  Much of the value of this investment will be lost if the Project fails due to the DBT's refusal to transition it in a reasonable and efficient manner.

**P.    The DBT Was a Mere Instrumentality of the Other Defendants.**

397.    The DBT is a single-purpose entity created by the other Defendants solely to limit Defendants' liability in connection with the design and construction of the Wheel, and it has no independent functionality.

398.    Upon information and belief, other Defendants, and not the DBT, exercised final decision-making control over the DBT's financial and operational decisions.

399.    Throughout the Project, the DBT sent countless notices to NYW, consistently copying MUSA Holding, Mammoet Member, Mammoet BV, Starneth Member, and Starneth BV.

400.    Non-DBT Defendants used their domination and control over the DBT to enter into nearly two-thirds of the Project subcontracts themselves, instead of allowing the DBT to enter into these subcontracts, as required by the Agreement.

401.    For example, Starneth Member directed Contracts for Work away from the DBT and to itself for its own benefit, including a Contract with Mendenhall Smith, the engineer of record for the Project, and another with Pagnotta Engineering, who is responsible for manufacturing the capsules.  And Mammoet BV directed critical Contracts for Work away from the DBT and to its subsidiary, Mammoet Engineer B.V., including a Contract for fabrication of main and capsule bearings, and another for fabrication of spokes.

402.    Starneth BV has exercised its control and domination of the DBT to take possession of the engineering drawings and Instruments of Service in order to withhold these documents from Developer and cause Developer to find and use another designer to begin designing the Wheel from scratch, at great expense to Developer.

403.    The other Defendants also used their domination and control of the DBT to exploit Developer and demand more money in negotiations between Developer and the DBT.  In intentionally steering the DBT away from entering into subcontracts, Defendants sought to gain leverage against Developer, resist the mandatory assignment of the subcontracts to Developer in the event of termination, and ultimately sell to Developer subcontracts that it has a legal entitlement to under the assignment clause in the Agreement.

404.    For example, Mr. Gerard Bastiaansen, the Project Director of Mammoet Global Support BV, would argue on behalf of the DBT's improper AFPs during the AFP reconciliation process between Developer and the DBT.  Additionally, during the MOU negotiations, Mr. Jelmar de Vries of Mammoet wrote to Mr. Ratner on September 16, 2016, that "MM," meaning

Mammoet, not the DBT, "has expressed the desire/requirement for higher compensation." Elsewhere in his email, he distinguished when it was the DBT that was responding to a negotiation item.

405.    Mammoet BV also dominated the DBT by removing key personnel responsible for the negotiation of a third amendment to the Agreement, including Jelmar de Vries, Pierre ten Holter, and Hermann Smit, and replacing them with other Mammoet entity employees like Gerard Bastiaansen and Victor Aquina.

406.    As a result of Mammoet BV's actions, the third amendment, which would have increased the amount payable to the DBT by more than 50%, was never executed, thereby depriving the DBT of additional revenue which it needed in order to continue work on the Project.

407.    Additionally, facing escalating costs and the increasing risk of being forced to complete the Project under the Completion Guaranty at a loss, the other Defendants caused the DBT to contrive a payment dispute with NYW.

408.    In exercising their control to deprive the DBT of critical Contracts for Work, other Defendants created conflicts of interest between themselves and the DBT with respect to payments owed to Project subcontractors.

409.    Because the Project went over budget through no fault of NYW, NYW's payments to the DBT were insufficient to cover all Contract expenses incurred by the Defendants.  Applying Progress Payments to non-DBT Contracts therefore would have been contrary to the DBT's best interests.

410.    On information and belief, based on a lack of public claims made against the non-DBT Defendants, Defendants abused the DBT's corporate form to pay themselves Progress Payments and, eventually, to pay the subcontractors with which they had entered deals for Work.

411.    The DBT has no other line of business to generate revenue to satisfy a judgment.

412.    Upon information and belief, based on statements made by Defendants' counsel during this Action, the DBT has no control over any Defendant funds that it could use to satisfy a judgment in this Action.

413.    The DBT needed cash flow from Progress Payments to satisfy its obligations under the Agreement.

414.    Defendants siphoned those Progress Payments to satisfy obligations to subcontractors under contract to them.

415.    Because the DBT has outstanding obligations to Developer but is not entitled to any more Progress Payments, the non-DBT Defendants have impaired the DBT's ability to satisfy a judgment in Developer's favor.

416.    At all relevant times, the DBT was a mere instrumentality of the other Defendants.

417.    The non-DBT Defendants did not respect the formalities of the DBT's corporate form.

418.    Over the course of the Agreement, the Defendants' roles on the Project were largely indistinguishable.

419.    Through their ownership interests in, and managerial control of, the DBT, the other Defendants completely controlled and dominated the DBT's contractual relationship with NYW, enjoyed the benefits of the Agreement without respect for the DBT's corporate form, and

orchestrated the DBT's willful breaches of the Agreement for the further benefit of the non-DBT Defendants.

420.    Developer required MUSA Holding and Starneth BV to deliver the Completion Guaranty, because by May 2015 it was clear that the DBT was a shell company that borrows funds from other Mammoet and Starneth entities and affiliates.

421.    At all times relevant to the payment dispute, the DBT's actions were controlled by employees of the Member Defendants and the BV Defendants, who were acting in the interest of those parent entities and to the detriment of the DBT, which stopped taking payments from Developer and eventually suspended Work under the Agreement in violation of its obligations to Developer.

422.    On information and belief, the DBT's assets were used to pay those subcontractors, leaving insufficient money for the DBT to perform its obligations under the Agreement.

423.    On information and belief, the DBT was inadequately capitalized for its intended business purpose of designing and constructing the New York Wheel, without independent assets or funds.

424.    Upon information and belief, at all relevant times, the other Defendants funded the DBT, a shell company.  The DBT was at no point an independent profit center.

425.    According to the DBT's counsel, the DBT required payment from Developer because the DBT "ha[s] problems, too, and ha[s] a need to have cash flow."

426.    The DBT's counsel also stated that if the DBT "[doesn't] receive the cash flow that is quote-unquote undisputed and [isn't] able to pass it down the line to [its] various

subcontractors, [that] requires [the DBT] to become a lender in the project, which is something that [the DBT] is just not prepared to do."

427.    The DBT's counsel further argued that the DBT "need[s] to protect our balance sheet" by shutting down operations on the Project, demonstrating that the other Defendants were starving the DBT of cash it desperately needed.

428.    Information concerning the relationships between the DBT and the other Defendants, including the Defendants' intertwined finances and operations, is primarily in the possession and control of the Defendants.

429.    Developer has no practical means of accessing this information outside of discovery.

430.    Upon information and belief, the Defendants' assets—including, at least, the Contracts for performance of the Work—are co-mingled.

