## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

NEW YORK WHEEL OWNER LLC and NEW YORK METROPOLITAN REGIONAL CENTER, L.P. II, ,

         Plaintiffs,

    v.

MAMMOET HOLDING B.V., STARNETH B.V., MAMMOET USA HOLDING, INC., MAMMOET USA NORTH, INC. and STARNETH LLC.,

         Defendants.

Case No. 17-cv-4026-JMF

---

MAMMOET USA NORTH, INC.,

         Counterclaim Plaintiff,

v.

NEW YORK WHEEL OWNER LLC,

         Counterclaim Defendant.

---

MAMMOET USA NORTH, INC.,

         Third-Party Plaintiff,

v.

THE CITY OF NEW YORK,

         Third-Party Defendant.

---

## DEFENDANT/THIRD-PARTY PLAINTIFF MAMMOET USA NORTH INC.'S AMENDED THIRD-PARTY COMPLAINT AND COUNTERCLAIMS

Defendant/Third-Party Plaintiff Mammoet USA North, Inc. (MUSA), as and for its Amended Third-Party Claims against Third-Party Defendant the City of New York (the "City") and Counterclaims against Plaintiff New York Wheel Owner LLC ("NYW"), alleges as follows:

## NATURE OF THE ACTION

1.      This dispute arises out of the lawful withdrawal, by Mammoet-Starneth, LLC (the "Design Build Team" or "DBA") from a Design Build Agreement, dated as of March 5, 2014, as amended (the "DBA"), between the DBT and NYW's predecessor,[1] for the design and construction of a 625-foot tall giant observation wheel ("the Wheel") on Staten Island on land leased to NYW by the City (the "Project"), and NYW's wrongful termination of  that Agreement.  MUSA asserts the claims herein as assignee of the DBT.

2.      Situated next to the Staten Island ferry terminal in St. George and overlooking New York Harbor, the Wheel, according to NYW, was to be just one part of a "privately managed ... $1.3 billion development project." But NYW's actions, including its multiple contractual breaches and defaults during the course of the Project that culminated with its failure to pay the DBT since November 2016 for the work it performed, left the DBT with no option other than to withdraw from the DBA pursuant to Section 13.3 of the DBA.

3.      At the time the DBT set in motion its eventual withdrawal from the DBA by suspending performance in May 2017, the DBT had worked for six months without pay, resulting in more than $32 million in outstanding payments.

4.      Moreover, because NYW had failed to obtain the required undertaking under the New York Lien Law that would have secured the DBT's right to prompt payment, and because the City had

---

[1] Because NYW succeeded to the rights and obligations of its predecessor, reference will hereinafter be made to NYW only, irrespective of whether particular actions were taken by NYW's predecessor or NYW.

failed to require NYW to do so, the DBT had no viable alternative means to compel NYW to make prompt payment other than suspending performance and threatening withdrawal.

5.     Rather than cure its payment (and other) defaults to avoid that fate, NYW sought to enjoin the DBT from suspending performance or withdrawing from the DBA. When that effort failed -- and with the DBT's withdrawal from the DBA, along with NYW's contractual obligation to pay tens of millions of dollars in damages, imminent -- NYW fired what it apparently thought would be a preemptive strike. On July 11, 2017, before the agreed cure period on its defaults expired, NYW sent the DBT notice that it was terminating the DBA for cause in ten days' time. NYW's alleged termination for cause lacked merit and, in the face of the DBT's lawful withdrawal and NYW's prior defaults, was a nullity.

6.     Contrary to the tale NYW spins in its Third Amended Complaint ("TAC") -- and the tales it spun in its Complaint, Amended Complaint and Second Amended Complaint -- NYW, and not the DBT, was the party responsible for the problems and delays encountered on the Project and its ultimate demise, and NYW, not the DBT, was the party that defaulted on its contractual obligations.

7.     NYW claims that its only responsibilities were to supply the Pad and make payments. In reality, NYW had far more obligations, and its failure to recognize as much goes a long way towards explaining why the Project ended the way it did. Indeed, NYW's refusal to acknowledge its contractual obligations, coupled with the fact that NYW never invested the time or money to properly and adequately supervise, manage or finance the Project, doomed the Project from the outset.

8.     NYW structured the Project, and the broader Development, such that it would retain responsibility for several scopes of work upon which the DBT's design, procurement and construction of the Wheel depended. Specifically, Section 1.3 of the DBA provided that: "[t]he performance by the Design Build Team of its obligations under this Agreement and the other Design Build Documents

shall be conditioned to the extent necessary upon Developer and Developer's Contractors performing their respective related obligations arising out of or in respect of the Project, the Pad, the Terminal Building and all other portions of the Development."

9.      Accordingly, unlike many design-build agreements, the performance of the DBT's obligations under the DBA was expressly conditioned upon NYW and its separate contractors performing their own contractual obligations. NYW and its contractors repeatedly failed to do so, to the DBT's detriment. Among other things:

  a.      NYW supplied a construction site with insufficient ground bearing capacity to support the construction of the Wheel, causing substantial delays and costs including the engagement of subcontractors to perform a complete re-design and re-engineering of the Wheel and the DBT's erection plan.

  b.      NYW supplied a permanent foundation for the Wheel that was inconsistent, unequal and excessive in its lateral stiffness, causing substantial delays and requiring the DBT to engage subcontractors to perform additional re-design and re-engineering activities to verify the ability of the Wheel to cope with the actual lateral stiffness of the foundations NYW provided.

  c.      NYW failed to secure a building permit for the construction of the Wheel, as required by the DBA, delaying the Project, causing the DBT to incur additional costs and preventing the DBT from ever being in the position to commence construction.

  d.      NYW interfered with the DBT's work by imposing onerous testing and inspection standards on fabricated works that differed from those provided for in the

Agreed Design Codes (defined herein), resulting in significant delays and increased costs.

e.      NYW failed to provide the DBT with full Site Turnover by the contractual March 15, 2016 deadline (the "Outside Site Turnover Date" or "OSTD") and failed to pay the agreed damages for missing that deadline, despite requiring the DBT to mobilize its cranes on the Site.

f.      NYW poorly supervised the Project, failed to coordinate and integrate the work of its other contractors with the work of the DBT, and failed to develop and implement an integrated and organized Project plan.

10.     Each of these, and other, breaches individually and collectively, had a material impact on the Project and caused significant damages to the DBT.  But the rapidly deteriorating situation came to a head when at the end of 2016 NYW ceased making any payments to the DBT, without justification and contrary to the express terms of the DBA.

11.     Despite the DBT having complied with its obligation to provide monthly Applications for Payment ("AFPs") that contained a detailed accounting of the progress of work, along with back-up documentation, beginning with AFP 13 which was submitted on October 15, 2016, NYW steadfastly refused to honor its payment obligations, manufacturing excuses intended to justify nonpayment.

12.     Specifically, NYW advanced an untenable interpretation of the payment provisions in the DBA, claiming, without merit, that it had no obligation to certify any amount for payment unless and until the DBT reached complete agreement with NYW on the amount due for each invoice, thereby unilaterally imposing conditions to payment of, and obligations on, the DBT that did not exist under the DBA.

13.     In addition to ceasing payments, in January 2017, NYW also sought to take back forcibly $5.4 million in monies it claimed to have overpaid to the DBT by refusing to issue Certificates for Payment unless the DBT conceded NYW's right to recoup these monies. NYW's overpayment claim was contrary to the terms of the DBA and the Schedule of Values upon which NYW's payments to the DBT were based.

14.     NYW ignored the DBT's numerous and repeated demands that NYW comply with its obligations, including the payment of undisputed amounts in progress payments and the payment of monies NYW had expressly agreed to pay as a result of its failure to achieve full Site Turnover by March 15, 2016.

15.     In January and February 2017, the DBT served default notices arising out of these payment defaults and other prior defaults, but NYW refused to cure them.

16.     Then, on May 10, 2017, after working for six months without pay, the DBT served one final default notice and confirmed that it would exercise its right to suspend performance (and eventually withdraw from the DBA) under Sections 10.3 and 13.3 of the DBA should NYW fail to cure its various payment (and other) defaults. The DBT subsequently suspended performance on May 26, 2017 and, after the expiration of an agreed extension to the contractual cure period, on July 20, 2017 formally withdrew from the DBA (subject only to the rights of the City or NYW's lenders to cure NYW's defaults within 30 days) because NYW never cured its defaults.

17.     Rather than cure the outstanding defaults, NYW tried to prevent the DBT from exercising its contractual rights. On May 30, 2017 NYW attempted to temporarily restrain and preliminarily enjoin the DBT from suspending work and/or withdrawing from the DBA, claiming it would be irreparably harmed by the DBT exercising its contractual rights because no other contractor could complete the Wheel.