431.    The interconnectivity and overlapping of Mammoet BV's web of entities has prevented Mammoet BV itself from accurately determining which Mammoet entities improperly entered into which subcontracts instead of the DBT (as was required by the Agreement).

432.    Upon information and belief, funds from Mammoet BV's bank accounts have been used to pay Project-related costs, including invoices issued under Contracts and the DBT's legal bills.

433.    Upon information and belief, the primary bank account used by the DBT for project-related expenses and wire transfers is controlled by an employee of Mammoet BV.

434.    Mammoet BV has held itself out as the primary contractor for the design and construction of the Wheel.

435.   On its website, Mammoet BV touted the New York Wheel Project, issuing press releases claiming that "[t]he New York Wheel will be yet another example of Mammoet's work on iconic city structures across the globe" and that the Wheel "will change the iconic skyline of the 'city that never sleeps.'"

436.   Upon information and belief, the DBT has been operated without regard to the observation of corporate formalities, has not maintained separate finances and accounts, has failed to hold regular board or membership meetings, and is not governed in accordance with its operating agreements and bylaws.

437.   Visits by Developer to Mammoet BV's Dutch office have revealed that the various Mammoet entities all occupy space in the same building complex.

438.   Business cards provided by individuals employed by Mammoet entities confirm this with respect to at least Mammoet Solutions, Mammoet Global Support B.V., and Mammoet Starneth LLC.  In fact, Mammoet Solutions and Mammoet Global Support B.V. actually share the same address and P.O. Box.

439.   All email addresses for employees of Mammoet's various entities, including the DBT, end in "@mammoet.com."

440.   Upon information and belief, there is significant overlap between the officers, directors, and personnel of Mammoet BV and the DBT.

441.   There is a revolving door between the companies, and employees frequently move between Mammoet entities and the DBT.

442.   DBT representatives have listed Mammoet BV, Mammoet Global Support BV, and other Mammoet entities on their email signatures, business cards, and professional networking profiles.

443.     Upon information and belief, Gerard Bastiaansen, Jan Kleijn, Jelmar de Vries, Victor Aquina, and other DBT personnel integrally involved in the Project are all employees of Mammoet BV or related entities.

444.     Visits by Developer to Starneth BV's Dutch office have revealed that the various Starneth entities all occupy space in the same building complex.

445.     All email addresses for employees of Starneth's various entities, including the DBT, end in "@starneth.com."

446.     Upon information and belief, there is significant overlap between the officers, directors, and personnel of Starneth BV and the DBT.

447.     There is a revolving door between the companies, and employees frequently move between Starneth entities and the DBT.

448.     DBT representatives have listed Starneth BV and Starneth Member entities on their email signatures and professional networking profiles.

449.     On information and belief, Starneth BV was primarily responsible for the DBT's design obligations, including the completion of the design and engineering drawings for the Wheel.

450.     Starneth BV was integrally involved in creating the original design plans for the Wheel, and has been the primary point of contact for the Project's design-related activity.

451.     On information and belief, the DBT representatives that primarily contacted Developer regarding design updates, questions, and concerns were employees of Starneth BV.

452.     On information and belief, Starneth BV is in sole possession of the design and engineering drawings for the Wheel and has refused to deliver these documents to Developer in order to impede Developer's post-termination transition and efforts to complete the Wheel.

453.     Developer is entitled to these drawings and documents under Section 1.6 of the Agreement, which grants Developer a license to the Instruments of Service.

454.     Starneth BV has exercised its control and domination of the DBT to take possession of the engineering drawings and Instruments of Service in order to withhold these documents from Developer and cause Developer to find and use another designer to begin designing the Wheel from scratch, at great expense to Developer.

455.     In exercising domination over the DBT to perpetrate these wrongs and injustices against Developer and the DBT, the Member Defendants, MUSA Holding, and BV Defendants have abused the corporate form.

456.     Developer is entitled to pierce the Defendants' corporate veils to satisfy judgments in this Action.

**COUNT 1**
**Material Breach – Grounds for Termination**
**(Against Defendant Mammoet-Starneth LLC)**

457.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

458.     The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

459.     Section 13.4 of the Agreement allows NYW to terminate the Agreement for cause if the DBT "abandon[s] the Work for more than seven (7) consecutive days," "fail[s] . . . to promptly and diligently prosecute the Work or to supply enough properly skilled workmen or proper materials for the Work," "submit[s] an Application for Payment, sworn statement or waiver of Lien, affidavit or document of any nature whatsoever which intentionally is falsified in

any material respect" or "otherwise violates any material provision of the Design Build
Documents."

460.    Because the conditions that would permit the DBT to suspend Work or withdraw
from the Agreement under Section 13.3 of the Agreement did not apply, the DBT breached its
obligations not to "abandon the Work for more than seven (7) consecutive days" by suspending
performance on May 26, 2017.  This breach constituted grounds for Developer's termination of
the DBT for cause.

461.    The DBT's unwarranted suspension of the Work also constituted a breach of its
contractual duty to "promptly and diligently prosecute the Work [and] . . . supply enough
properly skilled workmen or proper materials for the Work," and separate grounds for
termination for cause under Section 13.4 of the Agreement.

462.    The DBT breached its obligations not to "submit an Application for Payment,
sworn statement or waiver of Lien, affidavit or document of any nature whatsoever which
intentionally is falsified in any material respect."  The DBT knowingly submitted false AFPs that
overstated the DBT's percentage completion on the Work, sought to increase the Base Contract
Sum by secretly including cost overages not linked to any Change Order, and included cost
overages and delay damages for alleged Change Orders never agreed upon.  In addition, the DBT
submitted invoices for delay damages for crane-related costs to which the DBT knew it was not
entitled.  On the basis of these breaches, and pursuant to Section 13.4 of the Agreement,
Developer's termination of the DBT for cause was justified.

463.    The DBT also breached its contractual obligation not to "otherwise violate[] any
material provision of the Design Build Documents."  On several separate occasions, the DBT
violated material provisions of the Agreement.

464.    The DBT's failure to deliver to Developer engineering drawings necessary for the construction of the Pad and turnover of the Site until nine months after the date specified in the Agreement constituted a material breach of the Agreement and grounds for Developer's termination of the DBT for cause.

465.    The DBT also breached the Agreement by terminating Project Director Jelmar de Vries and DBT Representatives Robbie Hellstrom and Peter Adegeest without notifying Developer or obtaining written consent, in violation of Section 3.6 of the Agreement, which states that "[n]o Key or Project Personnel in an executive or supervisory role shall be changed or removed without the written consent of the Developer."  Under Sections 3.6 and 13.4 of the Agreement, terminations, reassignments and reduction in Project responsibilities "of any" Key Personnel are grounds for Developer to terminate the DBT "for cause" if not timely corrected to Developer's "reasonable satisfaction."