18.     Then, after the Court denied NYW's request for a temporary restraining order, but before the Court issued a ruling on its request for a preliminary injunction, NYW reversed course. In stark contrast to its position before this Court that the DBT should not be allowed to cease performance because no substitute contractors could be found, on July 11, 2017 NYW served the DBT with a so-called Notice of Termination for Cause that both purported to terminate the DBA for cause and revealed that NYW had, in fact, found an alternative means to build the Wheel -- using American Bridge Co. ("American Bridge"). (*See* https://therealdeal.com/2017/08/14/maybe-the-new-york-wheel-isnt-dead-after-all/).

19.     Like the manufactured payment disputes of late 2016 and 2017, NYW's dire claim that the DBT was the only contractor that could complete the Wheel was a sham. American Bridge was an original bidder on the Project and the DBT discovered that a mere two weeks after NYW made those representations to the Court, NYW had an American Bridge representative, John Callaghan, arrange in-person visits with MUSA and DBT subcontractors while claiming to be a representative of Broadwall Consulting Services -- the real estate development and consulting firm allegedly hired by NYW to manage the Project.

20.     Although Mr. Callaghan was an American Bridge employee with an American Bridge email address, he used a "hotmail.com" email address for communications relating to the DBT prior to NYW's disclosure of American Bridge as the planned completion contractor.

21.     Apparently, NYW at the time concluded that it would be able to use American Bridge as a replacement contractor and thus decided it was better to purport to terminate the DBA -- even though it had no legitimate grounds to do so -- than either cure its default or allow the Court to adjudicate its injunction application.  (Ultimately, however, NYW was unable to secure financing to pay American Bridge to complete the Project, resigned itself to the reality that the Project was not

financially viable, and in October 2018 issued a press release announcing that the Project would never be built.)

22.     NYW's purported Notice of Termination alluded to a number of alleged defaults that were factually and contractually groundless, as evidenced by NYW's failure to provide the DBT with a prior notice of default, or opportunity to cure, with respect to any of the breaches alleged in the purported Notice of Termination. Accordingly, NYW's purported Notice of Termination was null and void, and itself a breach of the DBA.

23.     In addition to sending a Notice of Termination for Cause, on July 11, 2017, NYW also wired the DBT $7.2 million in a false attempt to cure its payment default. That unilateral payment, however, was nothing more than a ruse to get the DBT to waive claims. It was accompanied by an email stating that the $7.2 million payment "is made and accepted in full satisfaction of amounts owed" on AFPs 13-20, which, of course, sought amounts far in excess of $7.2 million. The DBT immediately rejected the money and NYW's attempt to effectuate a waiver of the disputed amounts on those eight payment applications through an accord and satisfaction. NYW never resent the monies unconditionally.

24.     Finally, that same day (July 11, 2017) NYW sent letters to a number of the DBT's subcontractors advising that it had notified the DBT that it was terminating the DBA.

25.     Notwithstanding NYW's attempt to undermine the DBT's contractual right to withdraw from the DBA and deny the DBT its contractual remedies under Section 13.3 of the DBA, on July 20, 2017 the DBT notified NYW that is was withdrawing from the DBA pursuant to Section 13.3 of the DBA (subject only to the rights of the City or NYW's lenders to cure NYW's defaults within 30 days) because NYW never cured the defaults identified in the DBT's May 10, 2017 Notice of Default and prior Notices. The DBT suspended its various subcontracts, but it refrained from terminating them for a

period of 60 days at NYW's request in an effort to mitigate damages and facilitate NYW's then-stated desire to transition the Project to American Bridge. The DBT did so under a reservation of rights and incurred additional costs in the process.

26.     Neither the City nor any of NYW's lenders, including Plaintiff New York Regional Center, L.P. II,  exercised the right to cure NYW's default within 30 days of the DBT's withdrawal.

27.     Thereafter, on August 25, 2017, the DBT advised NYW that its withdrawal was "now effective," and made a formal Payment Demand for the amounts due and owing under DBA Section 13.3, namely its Work Costs, Demobilization Costs, Retainage, and the Proportionate Termination Fee, as each of those terms is defined in Section 13.1 of the DBA, as well as its actual damages, all of which NYW was obligated to pay pursuant to Section 13.3 of the DBA upon the DBT's withdrawal. The DBT calculated its Section 13.3 damages to be at least $82,000,000, and likely more.

28.     NYW refused to pay a dime -- another contractual breach.

29.     Through the amended Third-Party Complaint herein (included in Count One), MUSA, as assignee of the DBT, seeks to recover damages from the City incurred by the DBT as a result of the City's failure to require NYW to post adequate security to pay for the DBT's work as required under Section 5 of the New York Lien Law.

30.     Through the Counterclaims herein, MUSA, as assignee of the DBT, seeks, among other things, to hold NYW liable for the damages the DBT was entitled to receive as a result of its lawful withdrawal from the DBA pursuant to Section 13.3 and, to the extent not otherwise recovered under Section 13.3, to recover amounts due and owing under AFPs 13 through 23 and damages the DBT suffered as a result of NYW myriad breaches of its obligations under the DBA, as well as those arising out of NYW's wrongful termination of the DBA in the event the DBT's withdrawal under section 13.3(a) were for some reason deemed ineffective.  The Counterclaims also seek (a) recovery for the

damages suffered by the DBT as a result of NYW's own failure to post the security required by Section 5 of the New York Lien Law and (b) in the event it is held that NYW validly terminated the DBA under Section 13.4 of the DBA (which MUSA denies), damages, in the alternative, consisting of the amount that would then be due and owing to the DBA pursuant to said Section.

## THE PARTIES

31.     Defendant/Counterclaimant/Third-Party Plaintiff MUSA is a Delaware corporation with a principal place of business in California.  Following the DBT's filing for bankruptcy in December 2017 (*see In re Mammoet-Starneth, LLC*., Case. No. 17-12925-LSS (D. Del. 2017)), MUSA became owner, by assignment, of all claims asserted herein.

32.     According to the allegations of the TAC, Plaintiff/Counter-Defendant NYW is a Delaware limited liability corporation with members that are citizens of New York and New Jersey.

33.     Third-party Defendant the City is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because this is an action between citizens of different states and the amount in controversy exceeds $75,000.

35.     This Court has personal jurisdiction over NYW because NYW consented to the jurisdiction of the United States District Court for the Southern District of New York in Section 19.2.6 of the DBA and because NYW transacts business in New York.

36.     This Court has personal jurisdiction over the City because it is a municipal corporation formed and incorporated under the law of New York.

37.     Venue is properly laid in this Court because NYW agreed to this venue in Section

19.2.6 of the DBA and the City resides in this District.

## FACTUAL ALLEGATIONS

### A.     NYW And The DBT Enter Into The DBA To Design And Build A Giant Observation Wheel on Staten Island

38.     On March 5, 2014, NYW entered into the DBA with the DBT to design, procure,

fabricate, construct and commission the Wheel.

39.     The Wheel was just one part of a larger redevelopment project (the "Development").

The DBT's scope of work was limited to the design, procurement and construction of the Wheel; all

other aspects of the Development other than the Wheel (collectively, the "Balance of the

Development") were the responsibility of NYW and its separate contractors.

40.     The Balance of the Development for which NYW was responsible included, among

other things, all temporary foundations and crane supports, the permanent foundations and Pad to

which the Wheel was connected, the operations and control center for the Wheel, the embeds, and the

Wheel boarding/loading platform, including all temporary and final electrical infrastructure and data

transmission systems for its security systems.

41.     NYW selected the site for the Wheel. It was to be built on a plot of land leased from the

City situated on the northern shore of Staten Island, next to the St. George Ferry Terminal and the

ballpark for the Staten Island Yankees, and overlooking the New York Harbor.

42.     Although NYW contends in the TAC that it only had the obligations to supply the Pad,

perform the Balance of Development and pay DBT invoices, the plain language of the DBA confirms

that NYW had a number of important obligations critical to the success of the Project. Indeed,

pursuant to Section 1.3 of the DBA, the DBT's performance of its obligations were expressly

conditioned on NYW "performing [its] ... related obligations arising out of or in respect of the Project,

11

the Pad, the Terminal Building and all other portions of the Development." Among other things, NYW

was responsible for:

       a.     Furnishing all surveys and information describing the Project site's

physical characteristics, subsurface conditions, and soil reports, upon which the

DBT could rely in connection with its design and construction of the Wheel.

       b.     Providing a site suitable for construction of a Wheel consistent with

the Technical Specification SN 183/36 that was attached as Exhibit B to the DBA

("Project Criteria") and the DBT's Load and Power Criteria (including, but not

limited to, applicable ground bearing pressures), as that term is defined in the DBA.

       c.     Securing and paying for all necessary permits, approvals, easements,

licenses, assessments and charges required for the construction, use or occupancy

of the permanent structures, including the building or other similar permit required

by the New York City Department of Buildings ("DOB").

       d.     Supplying (including the design and construction of) all temporary

foundations and crane supports, the permanent foundation and Pad for the Wheel, the

Terminal Building, the boarding/loading platform and the operations and controls

center.

       e.     Furnishing any required auditing or independent testing services.

       f.     Integrating and coordinating the DBT's scope of work with those of

other contractors performing work for the Balance of the Development, and

providing suitable project management personnel to do so.

       g.     Achieving full Site Turnover by March 15, 2016, the OSTD.

      h.      Issuing Change Orders to increase the Contract Sum or Contract Time when changes to the DBT's scope of work, or other circumstances detailed in the DBA, warranted it.

      i.      Making timely progress payments in accordance with Article 10 of the DBA.

      j.      Otherwise discharging its contractual obligations in good faith and in a manner that does not deprive the DBT of the benefit of its bargain.