466.    On numerous occasions, the DBT intentionally refused to update and revise the SOV, frustrating NYW's contractual right to evaluate AFPs and issue appropriate Progress Payments, in breach of its obligations under Sections 3.4, 5.2(j), 10.1, 10.6, and 10.10.2.  This material breach of the Agreement constituted grounds for Developer's termination of the DBT for cause.

467.    The DBT's failure to provide Developer with access to various books and records related to the Project violated Sections 3.4.1(b) and 17.2 of the Agreement and also provided Developer with grounds for termination of the DBT for cause.

468.    An actual, present and existing controversy has arisen between NYW and the DBT regarding Developer's termination of the DBT for cause.  A declaratory judgment will tend

to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement and during the transition.

469.    Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the DBT is in material breach of the Agreement and that NYW was entitled to terminate the employment of the DBT for cause pursuant to Section 13.4 of the Agreement.

470.    In addition, as a direct and proximate result of the DBT's numerous breaches of the Agreement and Developer's termination of the DBT for cause, Developer has suffered damages in an amount to be proven at trial.

### COUNT 2
### Failure to Meet Substantial Completion Deadline
### (Against Defendant Mammoet-Starneth LLC)

471.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

472.    The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

473.    Because the DBT failed to achieve Substantial Completion of the Wheel by May 15, 2017, as prescribed by Section 5.2.1 of the Agreement, the DBT is in breach of its obligations under the Agreement.

474.    An actual, present and existing controversy has arisen between NYW and the DBT regarding the DBT's failure to achieve Substantial Completion by the date specified in the Agreement.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement and during the transition.

475.     Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the DBT is in material breach of the Agreement for its failure to meet the Substantial Completion Date.

476.     As a result of its failure to meet the Substantial Completion Date, and pursuant to Exhibit J, paragraph 2 of the Agreement, the DBT is also liable for damages of $50,000 per day for each day of delay in the completion of the Work beyond May 15, 2017.

### COUNT 3
### Failure to Perform Contracted Work
### (Against Defendant Mammoet-Starneth LLC)

477.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

478.     The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

479.     The DBT failed to perform several of its Work obligations, which have since been taken up and performed by NYW at substantial expense to NYW, including construction of the embeds that link the Wheel to the Pad at a cost of more than $8.25 million.

480.     NYW also constructed a temporary construction dock to receive components at the Site, installed lightning protection at the Site for the Wheel, paid the full on-Site utilities bill, paid for special inspections of the Work in progress, performed the load analysis for installation of the DBT's cranes, and incurred additional management and overhead expenses for all this Work.

481.     As a direct and proximate result of the DBT's breaches, NYW has suffered damages in an amount to be proven at trial, but no less than $16,621,753, the amounts incurred

or expected to be incurred to date as a result of the DBT's refusal to perform the following

obligations:

- Construction of temporary and permanent embeds integral to the Wheel construction (at least $8,248,067);

- Load spreaders and crane matting for crane Work (at least $1,000,000)

- Construction of a temporary construction dock to deliver equipment and components necessary for construction to the Site when part of the construction was to be performed by the DBT (at least $3,000,000);

- Installation of lightning protection at the Site (at least $402,670);

- One-half of on-Site utilities charges which the DBT agreed to pay (at least $650,000);

- Special inspections of the Wheel components to obtain the Building Permit (at least $5,000,000);

- Load analysis for crane Work (at least $1,121,016);

- Management and general conditions costs for Work assumed by NYW (at least $200,000); and

- Union labor costs (approximately $250,000).

## COUNT 4
### Fraudulent Inducement
**(Against Defendant Mammoet-Starneth LLC, the Member Defendants, the BV Defendants, and Defendant MUSA Holding)**

482.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if

fully set forth herein.

483.    The Agreement is an enforceable contract between NYW and the DBT that

contains an implied covenant of good faith and fair dealing.  NYW has performed all of its

material conditions, covenants, and promises, in accordance with the terms and conditions of the

Agreement.

484.    Following the execution of CAR 2, NYW succeeded to all of New York Wheel, LLC's rights and claims arising from the Agreement and its negotiation.

485.    Defendants fraudulently induced Developer to enter CAR 1 by knowingly and falsely representing that it would provide the necessary engineering drawings by December 31, 2014 and March 2, 2015.

486.    In fact, the Defendants knew that the DBT could not or would not deliver these engineering drawings until much later.

487.    The Defendants also knew that falsely representing the availability of these engineering drawings would induce Developer to agree to increase the Contract Sum in CAR 1.

488.    Based on the Defendants' representation that the drawings would be provided by December 31, 2014 and March 2, 2015, enabling the parties to continue Work on the Project, Developer agreed in CAR 1 to pay the DBT an additional $13.5 million for the Work.

489.    Defendants fraudulently induced Developer to enter CAR 2 by knowingly and falsely representing that the DBT would provide the engineering drawings needed to build the Pad and Wheel by July 1, 2015.

490.    In fact, the Defendants knew that the DBT could not or would not deliver these engineering drawings until much later.

491.    Defendants also knew that falsely representing the availability of these engineering drawings would induce Developer to agree to increase the Contract Sum in CAR 2.

492.    Based on the Defendants' representation that the drawings would be provided by July 1, 2015, enabling the parties to continue Work on the Project, Developer agreed in CAR 2 to pay the DBT an additional $6.5 million for the Work.

493.     The DBT actually submitted the engineering drawings in April 2016, more than nine months past the CAR 2 extended deadline, delaying the Wheel's completion and causing NYW lost profits.

494.     As a direct and proximate result of the Defendants' false representation regarding the status of the design drawings during the CAR 1 and 2 negotiations, NYW has suffered lost profits and other special damages in an amount to be proven at trial, but no less than $20 million.

495.     In the alternative, NYW is entitled to rescind CAR 1 and CAR 2 to the extent necessary to afford complete relief.

496.     An actual, present, and existing controversy has arisen between NYW and the DBT regarding Defendants' fraudulent inducement of Developer to increase the Contract Sum in CAR 1 and CAR 2.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement and during the transition.

497.     Accordingly, NYW respectfully requests that the Court enter a judgment declaring that Defendantsfraudulently induced Developer to enter into the two amendments to the Agreement, in violation of its obligations under the Agreement and the implied covenant of good faith and fair dealing.

**COUNT 5**
**Failure to Enter into All Required Subcontracts**
**(Against Defendant Mammoet-Starneth LLC)**

498.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

499.     The Agreement is an enforceable contract between NYW and the DBT that contains an implied covenant of good faith and fair dealing.  NYW has performed all of its

material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

500.    Section 2.2 of the Agreement required the DBT to enter into any subcontracts related to the Project.

501.    Section 3.2.1 of the Agreement required the DBT to assign all project subcontracts to NYW upon NYW's termination of the DBT for cause.  This is a material provision of the Agreement because it ensures that NYW can smoothly transition the Work in the event a termination for cause is necessary, as it was here.