43.      In addition to these contractual obligations, under Section 5 of the New York Lien Law, NYW was required to post, or cause to be posted, a bond or other form of undertaking guaranteeing prompt payment of the moneys due to the DBT, and the City's chief financial officer was obligated to require NYW to post or cause to be posted such bond or other form of undertaking.

44.      During the course of the Project, NYW and the DBT entered into two amendments to the DBA and, as discussed below, failed to enter into a third amendment. The parties executed the First Amendment to the Design Build Agreement, known as "CAR 1," which increased the original Contract Sum of $145 million to $158.5 million, on December 11, 2014. Five months later, on May 18, 2015, the parties executed the Second Amendment to the Design Build Agreement, known as "CAR 2," which increased the Contract Sum to $165 million.

45.      In addition to increasing the Contract Sum, with each amendment, the parties agreed to extend the Substantial Completion Date, which is listed as May 15, 2017 in CAR 2, although the actual date was much later as a result of time extensions deemed to apply under the express terms of the DBA and its amendments as a result of NYW's breaches.

**B.    NYW Repeatedly Breaches its Contractual Obligation During the Project.**

46.     Since nearly its inception the Project suffered setback and delays, most of which were attributable to NYW failing to meet its contractual obligations as well as its failure to supply adequate financial resources and staff to supervise this complex structural engineering Project.

47.     Each of NYW's breaches impeded the DBT's ability to perform its work, resulted in delay and extra work, and caused the DBT to incur costs far in excess of what it should have incurred in the process.

### 1.     *NYW Breaches Its Obligation to Supply a Site and Crane Foundations that Could Support the Construction of the Wheel*

48.     Pursuant to Sections 1.2, 2.1 and 4.8 of the DBA and Exhibit B (§2.2) thereto, among others, NYW was obligated to provide a Project site and foundations (both temporary crane and work foundations), all of which were part of the Balance of Development as that term is defined in the DBA, suitable for the construction and operation of the Wheel, based on the Project Criteria set forth in Exhibit B of the DBA and the Load and Power Criteria (as defined in Section 1.2 of the DBA) provided by the DBT.

49.     Pursuant to Section 2.1 of the DBA, NYW was also obligated to provide the temporary foundations detailed in Exhibit R to the DBA and confirmed in the Project Criteria, including the foundations necessary for "crane support."

50.     Finally, Developer was also required to provide DBT with all information describing the Site's physical characteristics, subsurface conditions and soil reports, and DBT was entitled to rely upon the accuracy, completeness and sufficiency of such information (absent patent, readily inferable, error), as provided in Section 4.2 of the DBA.

51.     NWY's compliance with its obligations regarding the site and foundations were critical to the DBT's performance of its Work, as the DBT's entire design, procurement and construction plan

depended on both temporary and permanent foundations sufficient to support the lifting and installation of the heavy Wheel components that were provided for in the concept design.

52.     In particular, similar to the Dubai wheel project, the initial Wheel design and erection plan called for the erection of four legs (each in one piece), which would then be connected at their top end with pre-fabricated, 1,500 ton, A-frame braces, hubs, spindle and bearings.

53.     The DBT relied upon NYW to fulfill its contractual obligations with respect to the site and foundations, as it was necessary that the soil possess sufficient ground bearing capacity to sustain the pressures imposed by both the Wheel and the lifting of heavy components with cranes during the planned erection process.

54.     In November 2014, however, the DBT learned that the site supplied by NYW lacked adequate foundational support, as the soil at the Wheel construction site, particularly where the DBT's cranes would be situated, lacked sufficient ground bearing capacity for the DBT's planned design and construction of the Wheel.

55.     Had the DBT attempted to proceed with its original plan with the site and foundation conditions provided by NYW, there was a material risk that its crane and equipment would sink into the ground and/or the ground would give out underneath them, "squeezing" the subsoil, along with the crane (and possibly the Wheel) out into the New York Harbor.

56.     This sudden, unexpected and untimely revelation led to a months' long analysis of potential solutions, including improving the soil conditions and foundations to allow the DBT to proceed with its initial Wheel design and erection plan.

57.     Over time the DBT provided the parties with a number of options to overcome the poor soil conditions, both in terms of reducing the ground bearing pressures imposed by the Wheel and erection processes and increasing the bearing capacity of the soil and/or the supporting foundations.

NYW deemed the various alternatives presented to improve the soil conditions too expensive and directed the DBT to perform value engineering activities and alternative design and construction analyses in order to accommodate the actual soil conditions. Acknowledging that it had to absorb the costs associated with remedying the site conditions, NYW reviewed all of the options presented by the DBT, ultimately landing on a solution that required the DBT to rework the Wheel design and erection methodology, motivated to employ the least expensive alternative to remedy its breach.

58.     The DBT's solution, which the parties did not settle on until after the parties entered into CAR 2, required a complete re-design and re-engineering of the Wheel and the erection plan to one that used lighter components and smaller cranes. That effort included: Splitting each leg into 2 pieces; Re-engineering the hubs/spindle /A-frame braces (one piece) into separate pieces (2 separate A-frame braces/2 end spindles/2 hubs/1 center spindle); changing the size of the hub from 6 meters to 5 meters in order to accommodate L2 bearings; re-engineering the component connections and erection methodology, including the implementation of a $6,000,000 "push-pull" mechanism; replacing the large MSG-80 crane that had been planned to perform the heavy lifts with lighter cranes and additional steel load spreaders that would impose lower pressures on the soil; and developing all new lifting calculations and temporary equipment based on the new cranes and steel load spreaders.

59.     In addition to design and engineering delays, the foregoing activities also delayed the placement of critical contracts with the DBT's fabricators.

60.     NYW's failure to provide a site in accordance with its contractual obligations substantially delayed the Project and caused the DBT to incur massive amounts of additional engineering, fabrication and other costs including substantial additional costs charged by subcontractors and vendors.

## 2. *NYW Breaches its Obligation to Deliver a Suitable Pad*

61.    Integral to the Wheel construction was NYW's obligation to supply the permanent foundation -- the Pad -- upon which the Wheel would be fixed, as detailed in Sections 1.2 and 4.8 of the DBA.

62.    In September 2015, NYW advised the DBT that the lateral stiffness of the permanent foundation (the Pad) exceeded the parameters upon which the DBT had based its structural design for the Wheel, and also was unequal from the north to south portions of the foundation.

63.    NYW's failure to deliver a suitable Pad significantly delayed the Project and required the DBT to engage its subcontractors to perform re-engineering and re-design related to foundation forces, earthquake stability, drive tower stiffness and tuned mass dampening, to ensure the Wheel would operate as intended and in a structurally sound manner, while also delivering the passenger experience NYW expected.

64.    In particular, the DBT was required to engage subcontractors to, among other things: (i) recalculate all load cases; (ii) reestablish the final load bearings; and (iii) revise and re-start the bidding, procurement and fabrication process for the Wheel components.

65.    If the DBT had not made adjustments as described above to the design to account for the changed parameters resulting from the lateral stiffness, the Wheel would have been susceptible to metal fatigue that would, in turn, have posed a safety issue and also negatively impact the desired consumer experience.

66.    Further complicating matters was the fact that, by the time the DBT learned of this problem with the Pad and made the design changes necessitated by it, DBT subcontractors had already commenced fabrication on a number of Wheel components.

67.     The Project experienced delay, and the DBT incurred additional costs, including

substantial additional costs from subcontractors and vendors, as a result of this breach.

**3.      *NYW Breaches its Contractual Obligation to Achieve Full Site
Turnover by the Outside Site Turnover Date (OSTD)***

68.     Section 5.2 of the DBA, as amended by CAR 2, required NYW to achieve full Site

Turnover by March 15, 2016, the OSTD. Meeting this obligation was not conditional.