502.    Upon information and belief, the DBT intentionally breached its contractual duty to enter into all subcontracts, and instead entered into such subcontracts through the Member Defendants, and potentially through other Mammoet and Starneth entities, for more than two-thirds of the subcontracts necessary to complete the Project.

503.    The DBT thus intentionally attempted to deprive NYW of the benefit of Section 3.2.1, ensuring a smooth and efficient transition in the event of termination for cause, by fraudulently attempting to keep certain contracts out of its scope.

504.    Indeed, as recently as August 16, 2017, the DBT has refused to recognize any duty to assign any subcontracts to which it was not a party, claiming that it can avoid the assignment provision even where it deceptively entered into contracts for the Work through its member entities.

505.    As a direct and proximate result of the DBT's breaches, NYW has suffered damages in an amount to be proven at trial, including damages due to delays in transition, the potential inability to assume all subcontracts at its option, and other damages.

506.     An actual, present and existing controversy has arisen between NYW and the DBT regarding the DBT's failure to enter into all required subcontracts.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement and during the transition.

507.     Accordingly, NYW respectfully requests that the Court enter a judgment declaring that either the DBT is in breach of the Agreement or that the DBT breached the implied covenant of good faith and fair dealing as a result of its failure to enter into all required subcontracts.

## COUNT 6
### Fraudulent Inducement
**(Against Defendant Mammoet-Starneth LLC, the Member Defendants, the BV Defendants, and Defendant MUSA Holding)**

508.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

509.     The Agreement is an enforceable contract between NYW and the DBT that contains an implied covenant of good faith and fair dealing.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

510.     The DBT is a limited liability company comprising only two members: the Member Defendants.

511.     None of the non-DBT Defendants is a party to the Agreement, but they each participated in the negotiation of its terms in addition to the DBT.

512.     Representatives of the non-DBT Defendants, including Chiel Smits of Starneth BV and Michael Schaap of Mammoet BV, also executed the Agreement on the DBT's behalf and were aware of the Agreement's terms.

513.    Section 2.2 of the Agreement requires the DBT, and not any of its members or affiliates, "to cause to be performed and provided through Contractors or its own forces all labor, materials, equipment, tools and services necessary for the Work."

514.    Section 3.2.1 of the Agreement requires the DBT to assign all project subcontracts to NYW upon NYW's termination of the DBT for cause.

515.    The non-DBT Defendants attempted to frustrate the application of Section 3.2.1 by migrating certain subcontracts away from the DBT and entering into those subcontracts on their own.

516.    Defendants fraudulently induced Developer to enter into the Agreement by knowingly and falsely representing that the DBT would enter into all subcontracts related to the Project, as required by Section 2.2 of the Agreement.

517.    During negotiations for the Agreement, specifically the assignment provision, representatives of Defendants requested a specific carve-out for contracts entered into by the Member Defendants.  Defendants represented that the carve out was to exempt the joint venture agreements governing the relationship between Mammoet and Starneth.  Such a request is not unusual in the industry when a joint venture entity, like the DBT, contracts for a construction project because it exempts the contracts pertaining to the joint venture from assignment.  That limited exemption, as requested, was consistent with the purpose of the Agreement because non-assignment of the joint venture documents does not impair Developer's right to salvage the Project should the DBT be unwilling or unable to complete the Project.

518.    When Defendants made the representation regarding the exemption, they knew the representation was false.  Upon information and belief, Defendants knew that they were requesting the exemption so that they could twist the words and intent of the Agreement and

frustrate Developer's right to salvage the Project by improperly causing Defendants' complex web of entities to enter into the Project's many subcontracts, and withholding certain of those subcontracts from Developer during the transition.

519.    NYW relied on these representation when it decided to enter into the Agreement.

520.    In fact, the non-DBT Defendants knowingly entered into over two-thirds of the subcontracts related to this Project.

521.    In August 2017, NYW discovered that non-DBT Defendants had entered into many subcontracts in place of the DBT and in violation of Section 2.2 of the Agreement.

522.    Now, the DBT refuses to assign to NYW any subcontracts to which the DBT is not a party, claiming that only the relevant Mammoet or Starneth entities have the ability to approve these assignments.

523.    Because NYW has no contracts with these non-DBT Defendants as signatories, none of them is plainly contractually obligated to assign any of its subcontracts to NYW.

524.    NYW must therefore re-source and re-negotiate new contracts with two-thirds of the Project subcontractors, further compounding the considerable expense and delay of this transition period.

525.    As a direct and proximate result of Defendants' false representation that the DBT, and not the Member Defendants, would enter into the Project subcontracts that are not joint venture agreements, NYW has suffered damages in an amount to be proven at trial.

526.    Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the Defendants fraudulently induced Developer to enter into the Agreement, in violation of the implied covenant of good faith and fair dealing.

## COUNT 7
### License to Instruments of Service
### (Against Defendant Mammoet-Starneth LLC)

527.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

528.     The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

529.     Under Section 1.6(b) of the Agreement, "[u]pon payment in full for Phase II of the Project," NYW was granted "a nonexclusive, nontransferable, irrevocable (except in accordance with this Section 1.6), perpetual, royalty-free license to use the Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and operating the Project."

530.     In or around May 2015, NYW issued the final payment for Phase II to the DBT.

531.     Under Section 1.6(a) of the Agreement, the Instruments of Service included all "Drawings, the Specifications . . . , all drafts and preliminary versions thereof, all refinements and changes thereto and all plans, opinions, reports, calculations and other work product."

532.     This license remains in force under Section 1.6, because NYW has not "fail[ed] to make any payment in full to Design Build Team which is properly due and payable under this Agreement," NYW has not "terminate[d] Design Build Team's employment under the Agreement for its convenience," and the DBT has not properly "withdraw[n] from this Agreement under Section 13.2 or 13.6."

533.   On August 1, 2017, the DBT's counsel rejected Developer's request for the Instruments of Service, claiming that Developer and Arup needed to first provide the DBT with a list of specific documents, and then the DBT would "determine what documents it will supply."

534.   Therefore, an actual, present and existing controversy has arisen between NYW and the DBT regarding whether NYW is in breach of its obligations under the Agreement.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement and during the transition.

535.   Accordingly, NYW respectfully requests that the Court enter an order of judgment declaring that NYW has an irrevocable, perpetual, royalty-free license to use the Instruments of Service for purposes of constructing, using, maintaining, altering, and operating the Project.