69.     "Site Turnover" meant "the complete turnover to the [DBT] of both the yellow and the

blue shaded portions depicted on Schedule B [of CAR2], which together comprise the area required

for the [DBT] to perform the Work."

70.     NYW failed to achieve this contractually-imposed deadline.

71.     In fact, the site was not ready to receive the DBT's cranes until early 2017, and even

then NYW could not deliver a Site ready for the commencement of construction.

72.     Pursuant to CAR 2, in the event NYW failed to achieve full Site Turnover by the

required OSTD, NYW agreed to provide the DBT the following remedy: (i) an extension of the Contract

Time and Substantial Completion Date; (ii) per diem damages calculated in accordance with an agreed

schedule of costs called Schedule A attached to CAR 2; and (iii) a weekly payment of $125,000. This

remedy compensated the DBT for, among other damages, the costs the DBT incurred as a result of

NYW directing the DBT to commence mobilizing its cranes during the summer of 2016 and to prepare

required barging in October 2016.

73.     Despite agreeing to these remedies in the DBA, NYW refused to pay any portion of the

agreed damages under Section 5.2 of the DBA (as amended by CAR 2), in breach of its obligations.

**4.      *NYW Breaches its Obligations To Avoid Interfering in the DBT's Work
By Directing Onerous and Unnecessary Inspections and Testing***

74.     NYW and the DBT agreed that the DBT's design, procurement and construction of the

Wheel was required to comply with the Agreed Design Codes (defined below), and that the DBT would

not bear any risk of being obligated to comply with requirements that differed from those Agreed Design Codes.

75.    Specifically, DBA Section 2.1 provided that "[t]he Work includes ... [the] design, procurement, construction and other activities required to comply with (a) the codes and standards in Exhibit "B" [of the DBA] (collectively "Agreed Design Codes"), and (b) to the extent outside the scope of the Agreed Design Codes, Applicable Law in full force and effect as of the date of the Agreement."

76.    The Project Criteria attached as Exhibit B to the DBA expressly provided that "the wheel is designed in accordance with the ASTM F2291-09a, the Standard Practice for Design of Amusement Rides and Devices (ASTM 2291) regulations." It further identified the Agreed Design Codes, which included specific testing and inspection requirements during fabrication, as follows:

- ASTM F2291-09a, the Standard Practice for Design of Amusement Rides and Devices (ASTM F2291)

- ASTM F1159-02, Standard Practice for Design and Manufacture of Amusement Rides and Devices

- ASTM Standard F846-92 (Re-approved 1998), Standard Guide for Testing Performance of Amusement Rides and Devices

- ASCE 7-05, Wind Load

- Strength Requirements: LRFD or ASD (8.21), strengths from AISC (8.26.1)

- Structural steel fatigue requirements: AISC, AWS, F2291-09a

- Serviceability requirements: check as defined in AISC (8.20)

- ANSI/AWS D1.1-02, Structural welding code.

77.    Further, Section 2.1 of the DBA provided that "[NYW] acknowledges and agrees that the [DBT] does not and shall not assume any risk, and shall not bear any liability, arising out of or otherwise relating to (x) any change in Applicable Law or tax after the date of this Agreement, or (y)

to any direction to, or obligation of, [the DBT] to comply with requirements that differ from the Agreed Design Codes (the events described above in clauses (x) and (y) are collectively "Code Changes")."

78.    Absent from the list of Agreed Design Codes was the New York City Building Code ("NYCBC"), or any specific section therein.

79.    Notwithstanding that the Agreed Design Codes did not include the NYCBC, in mid-2016 the DBT learned that NYW, at the request of the DOB, was imposing the requirements of the NYCBC, and in particular Chapter 17 of the NYCBC, on the DBT's design, fabrication and construction of the Wheel. This resulted in obligations being placed, under Chapter 17 of the NYCBC, on NYW as the owner of the Project, with NYW then taking actions to fulfill its obligations thereunder that interfered with the work of the DBT and directing the DBT to comply with requirements that differed from the Agreed Design Codes.

80.    Among other things, Chapter 17 of the NYCBC required that: (i) in-shop inspections/monitoring must be performed unless (ii) the fabricator(s) are "approved fabricators" and implement quality control processes that comply with BB (Building Bulletin) 2011-009.  As relevant here, Chapter 17 of the NYCBC covered the same subject matter as the Agreed Design Codes, as the in-shop inspections provided for in Chapter 17 of the NYCBC overlapped with the inspections provided for in the Agreed Design Codes, but the former were far more extensive and intrusive than the latter, requiring, *inter alia*, that the special inspectors perform reviews and inspections of fabricator procedures and ongoing fabrication work at the fabrication site.

81.    The imposition of Chapter 17 of the NYCBC so late in the design and fabrication process presented significant obstacles for the DBT. For example, obtaining "approved fabricator" status involved special application and approval processes for each fabricator. NYW had not directed

the DBT to use fabricators that had "approved fabricator" status, and only one of the fabricators that the DBT had already contracted with for the Wheel (primarily European fabricators that are ISO-9001 certified vendors) qualified as "approved fabricators" under NYCBC's specific standards.

82.     Accordingly, in order to comply with Chapter 17 of the NYCBC, NYW retained special inspectors to perform extensive in-shop inspections ("In-Shop Inspections") at the fabricators used by the DBT, and directed the DBT to allow those inspections to take place.

83.     To make a bad situation worse, NYW instructed its special inspectors to conduct 100% In-Shop Inspections at the fabricators' sites, meaning that special inspectors inspected the fabrication work on site daily. The rate of inspection directed by NYW exceeded any of the requirements under the NYCBC.

84.     In addition to the In-Shop Inspections imposed by NYW, NYW also imposed non-destructive testing ("NDT") requirements that went far beyond the requirements of the Agreed Design Codes, Applicable Laws or, for that matter, any relevant industry standards. Specifically, the NYW inspectors conducted 100% NDT (the "100% NDT Requirement"), a requirement that did not even exist under Chapter 17 of the Building Code.

85.     In late June 2017, NYW acknowledged that the 100% NDT Requirement was unnecessary and contrary to the terms of the DBA.

86.     By completely mismanaging the special inspection process, including allowing inspections to proceed and subjecting the DBT's fabricators to 100% In-Shop Inspections and 100% NDT Inspections, NYW (and the inspectors it retained) interfered with the progress of the DBT's scope of work, in violation of NYW's obligation under Section 4.8 of the DBA to "cause all [NYW] contractors ... to avoid interference with, or delay to, the performance of the Work."

87.     Fabrication stalled, and, among other things, the subcontractors charged the DBT substantial amounts for the delay and extra costs they incurred as a consequence of the interference that the In-Shop Inspections and the 100% NDT Inspections caused to their work.

### 5.     *NYW Breaches its Obligation to Secure a Building Permit*

88.     NYW also failed to fulfill its obligation to supply a Building Permit.

89.     Section 4.6 of the DBA provided that "[NYW] shall secure and pay for ... the building or other similar permit required by the New York City Department of Buildings or other public authority with jurisdiction over the Project (the 'Building Permit')."  That NYW was obligated to obtain the Building Permit was similarly stated in Section 3.4.1(j) of the DBA.

90.     Pursuant to Section 5.2(i)(a) of the DBA (as amended by CAR2), NYW was required to secure the Building Permit no later than February 15, 2016, and use diligent efforts to secure it as early as December 15, 2015, unless NYW did not receive, from the DBT, engineering drawings required for the Building Permit application by July 1, 2015, in which event February 15, 2016 deadline would be extended day-for-day measured from July 1, 2015 until the day of such receipt.  NYW has acknowledged, on multiple occasions, that it received the engineering drawings required for the Building Permit application by April 29, 2016, which means that NYW should have obtained the Building Permit by no later than mid-December 2016 -- the same 7.5 month period between the submission of the drawings and securing of the permit contemplated in CAR 2.

91.     NYW failed to obtain the Building Permit by mid-December 2016, and, in fact, never secured the Building Permit from the DOB.

92.     Upon information and belief, NYW had not made any payment to the DOB for the permits it was obligated to obtain.  This belief is based upon NYW's failure to have informed the DBT, at any time while the Project was continuing, that it had made such payment, and corroborating information provided by the Engineer of Record.

### C.     NYW Abruptly and Without Justification Ceases Paying the DBT for Its Work

93.     With NYW's breaches mounting, costs rising, and the Project schedule continuing to slip, throughout much of 2016 NYW and the DBT engaged in lengthy negotiations on a third amendment to the DBA to address some (but certainly not all) of these issues. Those discussions, however, eventually failed when, in January 2017, NYW withdrew from negotiations after the DBT conveyed its unwillingness to agree to NYW's last proposal.