### COUNT 8
### Failure to Provide Access to Books and Records
### (Against Defendant Mammoet-Starneth LLC)

536.   NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

537.   The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

538.   Under Section 3.4.1(b) of the Agreement, the DBT was required to make "on-Site records available for inspection and copying by Developer."

539.   Under Section 17.2 of the Agreement, "[o]n five (5) business days' prior written notice from Developer to the Design Build Team, Developer and its authorized representatives shall be afforded full access to all the Design Build Team's Project-related records required to

support an Application for Payment, Drawings, Specifications, Contracts (excluding economic terms), Change Orders, purchase orders (excluding economic terms), and other similar data, and shall have the right, at Developer's expense, to photocopy such books and records."

540.    On May 15, 2017, Developer requested that the DBT provide access to all "on-Site records" and "all the Design Build Team's Project related records," including the specific documents set forth in Section 17.2 of the Agreement.

541.    Further, Developer requested records reflecting "full and detailed accounts . . . with respect to disputed changes in the Work performance on a cost reimbursable basis pursuant to a Change Order, a Construction Change Directive or a field order" and "a log of all on-Site operations and staffing, minutes of regular progress meetings, and schedules."

542.    On May 19, 2017, Developer reiterated its request to "immediately inspect the books and records enumerated in [its] May 15 letter."

543.     In violation of its obligations under the Agreement, the DBT failed to comply with these requests and repeatedly denied NYW access to the books and records.

544.    Moreover, the DBT has an implied obligation to provide complete access to books and records, subcontracts, payment records, etc. in connection with its duty to assign the subcontracts on termination for cause at Developer's option pursuant to Section 3.2.1 of the Agreement.

545.    The DBT's failure to perform its obligations under these provisions of the Agreement have impeded NYW's ability to assess the progress of work on-Site and slowed the orderly transition of contracts and subcontracts since the termination of the DBT for cause on July 21, 2017.

546.    As a direct and proximate result of the DBT's breach, Developer has suffered

damages in an amount to be proven at trial.

547.    An actual, present and existing controversy has arisen between NYW and the

DBT regarding the DBT's refusal to provide access to project-related records, as required under

the Agreement.  A declaratory judgment will tend to eliminate the need for further legal action

insofar as it will settle the rights and obligations of the parties under the Agreement and during

the transition.

548.    Accordingly, NYW respectfully requests that the Court enter an order of

judgment declaring that NYW is entitled to access and inspect "all the Design Build Team's

Project-related records required to support an Application for Payment, Drawings,

Specifications, Contracts (excluding economic terms), Change Orders, purchase orders," and all

other records covered by Sections 3.4.1 and 17.2 of the Agreement.

### COUNT 9
### Failure to Assign Subcontracts
### (Against Defendant Mammoet-Starneth LLC)

549.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if

fully set forth herein.

550.    The Agreement is an enforceable contract between NYW and the DBT that

contains an implied covenant of good faith and fair dealing.  NYW has performed all of its

material conditions, covenants, and promises, in accordance with the terms and conditions of the

Agreement.

551.    Section 3.2.1 of the Agreement requires the DBT to assign all project subcontracts

to NYW upon NYW's termination of the DBT for cause.

552.    The Agreement also obligates the DBT to cause the Member Defendants to assign to Developer any project subcontracts entered into by the Member Defendants.

553.    The DBT has refused to assign its subcontracts to NYW as required by Section 3.2.1 of the Agreement.

554.    The DBT has also failed to provide sufficient information or transparency to enable NYW to determine whether it wishes to exercise its option to take assignment of the DBT's subcontracts.

555.    The DBT has suspended all of its subcontracts and encouraged its subcontractors to stonewall NYW's attempts to continue work on the Project.

556.    Without the ability to take assignment of all necessary subcontracts, construction and development of the Wheel is stalled indefinitely.

557.    As a direct and proximate result of the DBT's breach of the contract, NYW has suffered lost profits and other damages in an amount to be proven at trial.

558.    An actual, present and existing controversy has arisen between NYW and the DBT regarding the DBT's failure to assign its subcontracts to NYW.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement and during the transition.

559.    Accordingly, NYW respectfully requests that the Court enter an order of judgment declaring that the DBT's refusal to assign all subcontracts to NYW is a violation of Section 3.2.1 of the Agreement, and declaring that the DBT must assign all of its subcontracts to NYW.

**COUNT 10**
**Tortious Interference With Contract**
**(Against the Member Defendants, the BV Defendants, and Defendant MUSA Holding)**

560.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

561.    The Agreement is an enforceable contract between NYW and the DBT that contains an implied covenant of good faith and fair dealing.  NYW has performed all of its material conditions, covenants, and promises, in accordance with the terms and conditions of the Agreement.

562.    Section 2.2 of the Agreement requires the DBT "to cause to be performed and provided through Contractors or its own forces all labor, materials, equipment, tools and services necessary for the Work."

563.    Section 3.2.1 of the Agreement requires the DBT to assign all project subcontracts to which it is a party to NYW upon NYW's termination of the DBT for cause.

564.    Defendants formed the DBT in 2014 specifically to execute the Agreement and carry out Work on the Project.

565.    Defendants were thus well aware of the Agreement and its terms when it was executed by the DBT.

566.    Upon information and belief, Defendants, familiar with these requirements and concerned about their effect in the event of termination, intentionally attempted to frustrate the purpose of Section 3.2.1 and deprive NYW of the benefit of that provision by secretly entering into many subcontracts themselves and perhaps through other entities.

567.     The non-DBT Defendants maliciously and tortiously induced the DBT to breach Section 2.2 of the Agreement by entering into and executing subcontracts with over two-thirds of the Project's subcontractors in the DBT's place.

568.     The Defendants have obtained leverage over NYW and stalled the post-termination transition process by requiring NYW to independently acquire or renegotiate all subcontracts to which the DBT is not a party and which the DBT is not required to assign to NYW under Section 3.2.1 of the Agreement.

569.     As a direct and proximate result of the non-DBT Defendants' tortious interference with the Agreement, NYW has suffered damages in an amount to be proven at trial.

570.     Accordingly, NYW respectfully requests that the Court enter an order of judgment declaring that the non-DBT Defendants tortiously interfered with the Agreement between the DBT and NYW.

## COUNT 11
### Tortious Interference With Contract
**(Against Defendant Mammoet-Starneth LLC, the Member Defendants, the BV Defendants, and Defendant MUSA Holding)**

571.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

572.     In order to finance the Project, in 2015, NYW entered into a Loan Agreement with Highbridge.

573.     In 2016, in response to numerous construction delays and the increased Project costs after CAR 1 and CAR 2, NYW and Highbridge entered into an Amended Loan Agreement.