94.     At the time negotiations broke off, the DBT had submitted, and NYW had certified for payment and paid, twelve Applications For Payment for the work being performed under Phase III of the Project, with the last of those payments received in November 2016. That was the last time NYW paid any money to the DBT.

95.     NYW sought to justify its failure to make any payments on any Applications for Payment since November 2016 by standing behind a tortured interpretation of the progress payment provisions in the DBA, claiming that NYW and the DBT had to reach agreement on every line item on an AFP before NYW was obligated to issue a Certificate for Payment and make payment.

96.     NYW further attempted to justify its refusal to make any further payments to the DBT by claiming it had the right to recoup $5.4 million in payments it had made in payment of AFPs 1-12 on the grounds that it wrongfully paid the DBT a portion of a $13.5 million Performance Payment each month that was not due until after the DBT achieved Substantial Completion.

97.     Neither position had merit.

98.     Article 10 of the DBA, entitled "Payment," governed the manner in which the DBT was to be paid for its work. For Phase III work, the amount of each progress payment was computed by "multiplying the percentage of completion of each portion of the Work by the share of the Base Contract Sum allocated to that portion of the Work in the most recent Schedule of Values."

99.     The DBA called for the payment of such progress payments each month in accordance with Section 10.2 of the DBA. First, the DBT submitted for review and certification by NYW a "pencil-copy" Application for Payment "based on the most recent Schedule of Values reasonably approved" by NYW, that detailed the operations completed and measured against the current Schedule of Values, and included a good faith estimate of costs to be incurred through the end of the month. With the "pencil-copy" Application for Payment, the DBT was required to provide substantiating data and documentation.

100.    Second, NYW was supposed to review the "pencil copy" within seven days and supply comments. Thereafter, the DBT was to finalize the Application for Payment and submit it to NYW for certification and payment.

101.    Upon receipt of the final Application for Payment (*i.e.*, the version submitted after the "pencil-copy"), Section 10.3 of the DBA required NYW to (i) issue a Certificate for Payment, in whole or in part, or (ii) notify the DBT in writing the reasons for withholding the Certificate, in whole or in part.

102.    Section 10.3 of the DBA provided:

> Developer shall, within seven days after receipt of such Application for
> Payment, either issue to ...the [DBT] a certificate for payment (a "Certificate
> for Payment") for the amount of the Application for Payment or notify ... the
> [DBT] in writing of [NYW's] reasons for withholding certification in whole or
> in part as provided in Section 10.7.10 of the Agreement.

103.    The reasons for withholding a Certificate for Payment were limited to the ones enumerated in Section 10.7.10. That provision allowed NYW "in whole or in part" to withhold payment from the DBT only (a) "to the extent reasonably necessary to protect Developer because the Work has not reached the stage indicated in the Application for Payment" or (b) when "subsequently discovered evidence" nullified in whole or in part a previously approved Application, and then "only to such

extent as reasonably may be necessary to protect [NYW] from loss for which the DBT is responsible," such as defective work.

104.    Nothing in the DBA required NYW and the DBT to reach agreement on a "final" Application for Payment in order to trigger NYW's obligation to issue a Certificate for Payment and/or notice of withholding, as the case may be. The sole trigger of this obligation was the DBT's submission of its final version of an AFP.

105.    Finally, in addition to the Certificate for Payment requirements, the DBA obligated NYW to pay Applications for Payment no later than thirty (30) days of receipt. Of course, by that time, the DBA contemplated that NYW had already supplied the requisite Certification for Payment and/or notice of withholding.

106.    As of November 2016, the DBT had submitted, and NYW had certified for payment and paid, twelve Applications For Payment for the work performed under Phase III of the Project, with the last of those payments received on November 22, 2016, for Work performed up through September 15, 2016. The November 22, 2016 payment was the last payment that NYW ever made to the DBT.

107.    For Applications for Payments Nos. 13 through 23, the DBT complied with its obligations to submit AFPs and the associated back-up documentation in accordance with Section 10.2 of the DBA.

   a.    AFP 13: in the "final" version of the AFP, the DBT sought payment of $3,917,209 (before Retainage) for progressing the following Work, among other things -- Legs, A-Frame Braces, Drive Towers, Capsules, Drive and Control Systems, LED Lighting; and initial Wheel erection activities.

   b.    AFP No. 14: in the "final" version of the AFP, the DBT sought payment of $3,586,527 (before Retainage and exclusive of OSTD damages for

progressing the following Work, among other things -- Rim parts, Drive Towers, Cable Spokes, Capsules, Drive and Control Systems, LED Lighting; and initial Wheel erection activities.

       c.    AFP No. 15: in the "final" version of the AFP, the DBT sought payment of $3,014,860 (before Retainage and exclusive of OSTD damages) for progressing the following Work, among other things -- A-Frame Braces, Rim Parts, Drive Towers, Cable Spokes, Capsules, Drive and Control Systems, and LED Lighting and initial Wheel erection activities.

       d.    AFP No. 16: in the "final" version of the AFP, the DBT sought payment of $2,518,280 (before Retainage and exclusive of OSTD damages for progressing the following Work, among other things -- A-Frame Braces, Drive Towers, Spoke Cables, Bend Limiters, Dampers, Capsules, Drive and Control Systems, Bus Bar and Collector Gear and initial Wheel erection activities.

       e.    AFP No. 17: in the "final" version of the AFP, the DBT sought payment of $4,052,363 (before Retainage and exclusive of OSTD damages) for progressing the following Work, among other things -- Rim Parts, Drive Towers, Cable Spokes, Bend Limiters, Dampers, Bearings, Capsules, Drive and Control Systems, LED Lighting, initial Wheel erection activities, and the development of the Wheel O&M Manual.

       f.    AFP No. 18: the DBT sought payment of $2,451,721 (before Retainage and exclusive of OSTD damages) for progressing the following Work, among other things -- Rim Parts, Cable Spokes, Capsules, Drive and Control Systems, LED Lighting, Bus Bar and Collector Gear; initial Wheel erection activities;

and the development of the Wheel O&M Manual. The DBT also sought $213,242 for Steel Load Spreader Mats that NYW approved as confirmed in its response to TQ-118 as part of the remedy for the poor soil conditions.

g.      AFP No. 19: the DBT sought payment of $2,175,801 (before Retainage and exclusive of OSTD damages) for progressing the following Work, among other things -- Wheel design activities; Bend Limiters, Capsules, Drive and Control Systems, LED Lighting, initial Wheel erection activities and development of the Wheel O&M Manual. The DBT also sought payment of $303,040 for Steel Load Spreaders, Capsule Guest Experience changes previously approved by NYW and the procurement of spare Spoke Cables requested by NYW for future use by NYW in the operation and maintenance of the Wheel.

h.      AFP No. 20: the DBT sought payment of $4,776,952 (before Retainage and exclusive of OSTD damages) for progressing the following Work, among other things -- A-Frame Braces, Rim Parts, Capsules, Drive and Control Systems, LED Lighting, transportation costs, initial Wheel erection activities, and the development of the Wheel O&M Manual. The DBT also sought $44,173 for Steel Load Spreader Mats.

i.      AFP No. 21: the DBT sought payment of $3,025,125 (before Retainage and exclusive of OSTD damages) for progressing the following Work, among other things -- Rim Parts, Hubs and Spindle, Capsules, LED Lighting, transportation costs, initial Wheel erection activities; and development of the Wheel O&M Manual. The DBT also sought payment of $144,699 for Steel Load Spreaders, Capsule Guest Experience changes previously approved by NYW and the procurement of spare

27

Spoke Cables requested by NYW for future use by NYW in the operation and maintenance of the Wheel.

       j.       AFP No. 22: the DBT sought payment of $2,718,015 (before Retainage and exclusive of OSTD damages) for progressing the following Work, among other things -- Drive Towers, Hubs and Spindle, Capsules, initial Wheel erection activities and development of the Wheel O&M Manual. The DBT also sought payment of $43,982 for Steel Load Spreaders and Capsule Guest Experience changes previously approved by NYW.

       k.       AFP No. 23: the DBT sought payment of $2,018,618 (before Retainage and exclusive of OSTD damages) for progressing the following Work, among other things -- Capsules, Drive and Control Systems and LED Lighting, and initial Wheel erection activities. The DBT also sought payment of $6,010 for Steel Load Spreaders.

108.    Notwithstanding the DBT's compliance with its obligations, NYW refused to issue any Certificates for Payment, in whole or in part, for any of these Applications for Payment and also failed to issue any notice of withholding of such Certificates for Payment, in whole or in part, in accordance with Section 10.7.10 of the DBA.

109.    NYW even refused to issue a partial Certificate for Payment for those portions of the AFPs representing amounts NYW conceded it owed.