574.     Defendants were aware of the Loan Agreement and Amended Loan Agreement.

575.     The Amended Loan Agreement included Critical Path Items on which funding depend.  The Critical Path Items, as stated in Exhibit I to the Amended Loan Agreement, were:

commencing leg erection by February 1, 2017, commencing the A-Frame braces erection by August 1, 2017, completing the rim build by January 15, 2018, and commencing capsule installation by March 30, 2018.  Meeting these Critical Path Items required the DBT's performance of its obligations under the Agreement.

576.    When working with Defendants to identify the Critical Path Item deadlines, NYW representatives Jay Anderson, Andrew Ratner, Christopher DeLuca, Rachel Suna, and NYW's attorney, Todd Herbst, repeatedly informed Defendants that these deadlines were critical to securing funding under the Amended Loan Agreement.

577.    Defendants also knew, based on the repeated exhortations and reminders from NYW that NYW was relying on the assurances of Mssrs. de Vries, ten Holter, and Smit during its negotiation and ultimate execution of the Amended Loan Agreement with Highbridge.

578.    Defendants purported to assist NYW in identifying feasible and realistic deadlines for the Critical Path Items, the four construction milestones which NYW was obligated to meet in order to avoid default under Section 12.1(v) of the Amended Loan Agreement.

579.    In order to meet the Critical Path Items laid out in the Construction Schedule, NYW depended on Defendants' commitment to make the DBT diligently and timely complete its Work under the Agreement.

580.    Defendants maliciously and tortiously procured NYW's breach of the Loan Agreement by falsely representing the DBT's ability to meet the Critical Path Item deadlines and then actually failing to cause the DBT to meet them.

581.    Defendants knew in the fall of 2016 when they consulted with NYW to establish the deadlines for the Critical Path Items that the DBT would not be able to meet them.

582.     Indeed, at roughly the same time the DBT, under the control of Defendants, refused to enter into a third amendment to the Agreement, which incorporated the timeline set forth in the Critical Path Items, because Defendants knew that the DBT could not meet them.

583.     Because the Critical Path Item deadlines were not met, the loan was never actually disbursed and NYW received no money from Highbridge.

584.     NYW was forced to pay nearly $40 million to Highbridge in pre-disbursement fees.

585.     As a direct and proximate result of Defendants' tortious interference with the Loan Agreement, NYW has suffered damages in an amount to be proven at trial, but no less than $40 million.

### COUNT 12
### Negligent Misrepresentation
**(Against Defendant Mammoet-Starneth LLC, the Member Defendants, the BV Defendants, and Defendant MUSA Holding)**

586.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

587.     Defendants, as the Project designers and engineers, owe a special duty to NYW because of their unique skills and experience.

588.     Mammoet BV, a parent of the DBT's member, Mammoet Member, holds itself out on its website as being "known for the unique capability of our state-of-the-art equipment," and highlights its ability to "professionally move deadlines forward, improve uptime, and reduce cost."

589.     Starneth BV, the parent of the DBT's other member, Starneth Member, boasts that it "possesses the unique capability to offer a Giant Observation Wheel on a lump sum,

turnkey basis" and that it "know[s] of no other company able to offer this advantage and the expertise to minimize risk, cost and schedule resulting in a financeable project."

590.    In order to finance the Project, in 2015, NYW entered into the Loan Agreement with Highbridge.

591.    In 2016, in response to numerous construction delays and the increased Project costs after CAR 1 and CAR 2, NYW and Highbridge entered into an Amended Loan Agreement.

592.    Defendants were aware of the Loan Agreement and the Amended Loan Agreement.

593.    Defendants also purported to assist NYW in identifying feasible and realistic deadlines for the Critical Path Items, the four construction milestones which NYW was obligated to meet in order to avoid default under Section 12.1(v) of the Amended Loan Agreement.

594.    The Critical Path Items, as stated in Exhibit I to the Amended Loan Agreement, were:  commencing leg erection by February 1, 2017; commencing the A-Frame braces erection by August 1, 2017; completing the rim build by January 15, 2018; and commencing capsule installation by March 30, 2018.  Meeting these Critical Path Items required the DBT's performance of its obligations under the Agreement.

595.    When working with Defendants to identify the Critical Path Item deadlines, NYW representatives Jay Anderson, Andrew Ratner, Christopher DeLuca, Rachel Suna, and NYW's attorney, Todd Herbst, repeatedly informed Defendants that these deadlines were critical to securing funding under the Amended Loan Agreement.  In response, Jelmar de Vries, Pierre ten Holter and Hermann Smit repeatedly assured Developer that the Critical Path Items would be met.

596.    However, at the time, Defendants knew that this representation was false.

597.    It was for this very reason that the DBT did not enter into the third amendment to the Agreement:  Defendants did not want to be bound by milestone dates they knew the DBT would never be able to meet.

598.    Defendants also knew, based on the repeated exhortations and reminders from NYW, that NYW was relying on the assurances of Mssrs. de Vries, ten Holter, and Smit during its negotiation and ultimate execution of the Amended Loan Agreement with Highbridge.

599.    NYW actually relied on these assurances when it entered into the Amended Loan Agreement and would not have executed the Amended Loan Agreement if not for Defendants' assurances that the DBT would meet the Critical Path Item deadlines.

600.    Because the DBT did not meet the Critical Path Item deadlines, NYW was in default under the Amended Loan Agreement and the loan funds were never disbursed.

601.    NYW was ultimately forced to pay nearly $40 million to Highbridge in pre-disbursement fees.

602.    As a direct and proximate result of  Defendants' false and misleading representations about the status of the Project and the DBT's ability to meet the Critical Path Item deadlines, NYW has suffered damages in an amount to be proven at trial, but no less than $40 million.

## COUNT 13
## Alter Ego Liability/Misuse of Corporate Form
### (Against Defendant Mammoet BV)

603.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

604.    Mammoet BV exercised complete domination and control over the DBT.

605.     Throughout Mammoet BV's involvement in the Project, it provided employees used by the DBT who served non-DBT Defendants' interests, not the DBT's.

606.     At all relevant times, the DBT acted as the alter ego or an instrumentality of Mammoet BV, and had no real legal independence or significance apart from Mammoet BV.

607.     In Counts 1–12 above, Mammoet BV, using its complete control and domination of the DBT, was the actual party causing the breach or committing the tortious acts.

608.     By manipulating and abusing the corporate structure of the DBT, so as to harm and exploit Developer and render the DBT judgment proof and thereby avoid liability for the DBT's obligations under the Agreement, Mammoet BV has imposed an injustice on Developer.

609.     Therefore, upon information and belief, Mammoet-Starneth LLC, or the DBT, is an alter ego and mere instrumentality of Mammoet BV.

610.     Accordingly, Mammoet BV is liable for the full amount of the DBT's obligations to Developer under the Agreement and at common law.