110.    In refusing to do so, NYW claimed it had no obligation to issue any Certificate for Payment (or make any payment) unless and until the DBT submitted "conformed" AFPs limited to undisputed amounts due and owing.

111.    NYW maintained this position even when, on February 27, 2017, the DBT issued its finalized versions of AFP Nos. 13-16 and demanded the (partial) release of a Certificate for Payment for the undisputed portions of those AFPs.

112.    Notwithstanding that NYW agreed to the undisputed amounts in these AFPs, NYW refused to issue any Certificates for Payment or make any payments. Instead, NYW remained steadfast in its position that the "DBT [was] not entitled to partial payment or partial approval, because a Certificate [for] Payment cannot issue until a finalized Application for Payment is submitted."

113.    On April 14, 2017, NYW submitted a letter to the DBT attaching a proposed "Final" Application for Payment No. 13 that it would accept, if submitted, and issue a Certificate for Payment.

114.    NYW's proposed "Final" AFP No. 13 provided for a payment of $0.00 for the work the DBT performed, as reflected in that proposed AFP.

115.    NYW reduced the amount due to $0.00 by including a purported set-off to account for a portion of the $5.4 million NYW claimed it prematurely paid the DBT over the first twelve AFP's.

116.    According to NYW, it should have withheld 8% of every AFP to save up for the $13.5 million Performance Payment due after Substantial Completion, even though nothing in the DBA or its amendments provided for or contemplated such a withholding.

117.    NYW paid the first 12 AFPs without asserting the need to withhold monies for the Performance Payment and did not attempt to do so until after the DBT escalated the disputes over certain line items in AFP No. 13 by filing a formal Notice of Claim on November 25, 2016.

118.    In any event, the DBT had not invoiced or included in any AFP any portion of the Performance Payment.

119.     Contrary to NYW's representations to the DBT, however, NYW's Amended and Second Amended Complaints revealed the true reason why NYW manufactured reasons to withhold monies from the DBT.  NYW's lenders had ceased funding the Project.

**D.     The DBT Serves a Notice of Default and Lawfully Exercises Its Right To Suspend Performance and Withdraw From the DBA**

120.     The DBA provided specific remedies for NYW's failure to issue Certificates for Payment or to pay Applications for Payment. Specifically, Section 10.3 of the DBA allowed the DBT to stop work on seven days' written notice if (i) NYW "has not issued a Certificate for Payment in respect to any Application for Payment and has not notified the [DBT] of the withholding certification as provided [by Section 10.7.10]" or (ii) NYW has failed to make payment to the DBT in accordance with the DBA.

121.     Such failures also constituted defaults under Section 13.3 of the DBA.  Specifically, the DBT was permitted to provide a written default notice if NYW failed to issue a Certificate for Payment or to issue a written notice of withholding "for a permitted reason" as required under the terms of the DBA. If NYW failed to cure such default within ten (10) days of receiving such notice, the DBT "may suspend performance under the Agreement," and if it failed to cure within twenty (20) days, the DBT was entitled to "withdraw from the Agreement."

122.     The DBT did just that. On May 10, 2017, the DBT served NYW with a Notice of Default and Suspension of Performance of Design Build Agreement ("May 10 Notice of Default").

123.     The May 10 Notice of Default detailed NYW's defaults, including that NYW had failed to issue Certificates for Payment or withholding certificates for four Applications for Payment, AFPs 13-16.

124.     The DBT's May 10 Notice of Default also cited a number of other monetary and non-monetary defaults that the DBT had detailed in a number of prior claims and default notices, including

default notices it sent on January 17, 2017 and February 24, 2017. These included, among other things, NYW's failure to secure a Building Permit, the failure to provide Site Turnover by the OSTD, and the failure to pay the DBT the agreed damages for NYW's failure to achieve Site Turnover by the OSTD.

125.    Notwithstanding the DBT's repeated notices, NYW refused to cure any of its defaults, including its failure to comply with Section 10.3 of the DBA. Therefore, on May 26, 2017, the DBT suspended work, notifying NYW that it had done so in writing.

126.    Four days after the DBT suspended work, on May 30, 2017 NYW filed this action, along with an application for temporary restraining order and preliminary injunction. In seeking injunctive relief and claiming that the DBT was the only entity capable to complete the Wheel, NYW did not disclose its knowledge of American Bridge's capabilities.

127.    On the eve of that filing, NYW made one last effort to resolve this dispute, by admitting that the DBT had performed at least $15 million worth of the work reflecting on AFPs 13-20, and that the DBT was due a payment for $7.2 million of that amount.

128.    NYW did not issue a Certificate for Payment or pay this admitted debt. Instead, it supplied what it deemed to be acceptable Final AFPs and "offered" to make payment only if the DBT accepted NYW's calculations as to the amount of progress payments due, including a payment of $0.00 for AFP Nos. 14-16, the same calculation it arrived at previously with respect to AFP No. 13.

129.    The DBT rejected NYW's "offer" and the parties proceeded to a hearing on NYW's emergency application.

130.    On May 30, 2017, the Court rejected NYW's application for emergency relief, finding, among other things, that it failed to show a likelihood of success on its interpretation of the payment provisions or to demonstrate irreparable harm. In so ruling, the Court rejected NYW's argument that it would be irreparably harmed absent an injunction that prevented the DBT from exercising its

contractual right to suspend or withdraw from the DBA because no other contractor could build the Wheel.

131.    On June 5, 2017, the parties appeared before the Court to address NYW's preliminary injunction application.

132.    Thereafter, and before the Court issued any ruling on NYW's application, the parties agreed to extend NYW's cure period under the DBA through July 19, 2017 while the parties pursued mediation, and thus the DBT was not able to exercise its right to withdraw from the DBA until July 20, 2017.

133.    Mediation failed, but rather than cure its default or wait for a ruling on its injunction application, on July 11, 2017, NYW announced that it was on the precipice of engaging a new contractor (American Bridge) to complete the Wheel and sent notice to the DBT  that it was purportedly terminating the DBA for cause under Section 13.4 of the DBA in 10 days unless the DBT cured a laundry list of alleged defaults.

134.    NYW's July 11, 2017 purported Notice of Termination for Cause, however, was itself a breach of the DBA because it did not constitute a valid basis for termination. Among other things:

    a.    NYW claimed that the DBT was in default under Section 13.4 (iv) of the DBA because the DBT suspended work on May 26, 2017. The DBT suspended work pursuant to Section 10.3 of the DBA. Section 13.4(iv) of the DBA, by its terms, does not apply to suspensions under Section 10.3.

    b.    NYW claimed that the DBT was in default because it did not provide NYW with a complete set of the Instruments of Services, but the DBT had the right to terminate NYW's license to use the Instruments of Service due its non-payment of

monies due and owing and the DBT later exercised its right to terminate that license on July 20, 2017 in accordance with Section 1.6(e) of the DBA.

      c.    NYW claimed that the DBT was in default because it failed to achieve the May 15, 2017 Substantial Completion Date, ignoring NYW's various breaches that had extended that date far beyond May 15.

      d.    NYW claimed the DBT was in default for improperly terminating "Key Personnel," despite that NYW was aware of all personnel changes and did not object or demand that the DBT refrain from making any particular personnel change, or assert or purport to exercise a right to termination on account of such changes, at the times those changes were made.

      e.    NYW claimed that the DBT was in default for continuing to violate its "payment obligations" under Article 10 of the DBA with respect to the submission of AFPs, notwithstanding that such claim was premised on NYW's flawed reading of Article 10.

      f.    NYW claimed that the DBT was in default because it "has intentionally and repeatedly submitted falsified AFP's," which claim was, categorically, unsubstantiated and untrue and made despite NYW's never once having made that claim in the numerous communications with the DBT regarding specific disputes over the DBT's payment applications, or identifying a single instance of any such intentional falsification actually occurring.

135.    Also, NYW had not provided the DBT with prior notice of any of the alleged defaults identified in its purported Notice of Termination for Cause, nor did it provide the DBT with the

appropriate period to cure the alleged defaults before issuing its 10-day termination notice under DBA Section 13.4.

136.     In addition to claiming it would terminate the DBA on 10-days' notice, NYW wrongfully asserted a right to take an assignment of subcontracts pursuant to Section 3.2.1 of the DBA and claimed a right to possession of any Off-Site Materials, under Section 13.4, both of which are only triggered if NYW validly terminates the DBA for cause.

137.     In connection with this claimed right, NYW sent letters to a host of DBT subcontractors claiming it had terminated the DBT and reserving its right to take an assignment - - a right NYW only had, if at all, if it had validly terminated the DBA for cause.

138.     NYW also unilaterally wired $7.2 million to the DBT on July 11, 2017, purportedly to cure its payment default. The transmittal email that preceded the wire explained that "this payment is made and accepted in full satisfaction of amounts owed as to AFPs 13-20."