## COUNT 14
### Alter Ego Liability/Misuse of Corporate Form
**(Against Defendant Starneth BV)**

611.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

612.     Starneth BV exercised complete domination and control over the DBT.

613.     In Counts 1–12 above, Starneth BV, using its complete control and domination of the DBT, was the actual party causing the breach or committing the tortious acts.

614.     By manipulating and abusing the corporate structure of the DBT, so as to harm and exploit Developer and render the DBT judgment proof and thereby avoid liability for the DBT's obligations under the Agreement, Starneth BV has imposed an injustice on Developer.

615.     Therefore, upon information and belief, Mammoet-Starneth LLC, or the DBT, is an alter ego and mere instrumentality of Starneth BV.

616.     Accordingly, Starneth BV is liable for the full amount of the DBT's obligations to Developer under the Agreement and at common law.

## COUNT 15
### Alter Ego Liability/Misuse of Corporate Form
### (Against Defendant MUSA Holding)

617.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

618.     MUSA Holding exercised complete domination and control over the DBT.

619.     In Counts 1–12 above, MUSA Holding, using its complete control and domination of the DBT, was the actual party causing the breach or committing the tortious acts.

620.     By manipulating and abusing the corporate structure of the DBT, so as to harm and exploit Developer and render the DBT judgment proof and thereby avoid liability for the DBT's obligations under the Agreement, MUSA Holding has imposed an injustice on Developer.

621.     Therefore, upon information and belief, Mammoet-Starneth LLC, or the DBT, is an alter ego and mere instrumentality of MUSA Holding.

622.     Accordingly, MUSA Holding is liable for the full amount of the DBT's obligations to Developer under the Agreement and at common law.

## COUNT 16
### Alter Ego Liability/Misuse of Corporate Form
### (Against Defendant Mammoet Member)

623.     NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

624.     Mammoet Member exercised complete domination and control over the DBT.

625.    In Counts 1–12 above, Mammoet Member, using its complete control and domination of the DBT, was the actual party causing the breach or committing the tortious acts.

626.    By manipulating and abusing the corporate structure of the DBT, so as to harm and exploit Developer and render the DBT judgment proof and thereby avoid liability for the DBT's obligations under the Agreement, Mammoet Member has imposed an injustice on Developer.

627.    Therefore, upon information and belief, Mammoet-Starneth LLC, or the DBT, is an alter ego and mere instrumentality of Mammoet Member.

628.    Accordingly, Mammoet Member is liable for the full amount of the DBT's obligations to Developer under the Agreement and at common law.

## COUNT 17
## Alter Ego Liability/Misuse of Corporate Form
### (Against Defendant Starneth Member)

629.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

630.    Starneth Member exercised complete domination and control over the DBT.

631.    In Counts 1–12 above, Starneth Member, using its complete control and domination of the DBT, was the actual party causing the breach or committing the tortious acts.

632.    By manipulating and abusing the corporate structure of the DBT, so as to harm and exploit Developer and render the DBT judgment proof and thereby avoid liability for the DBT's obligations under the Agreement, Starneth Member has imposed an injustice on Developer.

633.    Therefore, upon information and belief, Mammoet-Starneth LLC, or the DBT, is an alter ego and mere instrumentality of Starneth Member.

634.    Accordingly, Starneth Member is liable for the full amount of the DBT's obligations to Developer under the Agreement and at common law.

**COUNT 18**
**No Damages for Site Turnover Delay**
**(Against Defendant Mammoet-Starneth LLC)**

635.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

636.    Section 5.2(c) of the Agreement provides for delay damages and penalties in the event that NYW did not turn over the Site by March 15, 2016 (the "Site Turnover Outside Date").

637.    However, the DBT's delays in delivering engineering drawings prevented NYW from completing the Pad and turning over the Site.

638.    Delivery of these engineering drawings, and the subsequent allowance of 8.5 months for Pad completion and Site Turnover, are conditions precedent to the Agreement's Site Turnover Outside Date.

639.    As a result of the DBT's refusal to deliver these engineering drawings before April 29, 2016, any liability for failure to turn over the Site was postponed until approximately January 13, 2017.

640.    NYW turned over the Site prior to January 13, 2017.

641.    Even if NYW had failed to turn over the Site for some period of time beyond January 13, 2017, the DBT has been in material breach of the Agreement since before that delay and has not suffered any harm from such delay.

642.    Moreover, the DBT's quantification of damages and penalties is unsupported by the Agreement.

643. An actual, present, and existing controversy has arisen between NYW and the DBT regarding the DBT's claim for delay damages and penalties under Section 5.2(c). A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement and during the transition.

644. Accordingly, NYW respectfully requests that the Court enter a judgment declaring that the DBT is not entitled to any damages or penalties for Site Turnover delay.

### COUNT 19
### No Progress Payments Owed
### (Against Defendant Mammoet-Starneth LLC)

645. NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

646. The Agreement is an enforceable contract between NYW and the DBT. NYW has performed all of its material conditions, covenants, and promises in accordance with the terms and conditions of the Agreement.

647. The DBT has neither properly engaged in the Phase III progress payment reconciliation process nor submitted a certified, final AFP since AFP 12, as required by both the Agreement and the contractual—and industry standard—AIA Form G-702.

648. As a result, Developer has neither the duty, nor the physical capability, to issue a Certificate of Payment for AFPs 13 onward.

649. Nor does Developer have the duty to issue further reasons for withholding certification beyond the reasons already provided.

650. Nevertheless, Developer tendered to the DBT the undisputed amounts contained in AFPs 13 through 20, to the best of its ability to determine them, given the DBT's refusal to engage in the process or provide adequate documentation.

651.    The DBT returned the payment, despite conceding in open court that such payment would cure any alleged payment default it had alleged, and even though the DBT would have retained all of its rights and purported claims if it had accepted the payment.

652.    Developer terminated the DBT for cause, and Section 13.4 of the Agreement provides that "the Design Build team shall not be entitled to receive any further payment for Work performed by the Design Build Team through the date of termination."

653.    On July 11, 2017, Developer's notified the DBT that Developer was terminating the DBT for cause.

654.    Developer also wired the DBT the undisputed amounts that would have been owed under AFPs 13–20, had the DBT submitted properly certified and final Applications for Payment, but the DBT returned those funds to Developer by check, although it had conceded in open court that such a payment would constitute a cure of any purported payment default by Developer, and although Developer made the payment without prejudice to either party's rights under the Agreement.

655.    Developer's termination of the DBT for cause was effective as of July 21, 2017, but the DBT nevertheless itself purported to "withdraw" from the Agreement on July 20, 2017, based on Developer's alleged non-payment of amounts due and owing under AFPs 13–16, which default never existed, and if it had, was cured by Developer's tender of the $7.2 million payment.