139.     The DBT promptly rejected the improperly-conditioned "payment" wire and NYW's attempt to get the DBA to waive its rights to monies due and owing through the use of an accord and satisfaction.  NYW never sent an "unconditional" payment thereafter.

140.     Finally, after informing the Court that it had allegedly terminated the contract, NYW proceeded to inform the media of what had transpired. Among other things, NYW's counsel appeared on a local Staten Island news program for an 8-minute interview mischaracterizing the events and attempting to justify its wrongful termination of the DBA.

141.     On July 20, 2017, the DBT responded to NYW's purported termination notice, declaring it ineffective and a nullity.

142.     That same day, the DBT withdrew from the DBA pursuant to Section 13.3.

143.     In addition, because NYW had repeatedly breached its obligation to pay the DBT monies due and owing under the terms of the DBA, the DBT exercised its right, under Section 1.6(e) of the DBA, to terminate NYW's license to the Instruments of Service.

144.     On August 25, 2017, after the expiration of the cure period afforded the City and NYW's lenders under separate agreements, the DBT deemed its withdrawal effective and demanded that NYW pay the damages it was obligated to pay as a result of the DBT's withdrawal from the DBA pursuant to Section 13.3 of the DBA, specifically all Work Costs, Demobilization Costs, Retainage and the Proportionate Termination Fee, as each is defined in Section 13.1 of the DBA and all other damages actually incurred and not expressly waived pursuant to the DBA.

145.     NYW failed to make the payment required under Section 13.3.

## COUNT ONE

### (Lien Law Section 5 Against the City and NYW)

146.     MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

147.     Section 5 of the Lien Law provides, in relevant part,

> [w]here no public fund has been established for the financing to a public improvement with an estimated cost in excess of two hundred fifty thousand dollars, the chief financial officer of the public owner shall require the private entity for whom the public improvement is being made to post, or cause to be posted, a bond or other form of undertaking guaranteeing prompt payment of the moneys due to the contractor

148.     The Project was being built on public land leased to NYW by the City.

149.     The Project was not financed by a public fund.

150.     NYW, a private entity, was the beneficiary of the Project, which was a public improvement.

151.     NYW did not "post, or cause to be posted, a bond or other form of undertaking guaranteeing prompt payment of the moneys due to the [DBT]."

152.    The chief financial officer of the City did not require NYW to provide such bond or other form of undertaking.

153.    As a result, the DBT was deprived of the payment security provided to it under the Lien Law, and thus had no security to compel prompt payment of the outstanding amounts due and owing for Work performed on the Project.

154.    The DBT was damaged as result.

**COUNT TWO**

**(Breach Of Contract Against NYW -- Failure To Pay Withdrawal Fees)**

155.    MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

156.    On May 10, 2017 the DBT served NYW with a Notice of Default, detailing the various defaults described above including NYW's failure to (i) issue Certificates for Payment, (ii) pay amounts due and owing the DBT, such as the contractually-agreed amounts for failing to achieve full Site Turnover by the OSTD, and (iii) obtain a Building Permit.

157.    NYW failed to cure each of these defaults.

158.    As a result, on July 20, 2017, the DBT withdrew from the DBA pursuant to Section 13.3 of the DBA.

159.    That withdrawal became effective on August 20, 2017, upon the expiration of a 30-day cure period the DBT provided to certain of the NYW's Lenders and the City.

160.    Pursuant to Section 13.3 of the DBA, when, as here, the DBT exercised its right to withdraw from the DBA as a result of an uncured default by NYW, it "shall be paid, in each case without duplication: (i) Work Costs, Demobilization Costs, Retainage and the Proportionate Termination Fee, (ii) damages actually incurred and not expressly waived pursuant to this Agreement."

161.    On August 25, 2017, the DBT demanded that NYW issue the amounts due under Section 13.3, but NYW refused to make payment, in breach of its obligations under Section 13.3.

162.    The DBT was damaged as a result.

## COUNT THREE

### (Breach of Contract Against NYW -- Failure to Pay Progress Payments)

163.    MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

164.    Pursuant to Section 10.2 of the DBA, the DBT was entitled to be paid progress payments measured against the progress of its work.

165.    Since its last payment from NYW on November 22, 2016, the DBT issued eleven separate AFPs -- AFP Nos. 13-23 -- detailing the work the DBT had performed under the DBA subsequent to September 15, 2016, including for approved Change Orders, along with the required documentation.

166.    In total, the unpaid progress of work detailed in these AFPs totaled $38,625,001.58 (inclusive of retainage).

167.    The DBT performed the work detailed in these AFPs and provided NYW with documentation reflecting it had done so.

168.    NYW failed to pay for this work, without lawful justification.

169.    Among the reasons advanced by NYW for failing to make such payments was its claim that it was allegedly entitled to withhold 8% of each AFP to accrue monies to pay the Performance Payment due after Substantial Completion and that it wrongfully advanced the DBT $5.4 million towards the Performance Payment when it paid AFP Nos. 1-12.

170.    NYW's withholding of progress payments on this purported ground was contrary to the express terms of the DBA.

171.     NYW also refused to make payment based on its claim that it did not have to issue a Certificate for Payment unless the DBT submitted an Application for Payment that NYW agreed to pay in all respects.

172.     Upon information and belief, NYW manufactured these excuses to avoid payments because its lenders had ceased issuing disbursements to it. This belief is based on allegations made in NYW's Amended and Second Amended Complaints to the effect that it had stopped receiving funds from its lenders, as well as statements made by NYW's Chief Operating Officer, Andrew Ratner, in an October 2, 2017 Declaration.

173.     NYW's failure to issue Certificates for Payment was contrary to the express terms of the DBA and/or the implied covenant of good faith and fair dealing.

174.     Through its unjustified and wrongful refusal to pay the DBT for work actually performed, the DBA has failed to pay the DBT in excess of $38,000,000 (including retainage, but excluding OSTD damages) in monies due and owing under the DBA.

175.     The DBT was damaged as a result.

## COUNT FOUR

### (Breach of Contract Against NYW-- Failure to Pay OSTD Damages)

176.     MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

177.     Section 5.2 of the DBA (as amended by CAR2) required NYW to achieve full Site Turnover by March 15, 2016, the OSTD.

178.     NYW failed to achieve that deadline (or, indeed, ever).

179.     Pursuant to Section 5.2(c) of the DBA, NYW agreed, in the event the OSTD was not met, to provide the DBT with, among other things, an equitable extension of the Contract Time and Substantial Completion Date, a per diem cost adjustment calculated in accordance with an agreed

schedule of costs, a weekly payment of $125,000 per week of delay, and additional and other substantiated costs reasonably incurred.

180.    Those payment obligations were unconditional.

181.    The DBT calculated, notified, and invoiced NYW for the costs and amounts due under Section 5.2(c) as a result of failure to achieve fully Site Turnover by the OSTD, which, as of July 20, 2017, totaled $28,343,823.45.  These costs and amounts were not subject to the Change Order provisions of the DBA (and the DBT accordingly was not required to, and did not, request a Change Order with respect to them).

182.    Despite having agreed to these delay damages, NYW refused to pay each and every payment demand issued by the DBT, in breach of its obligations.

183.    The DBT was damaged as a result.

## COUNT FIVE

### (Breach of Contract Against NYW -- Unsuitable Foundations)

184.    MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

185.    Pursuant to Sections 1.2, 2.1 and 4.8 of the DBA, among others, NYW was obligated to provide a Project site and foundations (both temporary crane and work) suitable for the construction and operation of the Wheel, based on the Project Criteria set forth in Exhibit B of the DBA and the Load and Power Criteria (as defined in Section 1.2 of the DBA) provided by the DBT.

186.    Pursuant to Section 2.1 of the DBA, NYW was also obligated to provide the temporary foundations detailed in Exhibit R to the DBA and confirmed in the Project Criteria, including the foundations necessary for "crane support."

187.    The foregoing were fundamental obligations of NYW, and the parties never contemplated that NYW would fail to comply with them.

188.     NYW breached those obligations by providing a site incapable of withstanding the ground bearing pressure imposed by the cranes and Wheel components during the construction of the Wheel.

189.     As a result of this breach, the DBT had to re-design and reengineer the Wheel and erection plan, at NYW's direction, resulting in substantial delay and costs increases, including substantially increased costs for work done by subcontractors and vendors, for which the DBT was not been compensated and for which NYW is liable.

190.     The DBT was not compensated for these costs, and thus was damaged as a result.

## COUNT SIX

### (Breach of Contract Against NYW -- Pad Lateral Stiffness)

191.     MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

192.     Pursuant to Sections 1.2, 2.1and 4.8 of the DBA and Section 1.1.6 of Ex. B thereto, NYW was "responsible for the design and construction of the Pad," which had to properly support the Wheel.

193.     The foregoing were fundamental obligations of NYW, and the parties never contemplated that NYW would fail to comply with them.

194.     As detailed above, NYW supplied a Pad with lateral stiffness that exceeded the parameters upon which the DBT had based its structural design for the Wheel, and also was unequal from the north to south portions of the foundation. In so doing, NYW breached its obligations under Sections 1.2, 2.1 and 4.8 of the DBA and Section 1.1.6 of Ex. B thereto.

195.     As a result, the DBT was substantially delayed and had to engage subcontractors to perform extensive re-engineering to ensure the Wheel would operate as intended and in a structurally sound manner.

196.     The DBT was not compensated for these costs, and thus was damaged as a result.

## COUNT SEVEN

### (Breach of Contract Against NYW -- Owner Interference)

197.     MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

198.     In July 2016, DOB announced that it was imposing additional inspection and testing requirements on the fabrication of Wheel components that derived from code obligations that differed from the Agreed Design Codes under the DBA, and thus constituted a "Code Change" as that term is defined in Section 2.1 of the DBA.

199.     Pursuant to Section 2.1 of the DBA, NYW "acknowledg[ed] and agree[d] that the [DBT] does not and shall not assume any risk, and shall bear no liability, arising out of or otherwise relating to" any Code Change.

200.     The NYCBC obligated NYW to retain special inspectors to conduct the inspections that NYW was required to have performed as a result of this Code Change.

201.     In connection with doing so, NYW instructed its inspectors to conduct inspections and testing at levels that far exceeded the DOB requirements.

202.     The special inspectors NYW hired to do this work were Developer Contactors, as that term is defined in Section 3.2 of the DBA.

203.     Pursuant to terms of Section 4.8 of the DBA, NYW was required to cause its Developer Contractors to avoid interference with or delay to the performance of the DBT's Work.

204.     NYW's special inspectors, who were directed by NYW to engage in 100% In-Shop Inspections and 100% NTD testing, interfered with the DBT's work in that their activities delayed and impeded the work of DBT subcontractors fabricating Wheel components, resulting in increased fabrication costs.

205.     As a result of NYW's interference, the Project was delayed.  Also as a result of that interference, DBT subcontractors incurred increased costs that were charged to, and paid by, the DBT.

41

206.   The DBT was not compensated for these costs, which were caused by NYW's breach, and thus was damaged as a result.  (For the avoidance of doubt, the damages sought in Count Seven do not include the actual cost of  the special inspections themselves, which the DBT agreed to pay for as part of CAR 2.)

## COUNT EIGHT

### (Breach of Contract Against NYW -- Building Permit)

207.   MUSA restates and realleges the allegations of ¶¶  1-145 as if set forth fully herein.

208.   NYW had an obligation to secure a Building Permit pursuant to Sections 3.4.1(j) and 4.6  of the DBA.

209.   NYW failed to do so.

210.   That failure caused delays and increased the DBT's costs, including costs of subcontractors and vendors.

211.   The DBT was not compensated for these costs, which were caused by NYW's breach, and thus was damaged as a result.

## COUNT NINE

### (Breach of Contract Against NYW -- Wrongful Termination;
### In the Alternative to Count Two)

212.   MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

213.   On July 11, 2017, NYW sent a purported Notice of Termination for Cause under Section 13.4 of the DBA.

214.   NYW sent this notice while it was in default on its obligations under the DBA.

215.   NYW premised that Notice upon a number of alleged defaults by the DBT.

216.   NYW did not provide prior notice or an opportunity to cure such alleged defaults prior to issuing its July 11, 2017 Notice of Termination.

217.     In any event, none of the defaults alluded to in the purported Notice of Termination was factually or contractually valid.

218.     NYW's termination effort was done in bad faith. Among other things, NYW attempted to terminate the DBT to avoid the DBT's impending withdrawal from DBA and the damages associated therewith.

219.     Subsequent to its Notice of Termination, NYW declared, and treated, the DBT as terminated for cause effective as of July 21, 2017. To the extent that the DBT's withdrawal from the DBA pursuant to Section 13.3(a) thereof is for some reason found not to have been effective, by so terminating the DBT without valid grounds to do so, NYW materially breached its obligations under the DBA and wrongfully terminated the DBT.

220.     NYW's actions, to the extent not a breach of the DBA's written terms, breached the implied covenant of good faith and fair dealing.

221.     As a result of the foregoing, the DBT was damaged, and MUSA as its assignee is entitled to recover, *inter alia*, the amounts the DBA otherwise would have received in accordance with Section 13.3(a) of the DBA or, alternatively, on a quantum meruit basis, for all work performed by the DBT on the Project.

## COUNT TEN

### (Breach of Contract Against NYW -- Failure to Pay Amount Due following Termination for Cause, in the Alternative to Counts Two-Nine )

222.     MUSA restates and realleges the allegations of ¶¶ 1-145 as if set forth fully herein.

223.     On July 11, 2017, NYW sent a purported Notice of Termination for Cause under Section 13.4 of the DBA.

224.     Section 13.4 provides, among other things, that

In case of … termination [for cause] of the Design Build Team's employment under this Agreement, the Design Build Team shall not be entitled to receive any

43

further payment for Work performed by the Design Build Team through the date of termination of Design Build Team's employment hereunder except to the extent hereafter provided. **If the unpaid balance of the Contract Sum exceeds the costs of finishing the Work and other costs incurred by Developer resulting directly from such termination** and not expressly waived, but excluding Change Orders and Change Order Directives issued after termination (and not resulting from the Design Build Team's default), **then such excess shall be paid to the Design Build Team.** If such costs incurred by Developer exceed the unpaid balance, then the Design Build Team shall pay the difference to Developer. The amount to be paid to the Design Build Team or Developer, as the case may be, is an obligation for payment which shall survive termination of this the Design Build Team under Agreement. (Emphasis added.)

225.    At the time of NYW's purported termination of the DBT for cause, the Contract Sum was $165 million.

226.    The total of the costs, if any, that NYW incurred in finishing the Work and any other costs incurred by NYW resulting directly from the purported termination for cause was substantially less than the unpaid balance of the Contract Sum.

227.    If it is held that NYW validly terminated the DBT for cause under Section 13.4, as it claims to have done, then NYW was required to make payment to the DBT of the excess of (a) the unpaid balance of the Contract Sum over (b) the total of the costs, if any, that NYW incurred in finishing the Work and other costs incurred by Developer resulting directly from such termination.

228.    Following its purported termination of the DBT under Section 13.4 of the DBA, NYW did not pay the amount described in ¶ 227 above to the DBT.

229.    Accordingly, in the event it is held that NYW validly terminated the DBT for cause under Section 13.4 of the DBA, the DBT was damaged.

**WHEREFORE**, MUSA respectfully requests that this Court enter Judgment in its favor and against NYW as follows:

    a.      On Count One:

    i.      Compensatory damages against NYW and the City for the unpaid Applications for Payment to the extent not recovered under Counts Two, Three or Ten.

    b.      On Count Two:

        i.      Work Costs, as that term is defined in Section 13.1 of the DBA;

        ii.      Demobilization Costs, as that term is defined in Section 13.1 of the DBA;

        iii.      Retainage, as that term is defined in Section 13.1 of the DBA;

        iv.      the Proportionate Termination Fee, as that term is defined in Section 13.1 of the DBA;

        v.      actual damages, including those caused by the suspension of the DBA and any of the DBT subcontracts;

    c.      On Counts Three through Eight:

        i.      Compensatory damages to the extent not recovered as damages under Count Two;

    d.      On Count Nine:

        i.      Compensatory damages for the costs due on account of, arising from, or incurred as a result of, NYW's wrongful termination of the DBA as an alternative to the damages sought in Count Two and to the extent not recovered under Counts Two, Three and/or Four-Eight;

    e.      On Count Ten:

        i.      the amount owed to the DBT pursuant to Section 13.4 of the DBA in the event it is held that NYW validly terminated the DBT under that Section, in the alternative to the damages sought in any and all of Counts Two-Nine; and

    f.      on all Counts:

        i.        pre and post judgment interest;

        ii.       an award of MUSA's costs; and

        iii.     such other and further relief as the Court deems just and proper.

Dated: February 3, 2020
       New York, N.Y.

DENTONS US LLP

By:     */s/ Jonathan S. Jemison*
        Jonathan S. Jemison
        jonathan.jemison@dentons.com
        Anthony B. Ullman
        anthony.ullman@dentons.com

        1221 Avenue of the Americas
        New York, NY  10020-1089
        Telephone:  (212) 768-6700
        Facsimile:   (212) 768-6800

        *Attorneys for Defendant/Third-Party Plaintiff Mammoet USA North Inc.*