656.    Developer therefore has no obligation to respond to or pay any amount contained in AFPs 13 through 23, or any subsequent AFP.

657.    An actual, present, and existing controversy has arisen between NYW and the DBT regarding the DBT's entitlement to progress payments under AFPs 13 through 23 and beyond.  A declaratory judgment will tend to eliminate the need for further legal action insofar as

it will settle the rights and obligations of the parties under the Agreement and during the transition.

658.    Accordingly, Developer respectfully requests that the Court enter a judgment declaring that the DBT is not entitled to any progress payments under AFPs 13 through 23 and beyond.

### COUNT 20
### No Breach
### (Against Defendant Mammoet-Starneth LLC)

659.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

660.    The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises in accordance with the terms and conditions of the Agreement.

661.    The DBT has repeatedly alleged that NYW is in breach of its obligations under the Agreement.

662.    The DBT has alleged that NYW has failed to issue Certificates of Payment pursuant to Article X of the Agreement.

663.    The DBT attempted to justify its improper suspension of performance on May 26, 2017 by arguing that NYW's alleged failure to pay AFPs 13–16 entitled the DBT to suspend performance pursuant to Section 13.3 of the Agreement.

664.    NYW has performed its obligations and issued payment on all amounts due under the Agreement and was never in default of any payment obligation, despite the DBT's allegations.  Indeed, even though it was never in such default, Developer offered and did pay approximately $7.2 million to the DBT on or about July 11, 2017, in satisfaction of undisputed

sums Developer determined, to the best of its ability, would have been owed under AFPs 13–20, had the DBT properly reconciled and certified those AFPs.  The DBT itself conceded in open court that such a payment would cure any alleged payment default and remove any alleged right of the DBT to suspend performance or withdraw from the Agreement.  The DBT returned these funds, but its rejection of this cure has no legal effect.  The DBT then purported to withdraw from the parties' Agreement on or about July 20, 2017.  But the DBT had no right to withdraw because Developer was not in breach, or if it were in breach, it had cured any breach.

665.    An actual, present, and existing controversy has arisen between NYW and the DBT regarding whether NYW is in breach of its obligations under the Agreement.  A declaratory judgment will tend to eliminate the need for further legal action insofar as it will settle the rights and obligations of the parties under the Agreement and during the transition.

666.    Accordingly, NYW respectfully requests that the Court enter an order of judgment declaring that NYW is not in breach of its obligations under the Agreement.

**COUNT 21**
**No Termination Fees Owed**
**(Against Defendant Mammoet-Starneth LLC)**

667.    NYW repeats the allegations contained in Paragraphs 1 through 456 above as if fully set forth herein.

668.    The Agreement is an enforceable contract between NYW and the DBT.  NYW has performed all of its material conditions, covenants, and promises in accordance with the terms and conditions of the Agreement.

669.    NYW has performed its obligations and issued payment on all amounts due under the Agreement and was never in default of any payment obligation, despite the DBT's allegations.  Indeed, even though it was never in such default, Developer offered and did pay

approximately $7.2 million to the DBT on or about July 11, 2017, in satisfaction of undisputed

sums Developer determined, to the best of its ability, would have been owed under AFPs 13-20,

had the DBT properly reconciled and certified those AFPs.  The DBT itself conceded in open

court that such a payment would cure any alleged payment default and remove any alleged right

of the DBT to suspend performance or withdraw from the Agreement.  The DBT returned these

funds, but its rejection of this cure has no legal effect.  The DBT then purported to withdraw

from the parties' Agreement on or about July 20, 2017, and claims it is owed a termination fee

and various other sums under the Agreement as a result of this withdrawal.  But the DBT had no

right to withdraw because Developer was not in breach, or if it were in breach, it had cured any

breach.

670.    An actual, present, and existing controversy has thus arisen between Developer

and the DBT regarding whether NYW is obligated to pay the DBT a Termination Fee, as defined

by the Agreement.  A declaratory judgment will tend to eliminate the need for further legal

action insofar as it will settle the rights and obligations of the parties under the Agreement and

during the transition.

671.    Accordingly, Developer respectfully requests that the Court enter an order of

judgment declaring that Developer is not required to pay a Termination Fee of any amount to the

DBT pursuant to the Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in

Plaintiff's favor and against Defendants, consisting of:

a) Injunctive relief requiring the DBT, Member Defendants, BV Defendants, and MUSA Holding to facilitate the transition of the Project including all reasonable measures and steps ancillary to and necessary for such transition, including assignment of all subcontracts related to the Project, complete turnover of all Project books and records, and delivery of all partial and completed Instruments of Service;

b) A declaration that NYW was entitled to terminate the employment of the DBT for cause pursuant to Section 13.4 of the Agreement;

c) A declaration that the DBT is in breach of the Agreement for its failure to meet the Substantial Completion Date;

d) A declaration that the DBT is in breach of Section 2.2 of the Agreement and the covenant of good faith and fair dealing;

e) A declaration that the non-DBT Defendants tortiously interfered with the Agreement by inducing the DBT to improperly allocate subcontracts to Member Defendants and potentially others, in violation of Section 2.2;

f) A declaration that NYW has a license to the Instruments of Service;

g) A declaration that NYW is entitled to access and inspect the DBT's books and records related to this Project;

h) A declaration that the DBT is in breach of the assignment provision of Section 3.2.1 of the Agreement and the covenant of good faith and fair dealing;

i) A declaration that Defendants tortiously interfered with the Loan Agreement and Amended Loan Agreement by maliciously inducing NYW to breach milestone covenants;

j) A declaration that the Member Defendants, as parties to the joint venture agreement establishing the DBT, are jointly and severally liable for all of the DBT's obligations and liabilities, including any damages resulting from the claims in this Second Amended Complaint.

k) A declaration that the non-DBT Defendants as the parent entities exerting control and domination over the DBT, are liable for any and all liabilities of the Member Defendants and the DBT, including the full amount of the judgment entered against the Member Defendants and the DBT.

l) A declaration that NYW does not owe damages for Site Turnover delay;

m) A declaration that NYW does not owe any further Progress Payments;

n) A declaration that NYW is not in breach of the Agreement;

o) A declaration that NYW is not required to pay a Termination Fee under the Agreement;

p) An award of money damages, together with interest thereon, to compensate NYW for Defendants' various contract breaches and tortious acts, and their unjust enrichment at NYW's expense;

q) An award of NYW's costs; and

r) Such other and further relief as this Court deems fit and proper.


### JURY TRIAL DEMANDED

Dated:   New York, New York
         November 28, 2017

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ Randy M. Mastro
     Randy M. Mastro
     Anne Champion
     Paul J. Kremer

200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff*