UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                          :

NEW YORK WHEEL OWNER LLC et al.,       :

                           Plaintiffs,    :

                                            :

              -v-                            :

MAMMOET HOLDING B.V. et al.,         :

                                            :

                         Defendants.   :

                                          :        17-CV-4026 (JMF)
-------------------------------------------------------------------X
                                          :        <u>OPINION AND ORDER</u>

MAMMOET USA NORTH INC.,           :

                       Third-Party Plaintiff,   :

                                            :

              -v-                            :

THE CITY OF NEW YORK,              :

                       Third-Party Defendant.  :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      This case arises from a project to design and build the largest "observation wheel" in the

Western Hemisphere.  The New York Wheel ("Wheel"), similar to the famous London Eye, was

to be the centerpiece of a revitalization plan for the Staten Island waterfront, looming over

Richmond County Bank Ballpark, home of the Staten Island Yankees, and visible all the way

from lower Manhattan.  Each pod of the Wheel was to hold forty people, and each rotation of the

massive Wheel was to transport up to 1,440 people in total.

      But it was not meant to be.  The project ran into problems not long after it started in 2014

and, in 2017, it fell apart altogether.  This complex litigation followed.  When the litigation

started, Plaintiff New York Wheel Owner LLC ("New York Wheel"), the project's developer, asserted claims against Mammoet-Starneth LLC (the "Design-Build Team" or "DBT"), the company hired to design and build the Wheel.  *See* ECF No. 149, ¶¶ 457-559, 571-602, 635-71. But the DBT soon declared bankruptcy, *see* ECF No. 162, and New York Wheel later settled with it, *see* ECF No. 214 ("Third Amended Complaint" or "TAC"), ¶ 9 n.1.  In the wake of that settlement (and an aborted global settlement), New York Wheel and Plaintiff New York Metropolitan Regional Center, L.P. II ("NY Regional") asserts claims against the DBT's members and associated companies: Defendants Mammoet Holding B.V. ("Mammoet"), Mammoet USA Holding, Inc. ("Mammoet Holding"), Mammoet USA North, Inc. ("Mammoet North"), Starneth LLC ("Starneth"), and Starneth B.V. (which has since declared bankruptcy as well, *see* ECF No. 245).  Mammoet North, as assignee of the DBT's claims, asserts counterclaims against New York Wheel, *see* ECF No. 251 ("Amended Third-Party Complaint and Counterclaims" or "ACC"), ¶¶ 146-229, as well as a claim against the City of New York (the "City"), which owns the land on which the Wheel was to be built, *see id.* ¶¶ 146-54.

Now before the Court are four motions: (1) Defendants' motions to dismiss claims asserted by New York Wheel and NY Regional, *see* ECF No. 230 ("Defs.' MTD Br"); (2) New York Wheel's motion to dismiss several of Mammoet North's counterclaims, *see* ECF No. 263 ("NYW MTD Br."); (3) the City's motion to dismiss Mammoet North's claim against it, *see* ECF No. 258; and (4) Mammoet North's motion to amend its third-party complaint and to join New York Wheel Mezz, LLC ("New York Wheel Mezz") as an additional third-party defendant, *see* ECF No. 266.  For the reasons that follow, the City's motion and Mammoet North's motion to amend are granted in their entirety; the other motions to dismiss are granted in part and denied in part.

## BACKGROUND

The following facts — taken from the pleadings and documents that are attached to,

integral to, or incorporated by reference the pleadings — are assumed to be true for purposes of

this motion.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).[1]

The City planned a substantial development on the Staten Island waterfront, and the

Wheel was to be the main attraction.  *See* TAC ¶ 1.  The City leased the land on which the Wheel

was to be built to New York Wheel, *see* ACC ¶¶ 1, 41, which would act as the developer on the

project, *see* TAC ¶ 2.  New York Wheel approached Starneth B.V. about serving as the designer

of the Wheel.  *See* TAC ¶ 152.  At some point, Mammoet entered the negotiations as a potential

builder.  *See id.* (alleging that Mammoet and Starneth B.V. negotiated the contract); *id.* ¶ 172

(alleging that "Mammoet entities were primarily responsible for the procurement, fabrication,

manufacturing, and erection" of the Wheel).  Mammoet and Starneth B.V. formed a new entity,

Mammoet-Starneth LLC, referred to as the "Design-Build Team" or "DBT," whose members are

Mammoet North and Starneth.  *See id.* ¶ 18.  The DBT's executives were also executives of

Mammoet and Starneth B.V., *see id.* ¶¶ 154-55, and the DBT, Mammoet, and Starneth B.V.

shared offices and email addresses, *see id.* ¶ 153.

On March 5, 2014, only a few days after the DBT was formed, New York Wheel and the

DBT entered the Design Build Agreement, or "DBA," relating to the design and construction of

the Wheel and related structures.  *See id.* ¶¶ 37-40, 152; ACC ¶¶ 7-8; *see also* ECF No. 231-1

("DBA").  Generally speaking, the DBA required the DBT to perform "all design, engineering,

labor, material, equipment, tools, temporary utilities, supervision and management services

---

[1]     Because there are two operative complaints at issue — Plaintiffs' Third Amended
Complaint and Defendants' Amended Third-Party Complaint and Counterclaims — the Court
draws the facts relevant to each claim from the pleading that asserts it.

required for the timely, lien-free, completion of the Project." DBA at 1. More specifically, the DBT agreed to "complete the design of the Wheel and prepare Construction Documents [consisting of Drawings and Specifications] consistent with the Project Criteria." DBA § 1.2. Once the design plans were approved by New York Wheel, the DBT was required "to construct the Wheel," but its obligations were "limited to the Work set forth in and reasonably inferable from the Drawings and Specifications . . . conditioned to the extent necessary upon [New York Wheel and its contractors] performing their respective obligations." DBA § 1.3. Generally speaking, New York Wheel's obligations under the DBA (other than making payments) related not to the Wheel itself, but rather to the foundation on which the Wheel would sit, a terminal, a parking structure, and other supporting facilities. *See* TAC ¶¶ 3-4; ACC ¶ 8; DBA §§ 1.2-1.3. The DBT was expected to substantially complete its work by October 1, 2016. *See* TAC ¶ 105.

In exchange for the DBT's work, New York Wheel agreed to pay "a lump sum, fixed-price" of $145 million — the "Contract Sum." DBA § 6.1. The funds were to be paid in progress payments, pursuant to a complex process set forth in the DBA. Included as an exhibit to the DBA was a "Schedule of Values," which allocated portions of the Contract Sum to the various tasks that the DBT was required to complete. *See* TAC ¶¶ 44-45. In order to be paid, the DBT was required to estimate the completion percentage of each task and submit its estimate and supporting documentation to New York Wheel in an "Application for Payment," or "AFP," on a monthly basis. *See id.* ¶ 46; DBA §§ 10.2, 10.7, 10.7.1. The precise procedure by which the DBT was required to submit AFPs, and by which New York Wheel could contest or approve the claimed amounts, does not matter here. What matters, though, is that at the end of the process, the DBA contemplated that New York Wheel would pay the DBT a progress payment in an amount equal to the completion percentage multiplied by the value in the Schedule of Values,

less any payments already made.  *See id.* § 10.7.  Progress payments were critical to the DBT's ability to fulfil its obligations under the DBA, as neither the DBT's members nor other Mammoet and Starneth-related entities "provide[d] the DBT with any of its own assets or funds to cover its expenses."  TAC ¶ 128.  That is, the DBT relied entirely on the progress payments to fund the project and cover its costs.  *Id.*

The DBA also provided that the parties could increase the Contract Sum through a "change order" procedure.  The parties could invoke this procedure in response to either a "change[] in the Work" ordered by New York Wheel or in response to an "Unavoidable Delay," *id.* § 9.1, which was defined to include "any act, failure to act, direction, directive, order, delay or default" of New York Wheel; "use or occupation by [New York Wheel] of any part of the Site or the Work contrary to the terms of th[e DBA]"; "design of any part of the Work or the Development by [New York Wheel]"; "untimely completion of or defective design or construction of the Balance of the Development that demonstrably impacts the Work"; and "fire, windstorm, flood, storms hurricane, lightning, earthquake, enemy action, [and] terrorist action." *Id.* § 5.2.2.  In the event of an Unavoidable Delay, the DBT was entitled to an extension of time and an adjustment of the Contract Sum equivalent to any resulting "additional Project related costs."  *Id*.  The DBA further provided that "[a]ll such extensions of the Contract Time and such adjustments in the Contract Sum shall be effected by Change Orders."  *Id.*  Pursuant to the change order procedure, the DBT was required to make any claim for an increase in the Contract Sum "within twenty one (21) days after the [DBT] became aware, or should have become aware, of the occurrence of the event or circumstances giving rise to such claim, failing which, [the DBT] shall waive such claim."  *Id.* § 9.6.1.  If the DBT disagreed with New York Wheel's adjustment of the Contract Sum, it could "commence" a "dispute resolution process set forth in

Section 19.2." *Id.* § 9.3.6.  Section 19.2, in turn, provided that some claims (up to $15 million in value) had to be submitted to arbitration and that the remainder — including "claims, disputes or matters in controversy pertaining to . . . any default by [New York Wheel] or any negligent act or omission by [New York Wheel]" — were to "be resolved by reference to judicial process." *Id.* §§ 19.2.1, 19.2.6.

Complicating matters, New York Wheel was not the only investor in the project. *See* TAC ¶ 7.  For instance, NY Regional lent $206 million to New York Wheel, which was to be used to fund the project.  *See id.* ¶ 207.  In order to protect its loan, NY Regional secured from Mammoet Holding and Starneth B.V. (the "Guarantors") a guaranty pursuant to which they agreed, in the event the DBT breached the DBA, either to fulfill the DBT's obligations under the DBA or pay damages.  *See id.* ¶¶ 207, 209-12; ECF No. 18-2 ("Completion Guaranty"), §§ 1.1(a), 1.2(c).  The City also obtained from New York Wheel Mezz — an entity apparently related to New York Wheel — a guaranty (the "Payment Guaranty") that "any and all liens or claims of any Persons furnishing materials, labor or services in connection with the design and/or construction . . . of the Guaranteed Work [i.e., the Wheel] filed with respect to the Premises and the City's interests therein, shall be removed by bonding or otherwise discharged within" certain time periods.  *See* ECF No. 268-1 (Mammoet North's proposed amended pleading), ¶ 233.

With that framework in place, the parties got to work — but it wasn't long before the project encountered significant problems.  The DBT incurred significant cost overruns, as it had underestimated how expensive the work would be.  For example, in March 2016, "the Schedule of Values provided $2,780,869 for the Wheel Hub and Spindle," but when the DBT solicited quotes from subcontractors, "the lowest quote it could get was $7,600,000." TAC ¶ 134.  The DBT also paid substantial and outsized sums to various Mammoet- and Starneth-affiliated

entities, which the DBT subcontracted to perform parts of the work.  According to the AFPs that the DBT submitted to New York Wheel, the DBT paid nearly $20 million dollars to Mammoet North for "erection expenses" — equal to nearly half of the Scheduled Value for such expenses — even though no erection work was ever completed.  *See id.* ¶ 138.  As a result of all this, the DBT was insolvent by early 2016.  *See id.* ¶ 135.  That year, to cover some of the DBT's cost overruns, Mammoet-affiliated entities began to loan the DBT money by directly paying the subcontractors hired by the DBT.  *See id.* ¶ 133.

The DBT also failed to meet early deadlines set by the DBA.  In particular, it did not provide completed engineering drawings for the project by November 28, 2014, as required by the DBA.  *See Id.* ¶ 105.  As a result, New York Wheel and the DBT engaged in negotiations to amend the DBA to get the contract back on track.  *See id.* ¶ 106.  In the course of these negotiations, certain DBT executives — who also held positions with Mammoet-related entities working with Starneth to create the drawings — represented to New York Wheel that "the engineering drawings were nearly complete."  *Id.* ¶¶ 110-11.  On December 11, 2014, *see id.* ¶ 106, in reliance on that representation, *see id.* ¶ 116, New York Wheel agreed to amend the DBA to, among other things, increase the Contract Sum by $13.5 million and create new deadlines for the drawings, *see id.* ¶¶ 107, 109.  In particular, the DBT was required to provide New York Wheel with a "permit-ready" set of documents on December 31, 2014, and a "100% construction-ready set of documents" no later than March 2, 2015.  *Id.* ¶ 108.  The amendments also extended the deadline by which New York Wheel was required to provide the foundation for the Wheel to January 4, 2016, and it extended the date by which the DBT was required to substantially complete its work to January 2, 2017.  *See id.*

Nevertheless, the DBT once again missed the deadline to provide permit-ready engineering drawings, *see id.* ¶ 112, and it continued to incur cost overruns, *see id.* ¶ 117.  As a result, the parties began a new round of negotiations.  Once again, the same DBT executives represented to New York Wheel "that the engineering drawings were nearly complete," *id.* ¶ 121, and, in reliance on that representation, *see id.*, New York Wheel agreed to a second amendment of the DBA on May 18, 2015, *see id.*  ¶ 117.  This second amendment increased the Contract Sum by another $6.5 million, bringing the total to $165 million.  *See id.* ¶ 120.  The amendment also imposed new deadlines: The DBT was required to deliver permit-ready drawings and documents no later than July 1, 2015, *see id.* ¶ 118; and it was required to substantially complete its work by May 15, 2017, *see id.* ¶ 119.  In the end, the DBT delivered drawings sufficient to allow permit review to begin on April 29, 2016, and it never provided drawings sufficient to obtain a permit — let alone construction-ready drawings.  *See id.* ¶ 122.

The DBT has its own share of complaints regarding New York Wheel's conduct.  For example, in September 2015, New York Wheel informed the DBT that the lateral stiffness of the foundation upon which the Wheel would be built "exceeded the parameters upon which the DBT had based its structural design for the Wheel, and also was unequal from the north to south portions of the foundation."  ACC ¶ 62.  Because New York Wheel did not provide "a suitable Pad," the DBT had to "engage its [own] subcontractors to perform re-engineering and re-design . . . to ensure the Wheel would operate as intended and in a structurally sound manner, while also delivering the passenger experience [New York Wheel] expected."  *Id.* ¶ 63.  Moreover, following the second amendment on May 18, 2015, the DBA required New York Wheel to turn over to the DBT the entire area for the DBT to perform its necessary work by March 15, 2016.  *Id.* ¶¶ 68-69.  New York Wheel failed to do so.  Only in early 2017 was the site

"ready to receive the DBT's cranes" and, "even then," New York wheel did not "deliver a Site ready for the commencement of construction." *Id.* ¶¶ 70-71.

There were also issues with the DBT's applications for, and New York Wheel's remittance of, payment. After New York Wheel paid AFP 12 in November 2016, the DBT submitted only preliminary versions of AFPs, ignored New York Wheel's objections, and failed to remove overcharges or submit certified AFPs. *See* TAC ¶¶ 69-70. The impasse continued for months until May 10, 2017, when the DBT informed New York Wheel that it was "exercis[ing] its right to invoke an immediate suspension of work in accordance with Section 13.3(a) of the [DBA]" as a result of New York Wheel's failure to pay the DBT. *See id.* ¶ 83. On May 30, 2017, New York Wheel provided additional notice of the DBT's breaches of the DBA and initiated this lawsuit, seeking, among other things, declarations regarding the parties' rights and obligations under the DBA and "[a]n order enjoining and restraining the DBT from suspending performance or withdrawing from the Agreement." ECF No. 1, at 47.

From there, the relationship only worsened. On July 11, 2017, New York Wheel gave notice that it had decided to terminate the DBT based on the latter's alleged breaches of the DBA. *See* TAC ¶ 89. The termination was to go into effect ten days later. *See id.*; DBA § 13.4 (providing a ten-day notice period). The same day, New York Wheel also wired the DBT over seven million dollars, which New York Wheel believes to be "the amount that would have been owed under [AFPs 13 through 20] had the DBT" complied with the proper procedure, and New York Wheel clarified that "[t]his payment is made without prejudice as to any other rights that either party may have under the [DBA]." *Id.* ¶ 92. But the DBT rejected the payment, arguing that New York Wheel had "conditioned the DBT's acceptance of the payment upon . . . waiv[er] of [DBT's] claims against [New York Wheel]." TAC ¶ 93. On July 20, 2017, one day before

New York Wheel's termination was to go into effect, the DBT itself claimed to withdraw from the DBA, asserting that it was still owed payment.  *See id.* ¶ 90.

In September 2017, in response to a motion to dismiss, New York Wheel amended its then-operative complaint and asserted additional claims against Mammoet North, Starneth, Mammoet, and Starneth B.V.  *See* ECF No. 59.  The DBT moved to dismiss certain claims asserted against it, *see* ECF No. 66, answered the remaining claims, and asserted claims of its own against New York Wheel and the City, *see* ECF No. 69.  New York Wheel, in turn, moved to dismiss certain claims against it, *see* ECF No. 99, as did Mammoet, Mammoet Holding, Mammoet North, Starneth B.V., and Starneth, *see* ECF No. 166, as well as the City, *see* ECF No. 146.  Many of these motions were in the process of getting briefed when, on December 13, 2017, the DBT filed for bankruptcy.  *See* TAC ¶ 136; ECF No. 162.  (New York Wheel later learned that, in the year before it declared bankruptcy, the DBT paid more than $20 million dollars to Mammoet, Mammoet North, and other Mammoet-affiliated entities, along with approximately $3.6 million to Starneth.  *See* TAC ¶ 139.)  The motions were pending when, on May 10, 2018, the parties informed the Court that they had "signed a conditional global settlement agreement" that would "provide[] a standstill of all actions until September 6, 2018 . . . to allow [New York Wheel] the opportunity to obtain financing and transition the Project to a new contractor."  ECF No. 187.  The parties asked the Court to stay the litigation until September 15, 2018, to allow them to seek and obtain approval of the settlement from the Bankruptcy Court and to satisfy the other settlement conditions.  *See id.*  The next day, the Court closed the case and allowed any party to move to reopen it in the event that the settlement was not consummated.  *See* ECF No. 188.

On October 23, 2018, New York Wheel issued a press statement declaring that "the dream of building a world class attraction in Staten Island will unfortunately not come to fruition."  *See* ECF No. 231-8; ECF No. 233 ("Pls.' MTD Opp'n"), at 39-40 (acknowledging press statement); *see also Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 262 (S.D.N.Y. 2019) (taking judicial notice of statements made in a press release because it is "a source whose accuracy cannot reasonably be questioned as to the fact that the statements contained therein were made" (internal quotation marks omitted)).  The project would not go on without the DBT.  Meanwhile, the parties requested and were granted several extensions of the deadline by which any motion to reopen this case had to be filed.  *See, e.g.*, ECF Nos. 190, 192, 197.  On June 26, 2019, Starneth B.V. declared bankruptcy in the Netherlands.  *See* ECF No. 198.  On July 30, 2019, NY Regional demanded that the Guarantors perform their obligations under the Completion Guaranty.  *See* TAC ¶ 215.  On August 7, 2019, the Guarantors stated that the Completion Guaranty was unenforceable and refused the demand. *See id.* ¶ 216.  And finally, on August 26, 2019, New York Wheel moved to reopen the case, as it was "not feasible . . . to obtain the necessary financing."  ECF No. 210, at 1.  The Court granted the motion and ordered the parties to "start fresh" — that is, to file new pleadings and motions. ECF No. 211.  On January 17, 2020 — after Defendants had moved to dismiss, but before that motion was fully briefed — the Court was notified that Starneth B.V. had filed for bankruptcy. *See* ECF No. 245.  As a result, all litigation with respect to Starneth B.V. is stayed.  *See* ECF No. 246.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor

of the plaintiff.  *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  To survive

such a motion, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on

its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must show "more than

a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels

and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have

not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must

be dismissed."  *Id.* at 570.  These well-established standards "appl[y] equally to claims,

counterclaims, cross-claims and third-party claims."  *Wine Enthusiast, Inc. v. Vinotemp Int'l

Corp.,* 317 F. Supp. 3d 795, 800 (S.D.N.Y. 2018).

## DISCUSSION

Now before the Court are four separate motions.  Defendants move to dismiss Plaintiffs'

Third Amended Complaint in its entirety; New York Wheel moves to dismiss certain claims

asserted against it by Mammoet North; the City moves to dismiss the third-party claim that

Mammoet North asserts against it; and Mammoet North moves to amend its third-party

complaint to add a claim against New York Wheel Mezz.  The Court will address each in turn.

## A.  Defendants' Motion to Dismiss Plaintiffs' Complaint

The Court begins with Defendants' motion to dismiss the Third Amended Complaint.  In

light of the stay as to Starneth B.V., the motion seeks dismissal of New York Wheel's claim for

breach of contract against Mammoet; New York Wheel's claim for fraudulent inducement

against Mammoet, Mammoet North, and Starneth; and NY Regional's claim for of the guaranty against Mammoet Holding.  The Court will address each in turn.

### 1.  Count One — Breach of Contract: Alter Ego and Agency Liability

New York Wheel advances two theories for why Mammoet is liable for the DBT's alleged breaches of contract: first, because the DBT is an alter ego of Mammoet; and second, because the DBT had either actual or apparent authority to act as Mammoet's agent and enter into the DBA on its behalf.  For the reason that follow, the Court concludes that the allegations in the Third Amended Complaint are sufficient to proceed on the first theory, but not the second.

#### a.  Alter Ego Liability

First, the Court concludes that New York Wheel plausibly alleges that the DBT is Mammoet's alter ego.  The DBT is organized under Delaware law, *see* TAC ¶ 18, and the parties therefore agree that Delaware law applies to this claim.  *See* Defs.' MTD Br. 7; Pls.' MTD Opp'n 1 & n.1; *see also, e.g.*, *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (noting that "where the parties agree" on what "law controls, this is sufficient to establish choice of law"); *NetJets Aviation, Inc. v. LHC Commc'ns LLC*, 537 F.3d 168, 177-78 (2d Cir. 2008) (applying Delaware law to an alter ego claim against a limited liability company organized under Delaware law).

Under Delaware law, "the members of an LLC generally are not liable for the debts of the entity, and a plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces a difficult task."  *NetJets*, 537 F.3d at 176 (internal quotation marks omitted).  In order to "pierce the corporate veil," the plaintiff must allege "fraud" or that "a subsidiary is in fact a mere instrumentality or alter ego of its owner."  *Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 793 (Del. Ch. 1992).  This inquiry is a "fact intensive" one.  *Case Fin., Inc. v. Alden*, No.

1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009).  First, a court must determine whether the relevant parties operated as a single entity by considering such factors as (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the controlling shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the controlling shareholder.  *See id.*  No one factor dominates the inquiry.  *See id.*

In addition, alter ego claims in Delaware "require[] an element of fraudulent intent." *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 147 (S.D.N.Y. 2012) (quoting *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 470 (D. Del. 2010)).  "Courts and commentators," however, "have noted that this standard is less than clear and has been criticized for its ambiguity and randomness."  *Id.* (internal quotation marks omitted).  Notably, the Second Circuit has explained that, under Delaware law, "a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'"  *NetJets*, 537 F.3d at 176 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)); *see also id.* at 177 (noting that a "plaintiff need not prove that the corporation was created with fraud or unfairness in mind" and that "[i]t is sufficient to prove that it was so used").

Applying those factors here, and mindful of the fact-intensive nature of the inquiry, the Court cannot dismiss New York Wheel's alter ego claim.  New York Wheel alleges that the DBT was funded entirely by progress payments, leaving it with little or no margin for error.  *See* TAC ¶¶ 127-30.  Given the complexity and size of the project, the DBT and its members should have — and may have — recognized that there was a substantial risk of cost overruns.  *See id.* ¶¶ 128, 130-31.  Because New York Wheel plausibly pleads that the DBT had insufficient capital to

14

cover reasonably anticipated costs, it also plausibly pleads that the DBT was undercapitalized. *See In re Autobacs Strauss, Inc.*, 473 B.R. 525, 552-53, 556 (Bankr. D. Del. 2012) (denying a motion to dismiss an alter ego claim under Delaware law in part because defendant's capital was insufficient to cover reasonably foreseeable costs); *see also Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) ("[T]he inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." (internal quotation marks omitted)).  New York Wheel also plausibly alleges that the DBT became insolvent no later than 2016, *see* TAC ¶¶ 134-36, and then overpaid Mammoet and its affiliated entities for subcontracting work, *see id.* ¶¶ 137-40.  The Third Amended Complaint further alleges that "[t]he DBT used a bank account controlled by Mammoet USA South," a Mammoet affiliate, and that "[n]umerous wire transfers . . . were initiated by Mammoet USA South," *id.* ¶ 149; that the DBT did not have its own office, *see id.* ¶¶ 153, 166-67; that the DBT's executives were also executives of Mammoet or Starneth B.V., *id.* ¶ 154, and used emails belonging to latter, *id.* ¶¶ 153, 168-69; and that the executives from the Mammoet side used business cards bearing the name of Mammoet or other Mammoet-affiliated entities, *see id.* ¶ 157. The DBA itself provides that it would not become effective absent approval by Mammoet's board of directors.  DBA § 19.24.  And on at least two occasions, both after the DBT's termination, the Chief Executive Officer of Mammoet authorized loans on behalf of the DBT, even though he had no position with the DBT and no authority to act on its behalf.  *See* TAC ¶¶ 143-45.  Taken together, these allegations are sufficient to state a claim that the DBT and Mammoet were a "single entity."

Given that "the same facts used to show that the business entities operate[] as a single enterprise can lend the requisite fraud or inequ[]ity," *Soroof*, 283 F.R.D. at 151, New York Wheel's allegations are also sufficient, at this stage, to plead "an overall element of unfairness or injustice," *NetJets*, 537 F.3d at 177.  In particular, drawing all inferences in New York Wheel's favor, as the Court must, the allegations regarding the commingling of assets among Mammoet-affiliated entities, the insufficient capital to cover reasonably foreseeable costs, and the outsize payments to Mammoet-affiliated entities are sufficient to plausibly establish an "inequitable use of the corporate form."  *Soroof*, 283 F.R.D. at 151 (quoting *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184-VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008)).  Mammoet argues that there can be no inequity because New York Wheel was aware that the DBT was merely a shell company, and yet it obtained the Completion Guaranty for its lenders' benefit, not its own.  *See* Defs.' MTD Br. 21.  New York Wheel's notice and acceptance of the risks may well be relevant factors, but they are not enough to warrant dismissal at this stage.

Mammoet's other arguments are also unpersuasive.  First, Mammoet argues that the alter ego claim must be dismissed because it asserts that the DBT was an alter ego of both Starneth B.V. and Mammoet, which is "logically and legally impossible."  Defs.' MTD Br. 19.  But unless and until the Court finds that the DBT is, in fact, an alter ego of Starneth B.V., the Court need not decide the question.  Second, Mammoet argues that the DBA contains a no-recourse provision, which forecloses any claim that New York Wheel may have against Mammoet related to the DBA.  *See* Defs.' MTD Br. 27-28.  Section 19.10 of the DBA provides that "[n]o personal liability shall arise out of the Work, this Agreement or the other Design Build Documents as against" any "member" of "the [DBT] or its constituent entities" and that the parties "shall look solely to the assets" of the DBT "in respect of the obligations of . . . the [DBT] under this

Agreement." DBA § 19.10.  Under Delaware law, however, such provisions bar only contract claims, not equitable claims, *see Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 793 (Del. Ch. 1992), and claims for alter ego liability are equitable in nature, *see, e.g.*, *LaSalle Nat'l Bank v. Perelman*, 141 F. Supp. 2d 451, 462-63 (D. Del. 2001) (holding an alter ego claim to be equitable); *Geyer*, 621 A.2d at 793 ("Such an alter ego claim is distinct from a contract claim and is equitable in nature."); *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, No. 8578, 1988 WL 5492, at *3 (Del. Ch. Jan. 27, 1988) (characterizing an "alter ego" claim as an "equitable claim[]").  Accordingly, New York Wheel's claim is not foreclosed by the no-recourse provision. *See LaSalle*, 141 F. Supp. 2d at 463 (finding an alter ego claim "not barred by the no recourse provisions"); *Mabon*, 1988 WL 5492, at *3 (holding that the "plaintiffs' equitable claims," such as "alter ego," were "not barred" by a no-recourse provision).

Mammoet argues that the foregoing cases are distinguishable on two grounds.  First, it argues that the no-recourse clause in the DBA, unlike those in *Geyer* and *LaSalle*, is, by its terms, not limited to contract claims.  *See* ECF No. 242 ("Defs.' MTD Reply"), at 10 (noting that Section 19.10 applies to any liability "aris[ing] out of the Work").  But *LaSalle* itself suggests that the analysis does not turn on the precise language of the contract.  *See LaSalle*, 141 F. Supp. 2d at 461 (interpreting *Geyer* not to "rely on . . . any specific language of the provision in limiting the provision to contract claims" but instead to "generally h[o]ld that no recourse provisions are limited to contract claims").  And in any event, the language of the clause in this case and the language of the clauses in *Geyer* and *LaSalle* are nearly identical.  *See, e.g.*, *Geyer*, 621 A.2d at 793 n.6 ("The Note states that 'no officer, director, employee or agent of Obligor . . . shall have *any liability hereunder* . . . but, instead, all parties shall look solely to the property and assets of Obligor for satisfaction of claims *of any nature* arising under or *in connection with* this

Note.'" (emphasis added)); *LaSalle*, 141 F. Supp. 2d at 455 ("A director, officer, employee or stockholder . . . of the Company or the Trustee shall not have any liability for any *obligations of the Company or the Trustee* under the Securities or this Indenture or for any claim based on, in respect of or by reason of such obligation or their creation." (emphasis added)).

Second, Mammoet argues that, "[u]nder New York law, *alter ego* is not a separate claim, but merely a vehicle for asserting a claim against a related company," and that the claim is therefore barred even if the no-recourse provision does apply only to claims for breach of contract.  *See* Defs.' MTD Reply 10 (internal quotation marks omitted).  But New York law provides that, under some circumstances, alter ego liability can be an independent cause of action.  *See, e.g.*, *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 522 (S.D.N.Y. 2014) (holding that a veil-piercing claim is an independent cause of action "when the corporation has already been held liable and a third party brings a later action seeking to enforce the judgment against its owners").  More importantly, however, Mammoet's argument is inconsistent with *LaSalle*, which also involved a contract governed by New York law and an underlying claim for breach of contract.  *See LaSalle*, 141 F. Supp. 2d at 459 ("New York law governs this dispute.").  The Court finds *LaSalle*'s reasoning persuasive.  *See id.* at 459-62. Moreover, New York law is relevant only with respect to the interpretation of the contract, not the categorization of the claims at issue here — which, as Mammoet itself argues, is governed by Delaware law.  *See* Defs.' MTD Br. 7.  In other words, New York law is relevant to the question of whether the no-recourse provision bars equitable claims; it is not relevant to whether the claim is equitable or contractual.

In sum, New York Wheel's claim for breach of contract against Mammoet survives to the extent that it asserts an alter ego theory of liability.

### b.  Actual and Apparent Authority

In the alternative, New York Wheel asserts that Mammoet was itself a party to the DBA, because the DBT was merely acting as its agent.  *See* TAC ¶¶ 190-206, 230-35; Pls.' MTD Opp'n 19-27.  "[T]o bind a principal to a contract" under New York law, "an agent must have real or apparent authority to do so."  *PMC, Inc. v. Atomergic Chemetals Corp.*, 844 F. Supp. 177, 182 (S.D.N.Y. 1994).  "Actual authority arises from a direct manifestation of consent from the principal to the agent."  *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009).  Actual "authority may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act."  *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).  Apparent authority, by contrast, turns on the putative principal's representations (through words or conduct) to the third party, and it exists "if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists."  *Themis Capital, LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508, 522 (S.D.N.Y. 2012) (internal quotation marks omitted).

Under many circumstances, a party with actual or apparent authority can bind its (actual or purported) principal to a contract.  Significantly, however, a principal is not a party to, or bound by, a contract from which it is expressly excluded.  *See, e.g.*, *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd.*, 954 F.3d 567, 572 (2d Cir. 2020) (considering whether a contract "explicitly exclude[s] a principal as a party").  As the Restatement (Third) of Agency explains, "[a]n agent who acts on behalf of a disclosed principal may enter into a contract with a third party that by its terms excludes the principal as a party. . . .  [T]he principal is not a party to the contract . . . because the third party has not manifested assent to an exchange with the principal."

Restatement (Third) of Agency § 6.01 cmt. b; *see also id.* § 6.01 cmt. c ("*Unless the contract*

*explicitly excludes the principal as a party*, parol evidence is admissible to identify a principal

and to subject the principal to liability on a contract made by an agent." (emphasis added)).

Here, the express terms of the DBA foreclose any finding that Mammoet is liable as the

DBT's principal.  In particular, Section 1.1 of the DBA provides that the "Design Build

Documents" — which include the DBA — "shall not be construed to create a contractual

relationship of any kind . . . between any persons or entities other than [New York Wheel] and

the [DBT]."  DBA § 1.1.  Additionally, Section 19.10 of the DBA provides that the parties to the

contract "shall look solely to the assets of . . . the [DBT], in respect of the obligations of . . . the

[DBT] under this Agreement."  *Id.* § 19.10.  Were the Court to conclude that the DBT acted as

Mammoet's agent and that Mammoet is bound by the DBA and liable for its breach as a result, it

would create a contractual relationship between Mammoet and New York Wheel, in direct

contravention of these provisions.  *See Trina Solar*, 954 F.3d at 572 (holding that a similar

"third-party beneficiary clause" makes clear that "no one — other than the . . . entities that are

designated as 'Parties' in the first clause of the contract . . . — has any rights whatsoever under

the Contract").  It follows that New York Wheel's effort to hold Mammoet liable for breach of

contract on a theory of actual or apparent authority fails as a matter of law.

New York Wheel makes two counterarguments, neither of which is persuasive.  First, it

argues that clauses like the one in Section 1.1 are common in construction contracts and intended

not to preclude claims against principals of parties to the contract, but rather to ensure that other

related parties cannot claim to be third-party beneficiaries.  *See* Pls.' MTD Opp'n 22-23.  "But

where, as here, the relevant contract language is unambiguous, there is no basis to look beyond

the four corners of the contract at a party's subjective understanding" or industry practice.

*Berkley Assurance Co. v. Hunt Constr. Grp., Inc.*, — F. Supp. 3d —, No. 19-CV-2879 (JMF), 2020 WL 3000399, at *6 (S.D.N.Y. June 4, 2020).  Moreover, the cases that New York Wheel cites in support of its argument do not suggest, let alone hold, that clauses like the one in Section 1.1 apply *only* to preclude third-party beneficiary claims.  *See E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1030-31 (5th Cir. 1977) (holding only that a similar provision caused plaintiff's assertion that it was an intended third-party beneficiary to fail); *Taylor Pipeline Constr., Inc. v. Directional Road Boring, In.*, 438 F. Supp. 2d 696, 709-10 (E.D. Tex. 2006) (holding only that the particular plaintiff's attempt "to create a contractual relationship . . . by weaving together various provisions" of various contracts "are futile" in light of a similar provision).  It is simply a *non sequitur* to say that just because such clauses have been construed to preclude claims by related parties to be third-party beneficiaries they do not also preclude claims against the alleged principal of a party to the contract.

Second, New York Wheel asserts that, even if the plain terms of the contract rule out a contractual relationship, they do not foreclose liability based on a different relationship, such as "contractual privity through agency."  Pls.' MTD Opp'n 23 (internal quotation marks omitted). But the sole case cited in support of that argument — *Epicentre Strategic Corp. v. Perrysburg Exempted Vill. Sch. Dist.*, No. 3:04-CV-7467, 2005 WL 646079 (N.D. Ohio Mar. 18, 2005) — is non-binding, arguably distinguishable, and ultimately unpersuasive.  The case is distinguishable because it involved a negligence claim under Ohio law, not a breach-of-contract claim.  *See id.* at *4.  The court did note that, under Ohio law, "there is no duty to exercise reasonable care to avoid purely economic loss to another unless there is contractual privity between the parties." *Id.*  But it is not obvious that "contractual privity" refers to the privity required to find liability for breach of contract.  In any event, *Epicentre* is unpersuasive for the simple reason that, if the

purported principal were held liable under the contract, the contract *would* be construed to create a contractual relationship between the third party and the principal.  That is, the contract is a necessary, albeit perhaps insufficient, basis for liability.  *Epicentre* cites no authority for the proposition that, under such circumstances, claims premised on agency theories of liability are not barred, *see id.* at *4-5, and no court has cited *Epicentre* for that conclusion.  Indeed, even the *Epicentre* court did not clearly reach such a conclusion.  Instead, it concluded that the third party's claims against an alleged agent failed for the adequate and independent reason that, "[a]s an agent of a disclosed principal, [he] cannot be said to be in contractual privity with [the third-party]."  *Id.* at *5.

In sum, by its plain terms, the DBA does not "create a contractual relationship of any kind . . . between any persons or entities other than [New York Wheel] and the [DBT]."  DBA § 1.1.  Thus, to the extent that Count One of New York Wheel's Complaint seeks to hold Mammoet liable for breach of contract on an agency theory, it must be and is dismissed.

## 2.  Count Two — Fraudulent Inducement

The Court turns, then, to New York Wheel's claim for fraudulent inducement against Mammoet, Mammoet North, and Starneth (the "Fraudulent Inducement Defendants").  Specifically, New York Wheel claims that Mammoet and Mammoet North fraudulently induced it to enter two amendments of the DBA and to increase the Contract Sum by representing during negotiations that certain required engineering drawings were nearly complete, when they were not.  *See* TAC ¶¶ 236-47.  New York Wheel also argues that the DBT, as either an agent or an alter ego of Mammoet, fraudulently induced it to amend the DBA.  *See* TAC ¶¶ 250-58.

Under New York law, to state a claim for fraudulent inducement, a plaintiff must allege "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false;

(3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001); *accord Neckles Builders, Inc. v. Turner*, 117 A.D.3d 923, 925 (2d Dep't 2014).  Needless to say, agency principles aside, a fraudulent inducement claim lies only where the defendant itself made the relevant misrepresentation or omission.  *See, e.g.*, *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) ("In order to prove fraudulent inducement under New York law, a plaintiff must prove . . . that the defendant made a representation . . . ." (internal quotation marks omitted)); *cf. Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (holding that, with respect to securities fraud claims under Section 10(b) of the Exchange Act, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it").  Because a claim of fraudulent inducement sounds in fraud, the plaintiff must also comply with Rule 9(b) of the Federal Rules of Civil Procedure, which means that "[t]he circumstances constituting fraud or mistake" must be "state[d] with particularity" (although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").  *Downey v. Adloox Inc.*, 238 F. Supp. 3d 514, 525 (S.D.N.Y. 2017) (internal quotation marks omitted).  That requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted).

To the extent that New York Wheel's claim for fraudulent inducement is premised on the Fraudulent Inducement Defendants' own conduct, it must be dismissed.  That is because New York Wheel does not plausibly plead that the representations at issue were made by, or on behalf

of, the Fraudulent Inducement Defendants, rather than on behalf of the DBT alone.  Conclusory assertions aside, New York Wheel's claim is premised on three relevant allegations: (1) that the individuals who made the statements held positions with both the DBT and Mammoet and its affiliates, *see* TAC ¶¶ 111, 121; (2) that the DBT "was working with related Starneth and Mammoet entities . . . to complete the drawings," *id.* ¶ 111; and (3) that Starneth had an "important role . . . in producing the engineering drawings," *id.*  Critically, however, none of the speakers held positions with Starneth or any related entity.  And the mere fact that Starneth entities were "working with" the DBT and had an "important role" in a portion of the project does not suggest that Starneth had "knowledge" of, let alone "approv[ed], and aid[ed]," misrepresentations by the DBT.  *Id.*  The question is perhaps closer with respect to Mammoet and Mammoet North, but New York Wheel cannot escape the fact that the representations at issue were made during negotiations regarding amendments to a contract with the DBT alone, *not* with Mammoet and Mammoet North.  Thus, absent any additional detail regarding the context and circumstances in which the representations were made, there is no basis to conclude that the statements were made on behalf of the Fraudulent Inducement Defendants.

In any event, New York Wheel fails to plausibly allege cognizable damages.  Under New York law, a plaintiff asserting a claim for fraudulent inducement can recover only "out of pocket" damages.  *Kumiva Grp., LLC v. Garda USA Inc.*, 146 A.D.3d 504, 506 (1st Dep't 2017); *see also Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1374 (N.Y. 1996) ("Even if the claims of fraud were sufficiently alleged, plaintiffs would be limited to recovering their losses.").  Significantly, "'[o]ut of pocket' damages are calculated in three steps.  First, the plaintiff must show the actual value of the consideration it received.  Second, the plaintiff must prove that the defendant's fraudulent inducement directly caused the plaintiff to agree to deliver

consideration that was greater than the value of the received consideration.  Finally, the

difference between the value of the received consideration and the delivered consideration

constitutes 'out of pocket' damages."  *Kumiva Grp.*, 146 A.D.3d at 506.  The Third Amended

Complaint pleads none of these steps.  Most obviously, New York Wheel does not allege the

value of the work performed by the DBT.  New York Wheel also fails to allege the value of the

consideration it delivered to the DBT.  New York Wheel does allege that it "suffered damages in

an amount . . . including at least $20 million in wrongfully obtained increases in the contract

price."  TAC ¶ 247.  But New York Wheel would not have paid the full increase until the project

was completed and, of course, it never was.[2]

Because New York Wheel fails to plausibly allege cognizable damages, its claim against

Mammoet for fraudulent inducement premised on agency or alter ego liability must be and is

dismissed.  For the same reason, and because New York Wheel fails to plausibly plead that the

Fraudulent Inducement Defendants made the statements at issue, the remainder of this claim

must also be dismissed.  The Court need not and does not consider other arguments raised by the

Fraudulent Inducement Defendants.

---

[2]     In its opposition, New York Wheel changes course, arguing that its damages are equal to
the amount that its progress payments increased as a result of the amendments.  *See* Pls.' MTD
Opp'n 30.  New York Wheel's argument fails to persuade for at least two reasons.  First, a
plaintiff cannot amend its complaint in a brief.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169,
178 (2d Cir. 1998).  Second, New York Wheel does not allege in the Third Amended Complaint
that its progress payments actually increased and, as the Fraudulent Inducement Defendants note,
it is at least possible that the total payments decreased.  *See* Defs.' MTD Reply 12.  And even if
the payments increased, the Court has no way of determining, from the pleadings or the briefing
papers, whether the increases were offset by either an increase in the value of the consideration
that the Fraudulent Inducement Defendants delivered or other changes in the value of the DBA
to New York Wheel as a result of other amended provisions.

### 3. Count Three — Breach of the Completion Guaranty

The final piece of the motion to dismiss the Third Amended Complaints relates to NY Regional's claim against Mammoet Holding for breach of the Completion Guaranty, pursuant to which Starneth B.V. and Mammoet Holding agreed that they would either complete the project or pay damages in the event that DBT were to breach the DBA. *See* TAC ¶ 209-10; Completion Guaranty §§ 1.1(a), 1.2(c). NY Regional alleges that the DBT did breach the DBA and that Mammoet Holding and Starneth B.V. must therefore pay the damages required by the Completion Guaranty. *See* TAC ¶¶ 217-19, 263-64. Mammoet Holding argues that, pursuant to the terms of the Completion Guaranty, it is not liable. In the alternative, it argues that performance was impossible. Neither argument justifies dismissal.

First, NY Regional states a plausible claim for breach of the Completion Guaranty. Section 1.2(a) of the Completion Guaranty provides that NY Regional may demand performance or payment when "a default by the [DBT] under the [DBA] has occurred and is continuing." Mammoet Holding argues that, to the extent the DBT defaulted, its default was not "continuing" because the agreement was terminated. *See* Defs.' MTD Br. 38; Defs.' MTD Reply 15.[3] The Court disagrees. A party is in default when it fails to perform its contractual obligations. Ordinarily, termination of an agreement does not change that state of affairs; the terminated party remains liable for the breach. Thus, the condition in Section 1.2(a) is more reasonably read to prohibit a demand based on a breach that the DBT has cured. That reading is further supported by the fact that the Completion Guaranty contemplates the possibility that New York Wheel might terminate the DBA prior to its completion and expressly provides that the guarantors'

---

[3]     Mammoet Holding also suggests that no breach ever occurred, because the DBT validly withdrew from the DBA. Defs.' MTD Br. 38. As Mammoet Holding concedes, however, that is "a factual question that cannot be resolved on this motion." *Id.*

obligations "shall survive."  Completion Guaranty § 2.4; *see Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) ("[A] contract should be construed so as to give full meaning and effect to all of its provisions." (internal quotation marks omitted)).

Mammoet Holding argues that Section 2.4 of the Completion Guaranty means only "that, once the Guarantor [*i.e.*, Mammoet Holding and Starneth B.V.] has commenced performance under the Guaranty, the subsequent termination of the DBA will not affect its responsibility to complete the Work."  Defs.' MTD Reply 15.  But this interpretation is made up out of whole cloth.  Partial performance is mentioned nowhere in Section 2.4.  And contrary to Mammoet Holding's contention, the requirement that the DBT's default be "continuing" is not rendered meaningless, as it would exclude any breach that is cured or excused by the party to which the DBT's obligation is owed.  Mammoet Holding also argues that NY Regional's interpretation would produce the "absurd result[]" of allowing NY Regional to "wait[] twenty-five, fifty or even more years before making [a] demand."  Defs.' MTD Reply 15-16.  But, of course, the Completion Guaranty itself terminates on "the date on which the Work is complete and the Guaranteed Obligations" — which include "full performance and completion of all Work required under the [DBA]," Completion Guaranty § 1.1(a) — are "otherwise fully satisfied," Completion Guaranty, art. XV.  Moreover, the Completion Guaranty expressly provides that "the rights of the Beneficiaries . . . and the obligations of Guarantor under this Guaranty shall be subject to all applicable statutes of limitation."  *Id.* § 2.2(f).  At most, the relevant provisions of the Completion Guaranty are ambiguous, which is enough to deny Mammoet Holding's motion. *See, e.g.*, *Orchard Hill Master Fund Ltd.*, 830 F.3d at 157.

As noted, Mammoet Holding argues in the alternative that performance under the Completion Guaranty was "objectively impossible" because the project was dead and it was

therefore unable to satisfy its obligation to guarantee "full performance and completion of all Work."  *See* Defs.' MTD Br. 38-40; Completion Guaranty § 1.1(a).  But the Completion Guaranty expressly provides that, "[i]n lieu of performance by Guarantor of the Completion Obligations, Guarantor shall, at the option of the Beneficiary that made such Performance Demand, be liable" for, among other things, damages roughly equal to the cost of completion or the cost of restoration of the premises to its prior condition.  Completion Guaranty § 1.2(c).  Mammoet Holding provides no reason why this obligation could not be satisfied, even if the project is dead.  Nor must NY Regional "allege that it plans to construct the Project" in order to succeed on this claim.  *See* Defs.' MTD Reply 16.  For one thing, cost of completion is only one of two alternative measures of payment.  In addition, the cost of completion can be assessed even if the payment is not ultimately put to that use.

The Court has considered the remainder of Mammoet Holding's arguments and finds them unavailing.  Thus, its motion to dismiss Count Three of the Third Amended Complaint must be and is denied.

## B.  The City's Motion to Dismiss Mammoet North's Third-Party Claim

Next, the Court considers the City's motion to dismiss Mammoet North's claim for violation of Section 5 of the New York Lien Law, which provides in relevant part as follows:

> Where no public fund has been established for the financing of a public improvement with estimated cost in excess of two hundred fifty thousand dollars, the chief financial officer of the public owner shall require the private entity for whom the public improvement is being made to post, or cause to be posted, a bond or other form of undertaking guaranteeing prompt payment of moneys due to the contractor . . . .

N.Y. Lien Law § 5.  The parties agree that Section 5 applies here, but they disagree about whether the Payment Guaranty provided by New York Wheel Mezz satisfied the City's obligations and, if it did not, whether Section 5 permits a suit against the City for damages.

The Court need not and does not resolve the first dispute because it agrees with the City that there is no implied private right of action for damages under Section 5 of the New York Lien Law.  When determining whether a private right of action may be implied from a New York state law, the Court must consider three factors: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme."  *Sheehy v. Big Flats Community Day, Inc.*, 73 N.Y.2d 629, 633 (N.Y. 1989).  Here, the first two factors cut in favor of Mammoet North.  When Section 5 was amended, its sponsor explained that the bill was intended to "address[] the issue of contractors and subcontractors working on privately-owned construction projects on public land. New York State Courts have considered such projects to be public improvements, thus prohibiting most contractors and subcontractors from perfecting a lien, because they cannot attain a lien against the public land, and there is no public fund which may be encumbered."  Bill Jacket, N.Y. Sen. Bill 595, Ch. 155 (2004) ("Bill Jacket"), Hannon Letter.  Moreover, the bill was specifically designed to "protect the interests of contractors and subcontractors in the above-described situations."  *Id.*  And, of course, there is no doubt that a private right of action would give contractors "effective remedies to ensure payment for their work or materials."  *Id.*

Providing a private right of action for damages, however, would be inconsistent with the statutory scheme contemplated by the New York Legislature.  "When an implied private cause of action would subject a municipality to potential financial liability," it should not be found consistent with the legislative scheme "unless there is clear evidence of the Legislature's willingness to expose the governmental entity to liability that it might not otherwise incur."  *Goddard v. Martino*, 970 N.Y.S.2d 382, 387 (Sup. Ct. 2013) (internal quotation marks omitted);

*see Alexander v. Westminster Presbyterian Church*, 719 N.Y.S.2d 457, 459-60 (Sup. Ct. 2000).

Here, there is no "clear evidence" of such willingness.  To the contrary, the Legislature

forecasted that the amendment would cause "no[]" fiscal impact.  *See* Bill Jacket.  To be sure,

there *would* be no fiscal impact if public owners uniformly complied with Section 5.  But as

other states around the country have learned, mistakes happen.  *See, e.g.*, *Accent Store Design,

Inc. v. Marathon House, Inc.*, 674 A.2d 1223 (R.I. 1996) (public authority failed to require

bond); *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 40 (Tex. 1992) (bonds

posted were discovered to be fraudulent).  Were the Court to adopt Mammoet North's position,

public owners would effectively become guarantors in the event of a mistake.  One would expect

that such a risk would cause the Legislature to anticipate at least *some* financial impact — or at

least explain why there would not be.  *See Uhr ex rel. Uhr v. E. Greenbush Cent. Sch. Dist.*, 720

N.E.2d 886, 891 (N.Y. 1999) (finding no implied private right of action against the government

in part because the Legislature forecasted that the bill would have "minimal financial impact on

school districts").  Moreover, the legislative history indicates that the Legislature contemplated

that contractors could "file a claim against the payment bond or undertaking" but did not further

contemplate a claim for damages against public owners who fail to obtain one.  *See* Bill Jacket.

Additionally, Mammoet North does not contest the City's argument that the DBT could

have filed an Article 78 proceeding against the City to compel it to require a bond or other

sufficient undertaking.  *See* ECF No. 260 ("NYC 3d Pty. MTD Br."), at 8-9; ECF No. 273

("Def.'s 3d Pty. MTD Opp'n"), at 15-19.  Where, as here, Article 78 is available to parties, New

York courts often "infer that had [the Legislature] intended to create a private right of action [for

damages], it would have specifically done so."  *Franza v. State*, 164 A.D.3d 971, 973 (3d Dep't

2018) (internal quotation marks omitted); *see also Signature Health Ctr., LLC v. State*, 92

A.D.3d 11, 17 (3d Dep't 2011); *Bennett v. State of New York*, 11 Misc. 3d 1088(A), 2006 WL

1152594 (Table) (N.Y. Ct. Cl. Feb. 21, 2006) ("[T]he mere violation of a regulation does not

necessarily give rise to a private cause of action for money damages. . . .  Here, claimant had an

article 78 review as well as the inmate grievance process available to prevent the unauthorized

opening of his privileged mail . . . and in view of those protections the Court can find no basis

for transforming a violation of [the regulation] into a private cause of action for money

damages." (interal quotation marks omitted)).  Mammoet North could have filed an Article 78

proceeding to protect its rights.  Mammoet North offers no reason why, having failed to do so, it

should be permitted to sue for damages under the Lien Law.

    Finally, the Court's conclusion that there is no private right of action for damages under

Section 5 of the Lien Law is reinforced by New York court decisions with respect to

constitutional torts.  The New York Court of Appeals has noted that the analysis regarding the

availability of a constitutional tort claim is "not unlike that which the Supreme Court [of the

United States] and [the New York Court of Appeals] have used to find a private right of action

based upon certain regulatory statutes."  *Brown v. State*, 89 N.Y.2d 172, 189 (1996).  And under

similar circumstances, New York courts have uniformly refused to imply private rights of action

for damages from constitutional violations.  *See, e.g.*, *LM Bus. Assocs., Inc. v. New York*, 124

A.D.3d 1215, 1219 (4th Dep't 2015) (dismissing a constitutional tort claim where the "claimants

could have raised their constitutional arguments in an application to County Court seeking the

return of their computers or, if such motion were denied, in a CPLR article 78 proceeding

seeking relief in the nature of mandamus or prohibition" (citation omitted)); *Carver v. State*, 79

A.D.3d 1393, 1394-95 (3d Dep't 2010) ("Where, as here, an alternative avenue of relief is

available — such as a declaratory judgment action or CPLR article 78 proceeding — a claim

based upon a constitutional tort will not lie."); *Shelton v. N.Y. State Liquor Auth.*, 61 A.D.3d

1145, 1150 (3d Dep't 2009) (affirming dismissal of state constitutional tort claims because the

"allegedly unlawful actions . . . could have been challenged in the context of a CPLR article 78

proceeding"); *Bullard v. New York*, 307 A.D.2d 676, 678-79 (3d Dep't 2003) (dismissing a

constitutional tort claim where the "claimants had an alternative remedy through a CPLR article

78 proceeding"); *see also Martinez v. City of Schenectady*, 761 N.E.2d 560, 563-64 (N.Y. 2001)

(refusing to recognize a constitutional tort claim where the exclusion of allegedly unlawfully

obtained evidence would adequately effectuate constitutional rights).  If anything, the case for a

private right of action to vindicate the statutory right here is weaker.

     *Davidson Pipe Supply Co. v. Wyoming County Industrial Development Agency*, 595

N.Y.S.2d 898 (Sup. Ct. Wyo. Cty. 1993), *rev'd on other grounds*, 196 A.D.2d 240 (4th Dep't

1994), upon which Mammoet North relies, does not alter the Court's analysis or conclusion.  *See*

Def.'s 3d Pty. MTD Opp'n 13-14.  In that case, the New York Supreme Court found a private

right of action for damages against a public entity for failure to require a bond as mandated by

Section 137 of the New York Finance Law, which is similar to the statute at issue here.  But

*Davidson Pipe* was decided before the New York Court Appeals decisions in *Uhr* and *Martinez*,

which weigh strongly against inferring a private right of action for damages in circumstances like

those here.  Moreover, *Davidson Pipe*'s holding has twice been rejected by New York courts.

*See Aldo Frustaci Iron Work, Inc. v. Promatech, Inc.*, No. 601278/00, 2001 N.Y. Misc. LEXIS

1449, at *11-12 (N.Y. Sup. Ct. Oct. 24, 2001) (holding that "[a] private right of action would be

inconsistent with the legislative intent and scheme behind State Finance Law section 137" in part

because "the filing of a bond" under the statute is "compulsory, and therefore, the remedy for the

failure to do so is mandamus to compel compliance with the statute"); *Diontech Consulting, Inc.*

*v. N.Y.C. Hous. Auth.*, No. 600321/2009, 2009 N.Y. Misc. LEXIS 6772 (N.Y. Sup. Ct. Mar. 18, 2009) (relying on *Aldo Frustaci* and concluding that "[a] private right of action would be inconsistent with the legislative intent and the scheme behind" Section 137 (internal quotation marks omitted)), *aff'd*, A.D.3d 527, 529 (1st Dep't 2010).  For these reasons, among others, the Court declines to follow the non-binding decision in *Davidson Pipe*.

The Court has considered Mammoet North's remaining arguments and finds them to be without merit.  Accordingly, the City's motion to dismiss must be and is granted.

## C.  New York Wheel's Partial Motion to Dismiss Mammoet North's Counterclaims

The Court turns, then, to New York Wheel's motion to dismiss seven of the ten claims that Mammoet North brings in its Amended Third-Party Complaint and Counterclaims.  *See* ECF No. 261.  Specifically, New York Wheel moves to dismiss Count One, for violation of Section 5 of the New York Lien Law; Counts Four through Eight, all of which allege breach of contract; and Count Ten, which also alleges breach of contract.  The Court addresses each in turn.

### 1.  Count One — New York Lien Law

First, Mammoet North argues that New York Wheel failed to "post a bond or other undertaking" that guaranteed payment for work performed and that it is therefore liable for damages under Section 5 of the New York Lien Law.  New York Wheel moves to dismiss the claim on the ground that Section 5 creates no right of action against it, as a private party.  *See* ECF No. 263 ("NYW MTD Br."), at 1-5.  The Court agrees.

As explained above, the "essential factors" that must be considered when determining whether "a private right of action may fairly be implied" under a statute are: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether

creation of such a right would be consistent with the legislative scheme." *Sheehy*, 73 N.Y.2d at

633. Private rights of action may be implied, however, only to enforce existing obligations, not

to create new ones. *See Uhr*, 720 N.E.2d at 890 (characterizing a private right of action as an

"enforcement mechanism"); *Schlessinger v. Valspar Corp.*, 991 N.E.2d 190, 192 (N.Y. 2013)

(finding no "express or implied private right of action to *enforce*" a particular statute (emphasis

added)); *Maimonides Med. Ctr. v. First United Am. Life Ins. Co.*, 116 A.D.3d 207, 214 (2d Dep't

2014) (finding that the enumeration of "specific duties upon insurers and creat[ion of] rights in

patients and health care providers . . . militates in favor of the recognition of an implied private

right of action to enforce such rights"). Put differently, to imply a private right of action against

a party under no statutory obligation would be inconsistent with legislative intent.

      By its terms, Section 5 of the New York Lien Law imposes obligations only on public

owners, as it provides that "the chief financial officer *of the public owner shall require* the

private entity for whom the public improvement is being made to post" a bond or other

undertaking. N.Y. Lien Law § 5 (emphasis added). Thus, the statute *itself* does not impose

obligations on private entities such as New York Wheel; instead, the statute directs the public

owner to do so. Notably, this is in contrast to similar statutes in other states, which explicitly

impose obligations on the private entity to post a bond. *See, e.g.*, Ariz. Rev. Stat. § 34-222(A)

(providing that "*the person* shall furnish . . . the following bonds"); Mich. Comp. Laws

§ 129.201 (providing that "the proposed contractor . . . shall furnish . . . a performance bond and

a payment bond"); 8 Pa. Cons. Stat. § 193(a) (providing that "*such contractor* shall furnish . . .

the following bonds"). Had the New York Legislature intended for the statute to impose an

obligation on private entities, it could have drafted the statute similarly. As the only New York

courts to address the issue have held, it follows that where, as here, the statute is allegedly

violated, there is no private right of action against the private entity. *See Empire Outlet Builders LLC v. NYC Fire Sprinkler Corp.*, Nos. 655572/2019, 595961/2019, 2020 WL 3473682, at *4 (N.Y. Sup. Ct. June 23, 2020) ("Lien Law § 5 expressly requires the 'public owner' to require the private entity for whose benefit the project is made to post a bond or other undertaking, but it places no affirmative obligation on the private entity."); *A.J. McNulty & Co. v. Empire Outlet Builders LLC*, No. 655727/2018, 2020 WL 1156469, at *2 (N.Y. Sup. Ct. Mar. 9, 2020) (holding that the court is not "free to read into Section 5 a requirement that developers of projects on public land guaranty payments to contractors and subcontractors," as "[t]he Legislature could easily have so provided" but "chose, instead, to require the public owner to take action").

This conclusion is bolstered by the litigation between Skanska USA Building Inc. and Atlantic Yards B2 Owner, LLC.  There, contractors asserted claims for breach of contract against the developer of a project on public land, arguing that the developer failed to provide a bond that satisfied Section 5 of the New York Lien Law. *See Skanska USA Bldg. Inc. v. ATL. Yards B2 Owner, LLC*, 146 A.D.3d 1, 7 (1st Dep't 2016) ("*Skanska I*").  The Appellate Division, First Department, of the New York Supreme Court granted the developer's motion to dismiss, finding that the *public owner* had "met its obligations under the statute" by obtaining from an affiliate of the developer a "formal 'Guaranty'" that the developer would pay all costs. *See id.* at 10.  The Court of Appeals affirmed, but on a different ground. *See Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 98 N.E.3d 720 (N.Y. 2018) ("*Skanska II*").  The Court of Appeals held that the developer had not breached its agreement with the contractor because the contract "contain[ed] no express provision requiring compliance with the Lien Law." *Id.* at 723.  The Court of Appeals further concluded that it could not read any such obligations into the contract, even though the property was publicly owned in New York and the contract was governed by New

York law.  *See id.*  Although not dispositive, that holding casts doubt on the existence of a

private right of action against the developer.  If the contractor had a claim against the developer

for violation of the Lien Law but improperly asserted it as a claim for breach of contract, it might

not have been dismissed.  *See, e.g.*, *Kraft v. Sheridan*, 134 A.D.2d 217, 218 (1st Dep't 1987)

(reversing dismissal of a claim that the lower court characterized as one for fraud because the

claim "ma[d]e out a valid claim for breach of contract"); *Diemer v. Diemer*, 168 N.E.2d 654, 658

(N.Y. 1960) ("It is enough now that a pleader state the facts making out a cause of action, and it

matters not whether he gives a name to the cause of action at all or even that he gives it a wrong

name.").  Indeed, the trial court later rejected the contractor's attempt to amend its complaint to

include a claim directly under the Lien Law, holding it was "no more than an attempt to

circumvent previous trial and appellate decisions in this case which held that [the contractor] did

not have a contractual right to additional financial security under Lien Law § 5 as no such right

was provided for" in the agreement.  *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, No.

652680/2014, 2019 WL 4962557, at \*7 (N.Y. Sup. Ct. Oct. 8, 2019).

Mammoet North's arguments to the contrary fail to persuade.  First, Mammoet North

identifies stray pieces of legislative history suggesting that the "bill requires private developers

. . . to post a payment bond or other security."  ECF No. 271 ("Mammoet North MTD Opp'n"),

at 5 (internal quotation marks omitted); Bill Jacket, Division of Budget Recommendation.  But

that is a slim reed indeed given the plain language of the statute.  Moreover, on balance, the

legislative history is consistent with the Court's interpretation of the statutory language.  Most

notably, consistent with the plain language, the amendment's sponsor explained to the Governor

that "the bill before you now mandates *the public owner* of the land to require the private entity"

to post a bond or other undertaking.  Bill Jacket, Hannon Letter (emphasis added).  Mammoet

North also argues that a private right of action may be implied because the Lien Law "is to be construed liberally to secure the beneficial interests and purposes thereof."  N.Y. Lien Law § 23. But that section is directed primarily at ensuring that "substantial compliance" with requirements regarding the establishment and enforcement of mechanic's liens "shall be sufficient."  *Id.*  And in any event, it does not give the Court license to disregard the linguistic choices made by the New York Legislature.

Nor do *A.C. Legnetto Construction, Inc. v. Hartford Fire Insurance Company*, 702 N.E.2d 830 (1998), and *Willets Point Asphalt Corp. v. R.L.I. Insurance Company*, 294 A.D.2d 356 (2d Dep't 2002), upon which Mammoet North relies, call for a different conclusion than the one the Court has reached.  Both involved performance and payment bonds required by Section 137 of the New York State Finance Law, which, as already noted, bears some similarity to Section 5.  *See* N.Y. State Fin. Law § 137(1) (mandating that public entities "require . . . a bond guaranteeing prompt payment of moneys due to all persons furnishing labor or materials to the contractor").  But neither court confronted the question at issue here.  Indeed, in both cases, bonds had actually been posted; the relevant question was merely whether they were Section 137 bonds of some other kind of bonds.  *See A.C. Legnetto*, 702 N.E.2d at 830-31; *Willets Point*, 294 A.D.2d at 356-57.  Thus, the stray statements in these decisions to the effect that "[t]he general contractor was required by [Section 137] to furnish a bond," *Willets Point*, 294 A.D.2d at 356-57; *accord A.C. Legnetto*, 702 N.E.2d at 831, do not support the weight that Mammoet North places on them.  Were there any doubt, it would be resolved by the fact that, elsewhere in *A.C. Legnetto*, the Court of Appeals clearly identified the public entity as the regulated actor.  *See A.C. Legnetto*, 702 N.E.2d at 832 (noting that, as a result of Section 137, "*municipalities were required* to bond all substantial construction projects" (emphasis added)).

In short, New York Wheel's motion to dismiss Mammoet North's claim against it for violation of Section 5 of the New York Lien Law must be and is granted.

## 2. Counts Four Through Eight — Breaches of Contract

Next, New York Wheel moves to dismiss Counts Four through Eight of Mammoet North's Amended Third-Party Complaint and Counterclaims, all of which assert claims for breach of contract. There is no dispute that the DBT was long aware of the facts giving rise to each of these claims. *See* ACC ¶¶ 68-70, 177-81 (Count Four); *id.* ¶¶ 44, 58, 188-89 (Count Five); *id.* ¶¶ 62, 194-95 (Count Six); *id.* ¶¶ 85, 198, 204-05 (Count Seven); *id.* ¶¶ 90-91, 208-10 (Count Eight). Nor is there any dispute that the DBT did not invoke the change order procedures set forth in Article IX of the DBA to recover damages arising from any such breach. Instead, the parties' dispute turns on whether, under the DBA, the DBT's claims for increased costs resulting from New York Wheel's defaults were waived because it did not invoke the change order procedures. *Compare* NYW MTD Br. 5-13, *with* Mammoet North MTD Opp'n 6-14.

It is well established that a written contract must be interpreted according to the parties' intent, which is "derived from the plain meaning of the language employed in the agreements." *In re Lehman Bros. Inc.*, 478 B.R. 570, 585-86 (S.D.N.Y. 2012) (internal quotation marks omitted). In a dispute over the meaning of a contract, the threshold question is whether the contract terms are ambiguous, *see, e.g.*, *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000), which is a question of law for the Court to decide on a claim-by-claim basis, *see, e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005); *Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 178 (2d Cir. 2004). A contract is unambiguous where it has "'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable

basis for a difference of opinion.'"  *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

When a contract's language is unambiguous, a court may resolve a claim for breach of contract on a motion to dismiss.  *See, e.g.*, *Advanced Mktg. Grp. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008); *see also, e.g.*, *Rounds v. Beacon Assoc. Mgmt. Corp.*, No. 09-CV-6910 (LBS), 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009) ("Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss." (internal quotation marks omitted)).  But "when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal" on a Rule 12(b)(6) motion.  *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) (internal quotation marks omitted); *accord, e.g.*, *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 55 (2d Cir. 2012) (explaining that "where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered, and in the context of a motion to dismiss, if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state [a] claim" (internal quotation marks and citations omitted)).

Here, the DBA is unambiguous, and New York Wheel's interpretation — that the DBT was required to invoke the change order procedures to obtain the payment it now seeks — is the only reasonable one.  The DBA provides that the Contract Sum is "a lump-sum, fixed-price . . . for a fully and completely constructed Project," DBA § 6.1, "inclusive of all costs necessarily incurred by the [DBT] in the proper performance of the Work," DBA § 8.1.1.  The parties recognized, however, that costs might increase, making a price adjustment appropriate.  As

relevant here, the parties contemplated that costs might increase as a result of "Unavoidable

Delay[s]," which include, among other things, "any act, failure to act, direction, directive, order,

delay or default of [New York Wheel]"; "use or occupation by [New York Wheel] of any part of

the Site or the Work contrary to the terms" of the DBA; and "design of any part of the Work or

the Development by [New York Wheel]." *Id.* § 5.2.2. If an Unavoidable Delay were to

materialize, then the DBT would be "entitled to an equitable adjustment to the Contract Sum"

equivalent to any "additional Project related costs." *Id.* But the DBA further provides that any

such adjustments "shall be effected by Change Orders entered into in accordance with Article

IX" of the DBA. *Id.* Section 9.1 emphasizes the point, reiterating that "in the event that, in

accordance with Article V, the [DBT] is entitled to . . . an adjustment of the Contract Sum in

respect of an Unavoidable Delay, such . . . adjustment shall be effected pursuant to a Change

Order." *Id.* § 9.1. And finally, Section 9.6.1 provides that "[i]f the [DBT] wishes to make a

claim for an increase in the Contract Sum . . . the [DBT] shall give Developer written notice

thereof within twenty-one (21) days after the [DBT] became aware, or should have become

aware, of the occurrence . . . giving rise to such claim, failing which, [DBT] shall waive such

claim." *Id.* § 9.6.1. Taken together, two conclusions follow from these provisions: first, that the

DBT was entitled to payment only in the amount of the Contract Sum; and second, that if its

costs increased — including as a result of New York Wheel's breach — it had to invoke the

change order procedure to change the Contract Sum.

     Mammoet North's arguments to the contrary do not pass muster. First, Mammoet North

claims that, although the change order procedure applies to claims for increases in the Contract

Sum, it does not apply to the claims asserted here, "which do not seek an adjustment to . . . the

Contract Sum." Mammoet North MTD Opp'n 7-8, 12, 14. The language in the contract,

however, does not support the asserted distinction.  As noted, the DBA describes the Contract

Sum as payment for a "fully and completely constructed Project," DBA § 6.1, inclusive of "all

costs necessarily incurred by the [DBT] in the proper performance of the Work," *id.* § 8.1.1.

Even more importantly, the DBA explicitly contemplates that claims for damages arising from

New York Wheel's breach can be compensated by an adjustment to the Contract Sum.  *See id.*

§ 5.2.2 (providing that the DBT "shall be entitled to an equitable adjustment *to the Contract

Sum*" if any Unavoidable Delay, including a "default of [New York Wheel]," causes "additional

Project related costs" (emphasis added)).  Given that reimbursement for such costs is considered

part of the Contract Sum (and is available only if the change order procedure is followed), it is

not clear what Mammoet North is seeking if not an adjustment of the Contract Sum.

Mammoet North also relies on Section 2.1 of the DBA, which provides that the Contract

Sum is "based upon" the Work as "described in the Design Build Documents."  DBA § 2.1.  In

Mammoet North's view, that does not include "work performed by the DBT due to breaches" by

New York Wheel.  Mammoet North MTD Opp'n 13-14.  But the more general Section 2.1

cannot prevail over the more specific Section 5.2.2, which provides that any "Project related

costs" incurred by the DBT as a result of a breach by New York Wheel entitles the DBT to an

adjustment in the Contract Sum.  DBA § 5.2.2; *see Bowmer v. Bowmer*, 406 N.E.2d 760, 762

(N.Y. 1980) (noting "the rule of [contract] construction that . . . the specific provisions tend to

restrict the general").  Mammoet North also creates a strawman of New York Wheel's defense.

Contrary to Mammoet North's characterizations, New York Wheel does not suggest that "the

DBT had agreed to bear all costs caused by [New York Wheel's] breaches of its obligations"

under the DBA.  Mammoet North MTD Opp'n 13.  New York Wheel simply argues that the

DBA requires that any claims for such costs be funneled through the change order procedure.

Second, Mammoet North argues that if the Court were to adopt New York Wheel's interpretation of the DBA, it would mean that "the Article IX change order procedure constituted the DBT's . . . exclusive remedy for contractual breaches by [New York Wheel]."  Mammoet North MTD Opp'n 8.  The Court may not reach such a conclusion, Mammoet North continues, because New York law requires a clear indication that the parties intended contractual remedies to be exclusive, and no such intent is evident in the DBA.  *See id.* at 8-12; *see also Inter-Am. Dev. Bank v. NextG Telecom Ltd.*, 503 F. Supp. 2d 687, 698 (S.D.N.Y. 2007) ("Under New York law, contractual remedies are deemed to be nonexclusive absent some indication of contrary intent." (alterations and internal quotation marks omitted)).  But once again, Mammoet North mischaracterizes New York Wheel's position.  New York Wheel does not argue that, if it had refused to approve a change order for costs resulting from its breach, the DBT — and now Mammoet North — would be out of luck.  Instead, New York Wheel merely argues that the DBT was first required to seek a change order.  In other words, the DBA prescribes a procedure; it does not restrict ultimate remedies.

Indeed, the DBA provides that the DBT may resort to the courts to resolve any dispute that remains after the conclusion of the change order process.  Change orders are to adjust the Contract Sum using a methodology "based on those listed . . . in Section 9.3.3," DBA § 9.2.2, which, in turn, permits adjustments "as provided in Section 9.3.6," *id.* § 9.3.3.4.  Under Section 9.3.6, "[i]f the [DBT] . . . disagrees with the method for adjustment . . . the [DBT] shall perform the disputed Work and may give notice to [New York Wheel] of its dissatisfaction with a determination within fourteen (14) days," after which time "[e]ither party may then commence the dispute resolution process set forth in Section 19.2."  *Id.* § 9.3.6.  There, the DBA expressly states that "[a]ll claims, disputes or matters in controversy . . . that arise as a result of any default

by [New York Wheel] . . . shall be resolved by reference to judicial process." *Id.* § 19.2.6.

Many of the cases cited by Mammoet North are therefore inapposite. *See In re Hale Desk Co.*,

97 F.2d 372, 373 (2d Cir. 1938) (holding that a contractual right to return shares in the event of

default was not the sole remedy); *Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo*

*"Spartak*,*"* No. 13-CV-2302 (ENV), 2016 WL 4532113, at *10 (E.D.N.Y. Aug. 29, 2016)

(holding that termination of the agreement was not the party's sole remedy for a material

breach); *see also Kahala Corp. v. Holtzman*, No. 10-CV-4259 (DLC), 2010 WL 4942228, at *2

(S.D.N.Y. Dec. 3, 2010) (similar); *Regent Ins. Co. v. Storm King Contr. Inc.*, No. 06-CV-2879

(LBS), 2008 WL 563465, at *9 n.1 (S.D.N.Y. Feb. 27, 2008) (similar); *J. Petrocelli Contracting,*

*Inc. v. Morganti Grp., Inc.*, 27 N.Y.S.3d 646, 648 (2d Dep't 2016) (similar); *Huen N.Y., Inc. v.*

*Bd. of Ed. Clinton Cent. Sch. Dist.*, 890 N.Y.S.2d 748, 749-50 (4th Dep't 2009) (similar); *Sec. &*

*Law Enf't Emps., Dist. Council 82, AFSCME, AFL-CIO ex rel. Krom v. Hartnett*, 500 N.Y.S.2d

571, 572 (3d Dep't 1986) (similar).

Because the change order procedure did not restrict the DBT's ability to seek relief

through the judicial process, it is more like a notice or prelitigation mediation requirement.

Under New York law, where a contract "specifically provide[s] that the failure to comply" with

contractual notice requirements "would constitute a waiver" of a contractor's "claim for

damages," such notice requirements constitute a condition precedent and will be enforced.

*Morelli Masons, Inc. v. Peter Scalamandre & Sons*, 294 A.D.2d 113, 113 (1st Dep't 2002); *see*

*also Mendelsohn v. Port Auth. Trans-Hudson Corp.*, No. 11-CV-3820 (ADS), 2012 WL

3234107, at *1 (E.D.N.Y. Aug. 3, 2012) (construing a provision stating that "[t]he failure of the

Contractor to give [required] written notice . . . as to any claim shall be conclusively deemed to

be a waiver . . . of such claim" to be a condition precedent); *Rojas v. Don King Prods., Inc.*, No.

11-CV-8468 (KBF), 2012 WL 760336, at \*1, \*3 (S.D.N.Y. Mar. 6, 2012) (dismissing a claim for breach of contract because the complaint "fail[ed] to allege compliance" with a notice provision, which provided that, if the plaintiff "fails for any reason whatsoever to provide notice to [the defendant] of such claimed breach within the 30 Day Period . . . [the plaintiff] shall be deemed to have waived and released and hereby does waive and release [defendant] from any and all liability"); *Northgate Elec Corp. v. Barr & Barr, Inc.*, 61 A.D.3d 467, 468-69 (1st Dep't 2009). New York courts similarly enforce contract provisions requiring that the parties pursue mediation before filing suit.  *See, e.g.*, *Archstone Dev. LLC v. Renval Constr. LLC*, 156 A.D.3d 432, 433 (1st Dep't 2017) (affirming dismissal of a breach of contract claim because the plaintiff "did not pursue mediation as required").  The change order requirement here is no different.  *See* DBA § 9.6.1 (providing that, if the DBT fails to give notice within twenty-one days after becoming aware of the circumstances giving rise to a claim for an increase in the Contract Sum, the DBT "shall waive such claim").  Mammoet North's contention that the Court's conclusion converts the change order procedure into an exclusive remedy is thus without merit.

Finally, Mammoet North argues that Section 19.2.6 differentiates between "claims pertaining to change order issues and claims pertaining to defaults" and "underscores . . . that claims for contractual breach are outside the scope of the Change Order process."  Mammoet North MTD Opp'n 11.  As an initial matter, Mammoet North distorts the contractual language, which refers generally to claims "pertaining to *changes in the Work*" — not to matters "pertaining to change order issues" — and claims "that arise as a result of any default."  DBA § 19.2.6 (emphasis added).  New York Wheel does not argue that damages arising from its default amount to a change in the Work, merely that claims from its default must be submitted to the change order process.  The DBA categorizes the two differently, but it expressly states that

the change order process applies to both.  *See* DBA § 5.2.2 (providing that "adjustments in the

Contract Sum" resulting from an Unavoidable Delay such as the "default of [New York Wheel]"

are to be "effected by Change Orders entered into in accordance with Article IX"); *id.* § 3.1

(providing that a request issued by New York Wheel "shall be deemed a change in the Work if

(i) such request is inconsistent with any prior request . . . or (ii) the design proposed by the

[DBT] conforms to the Project Criteria"); *id.* § 9.1 (primarily discussing changes in the work and

clarifying that, "[n]otwithstanding the foregoing provisions of this Section 9.1, in the event that,

in accordance with Article V, the [DBT] is entitled to . . . an adjustment of the Contract Sum in

respect of an Unavoidable Delay, such . . . adjustment shall be effected pursuant to a Change

Order").  Moreover, Section 19.2 says nothing at all about the change order process.  It merely

provides that disputes are to be submitted to arbitration except, as relevant here: (1) claims that

exceed the fifteen-million-dollar Arbitration Cap and (2) claims arising from a breach of

contract.  *See id.* § 19.2.1 ("The first Fifteen Million Dollars . . . ('Arbitration Cap') in the

aggregate of claims, disputes or matters in controversy . . . pertaining to cost or any changes in

the Work . . . arising out of or relating to this Agreement, shall be subject to expedited arbitration

. . . ."); *id.* § 19.2.6 ("All claims, disputes or matters in controversy pertaining to changes in the

Work exceeding the Arbitration Cap or that arise as a result of any default by [New York Wheel]

. . . shall be resolved by reference to judicial process.").  Thus, for the matters subject to the

change order process, Section 19.2 is relevant only to the extent that disputes remain after the

change order process concludes.

In sum, the DBA unambiguously provides that the claims Mammoet North asserts as

Counts Four through Eight were waived by the DBT when it failed to submit them to the change

order process.  Accordingly, New York Wheel's motion to dismiss those claims must be and is

granted.  The Court need not, and does not, consider New York Wheel's other grounds for

dismissal of Count Five.  *See* NYW MTD Br. 13-20.

### 3.  Count Ten — Breach of Contract

By contrast, Count Ten of Mammoet North's Amended Third-Party Complaint and

Counterclaims, which alleges that New York Wheel violated Section 13.4 of the DBA, cannot be

resolved on a motion to dismiss.  *See* ACC ¶¶ 222-29.  Section 13.4 provides that, in the event

New York Wheel terminates the DBT's employment:

> If the unpaid balance of the Contract Sum exceeds the costs of finishing the Work
> and other costs incurred by [New York Wheel] resulting directly from [New York
> Wheel's termination of the DBT's employment] . . . then such excess shall be
> paid to the [DBT].  If such costs incurred by [New York Wheel], then the [DBT]
> shall pay the difference to [New York Wheel]."

DBA § 13.4.  Mammoet North argues that this provision requires a payment equal to the

difference between the costs incurred in an effort to finish the Wheel, along with other costs

incurred as a result of the DBT's termination, and the unpaid balance of the Contract Sum.  *See*

Mammoet North MTD Opp'n 19-25.  New York Wheel argues that Section 13.4 applies only if

the Wheel is actually completed, and thus is irrelevant here.  *See* NYW MTD Br. 20-25.

The language of the DBA does not unambiguously support New York Wheel's

interpretation.  First, under New York Wheel's interpretation of Section 13.4, completion of the

Wheel would effectively be a condition precedent to any payment.  Under New York law, courts

should not lightly conclude that a provision imposes a condition precedent.  Instead, courts must

look for "unmistakable" conditional language such as "if," "unless and until," or "null and void."

*See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995);

*see also Mendelsohn*, 2012 WL 3234107, at *1 (finding a provision stating that failure to provide

"written notice . . . as to any claim shall be conclusively deemed to be a waiver . . . of such

claim" demonstrated that the notice requirement was a condition precedent).  There is no

conditional language in Section 13.4, let alone "unmistakable" conditional language. *Oppenheimer & Co.*, 660 N.E.2d at 418.  Second, there is little in the DBA suggesting, let alone providing, that Section 13.4 applies only when New York Wheel "goes on to finish the Work" after terminating the DBT's employment.  NYW MTD Br. 21 (internal quotation marks and alteration omitted).  Critically, the language upon which New York Wheel relies is drawn from the description of how any such payment is to be calculated — not from a description of when such a payment is to be made.  *See* DBA § 13.4.

The gravamen of New York Wheel's argument is that adopting Mammoet North's interpretation of Section 13.4 would produce an "absurd" and "commercially unreasonable" result "contrary to the reasonable expectations of the parties."  *AAR Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, No. 13-CV-3241 (JMF), 2014 WL 1807098, at *4 (S.D.N.Y. May 6, 2014) (internal quotation marks omitted).  In particular, New York Wheel fears that, if a payment were required under Section 13.4, a contractor could default in such a way that makes finishing the project impossible (at least as a practical matter) and then receive a windfall.  *See* NYW MTD Br. 25.  But the flaw in this argument is its premise that, absent a requirement that the Wheel be completed, Section 13.4 would necessarily require payment.  Critically, Section 13.4 differentiates between "the costs of finishing the Work" and "other costs *incurred* by [New York Wheel] resulting directly from such termination and not expressly waived."  *Id.* (emphasis added).  "[T]he costs of finishing the Work," therefore, are not necessarily costs that were actually incurred — they might also include the *estimated* costs that New York Wheel would have to incur if it *were* to finish the Wheel.  Framed in this way, Section 13.4 is consistent with traditional principles of contract law: It would provide New York Wheel with expectation damages, *see* Restatement (Second) of Contracts § 347 (explaining that expectation damages are

"measured by (a) the loss in value to [the injured party] of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that [the injured party] has avoided by not having to perform"), except that any reduction in the cost of the project would inure to the DBT's benefit.  And that makes sense.  Where the cost of completing the project is less than the unpaid balance of the Contract Sum, that might be because the value of the DBT's work exceeded what it had been paid.

Accordingly, New York Wheel's motion to dismiss Count Ten must be, and is, denied.

**D.  Mammoet North's Motion to Amend and to Add New York Wheel Mezz as a Party**

Finally, the Court turns to Mammoet North's motion to amend its pleading and to add New York Wheel Mezz as a party.  As noted above, the City maintains that it satisfied its obligations under Section 5 of the New York Lien Law by obtaining the Payment Guaranty from New York Wheel Mezz.  *See* NYC 3d Pty. MTD Br. 5-7.  Mammoet North thus moves for leave to amend its pleading to add a third-party claim against New York Wheel Mezz under the Payment Guaranty.  *See* ECF No. 266; ECF No. 268-1, ¶¶ 231-38.  Because New York Wheel Mezz is not yet a party, Mammoet North also moves to join it as a third-party defendant.  Both New York Wheel Mezz and the City oppose the motion.

Motions to amend are generally governed by Rule 15(a), but Rule 21 governs when the proposed amendment would add a defendant.  *See Hai Yang Liu v. 88 Harborview Realty, LLC*, 5 F. Supp. 3d 443, 450 n.1 (S.D.N.Y. Mar. 12, 2014).  Under Rule 21, the court may allow a party to be added or removed "at any time, on just terms."  Fed. R. Civ. P. 21.  "In deciding whether to permit joinder, courts apply the same standard of liberality afforded to motions to amend pleadings under Rule 15."  *Bridgeport Music, Inc. v. Universal Music Grp., Inc.*, 248

F.R.D. 408, 412 (S.D.N.Y. 2008) (internal quotation marks omitted).  Several factors might

warrant denial of a motion to amend under Rule 15, including (1) "undue delay, bad faith[,] or

dilatory motive on the part of the movant"; (2) "repeated failure to cure deficiencies by

amendments previously allowed"; (3) "undue prejudice to the opposing party by virtue of

allowance of the amendment"; and (4) "futility of amendment."  *Foman v. Davis*, 371 U.S. 178,

182 (1962).  Moreover, joinder of defendants is permitted only if "any right to relief is asserted

against them jointly, severally, or in the alternative with respect to or arising out of the same

transaction, occurrence, or series of transactions or occurrences; and . . . any question of law or

fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2).

Applying these standards here, the Court concludes that Mammoet North should be

permitted to amend its pleading and add New York Wheel Mezz as a party.  For starters, the

parties do not dispute that Rule 20 is satisfied here.  Mammoet North seeks to hold New York

Wheel Mezz liable for contract damages in connection with five of its claims against New York

Wheel.  *See* ECF No. 268-1, at 46-47 (seeking, on the newly proposed count, "[c]ompensatory

damages against NYW Mezz to the extent not recovered under Count One," in which Mammoet

North seeks "[c]ompensatory damages . . . to the extent not recovered under Counts Two, Three,

Ten or Eleven").  And because New York Wheel Mezz's liability to Mammoet North turns in

part upon the validity of Mammoet North's claims against New York Wheel — and the amount

of any damages therefrom — there will be common questions of fact and law.  *See* Charles Alan

Wright, Arthur R. Miller, & Mary Kay Kane, 7 Fed. Prac. & Proc. Civ. § 1657 (3d ed.) (noting

"courts have permitted the joinder of a principal obligor and guarantor").

Instead, the parties dispute whether amendment should be permitted under Rule 15.  The

City argues that Mammoet North's motion should be denied as futile because Mammoet North

was never assigned the DBT's claims against New York Wheel Mezz.  *See* ECF No. 277.  In

general, however, "current parties unaffected by the proposed amendment do not have standing

to assert claims of futility on behalf of proposed defendants."  *Custom Pak Brokerage, LLC v.*

*Dandrea Produce, Inc.*, No. 13-CV-5592 (NLH) (AMD), 2014 WL 988829, at *2 (D.N.J. Feb.

27, 2014) (alterations and internal quotation marks omitted); *see also Clark v. Hamilton Mortg.*

*Co.*, No. 07-CV-252, 2008 WL 919612, at *2 (W.D. Mich. Apr. 2, 2008) ("[T]he objecting

defendants have not cited any authority that would . . . authorize present parties who are

unaffected by the proposed amendment to assert claims of futility on behalf of the proposed new

defendant.").  To be sure, some courts have allowed a defendant to assert futility on behalf of a

prospective defendant, but in these cases there was usually "a close legal relationship" between

the two.  *Agri Star Meat & Poultry, LLC v. Moriah Capital, L.P.*, No. C10-1019, 2011 WL

1743712, at *7 (N.D. Iowa May 6, 2011); *see also Soroof*, 283 F.R.D. at 149-52 (considering

defendants' futility objection relating to alter ego claims).  Because that is not the case here, the

Court declines to consider defenses that may be available to New York Wheel Mezz but are not

raised by it, and will instead allow New York Wheel Mezz to assert any defenses on a clean

slate.

New York Wheel Mezz also opposes the motion.  But non-parties have no standing to

object to a joinder motion at all.  *See Goel v. Coalition Am. Holding Co.*, No. 11-CV-2349

(GAF), 2011 WL 13128719, at *2 (C.D. Cal. Aug. 30, 2011) (holding that the prospective

defendant "does not have standing to oppose [p]laintiff's motion for leave to file an amended

complaint"); *Dungan v. Acad. at Ivy Ridge*, No. 06-CV-0908 (TJM), 2009 WL 2176278, at *2

(N.D.N.Y. July 21, 2009) ("As non-parties, [prospective defendants] do not have standing to

oppose the motion for leave to amend."); *State Farm Auto. Ins. Co. v. CPT Med. Servs., P.C.*,

246 F.R.D. 143, 146 n.1 (E.D.N.Y. 2007) (holding that prospective defendants "do not have standing to oppose the motion for leave to amend because they are not yet named parties to this action"); *Vasquez v. Summit Women's Ctr., Inc.*, No. 3:01-CV-955 (PCD), 2001 WL 34150397, at *1 n.1 (D. Conn. Nov. 16, 2001) ("The standing of non-parties to challenge a motion for leave to file an amended complaint that seeks to add them is, at best, dubious.").  Accordingly, New York Wheel Mezz's objections are not a basis to deny Mammoet North's motion.

Nevertheless, it is worth addressing New York Wheel Mezz's argument that Mammoet North's proposed amended pleading would run afoul of Rule 11.  New York Wheel Mezz argues that is the case because Mammoet North's proposed amendment is inconsistent with positions Mammoet North took in its opposition to the City's motion to dismiss.  *See* ECF No. 276, at 2-3. It is a bedrock principle of modern civil procedure, however, that a party may plead inconsistent claims or defenses.  *See* Fed. R. Civ. P. 8(d); *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 617 (S.D.N.Y. 2016); *Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d 118, 136 (S.D.N.Y. 2012).  New York Wheel Mezz recognizes as much, but nonetheless argues that the proposed amendment "risk[s] a Rule 11 violation" because Mammoet North "believes" its new allegations "to be false."  ECF No. 276, at 2.  But to support that contention, it does no more than quote from Mammoet North's opposition to the City's motion to dismiss.  *See id.*  Were that enough, inconsistent claims could not survive a motion to dismiss — a result clearly foreclosed by Rule 8.  Indeed, if anything, in arguing otherwise, New York Wheel Mezz itself comes close to violating Rule 11.

In sum, no party demonstrates that Mammoet North's proposed amendment would cause existing defendants prejudice or undue delay, and no existing defendant has standing to argue

that the amendment is futile.  Accordingly, Mammoet North's motion to amend its third-party complaint and join New York Wheel Mezz as a third-party defendant is granted.

## CONCLUSION

For the reasons stated above, the Court rules as follows:

(1) Defendants' motion to dismiss New York Wheel's Third Amended Complaint is GRANTED in part and DENIED in part.  In particular, it is GRANTED to the extent that it seeks dismissal of the agency allegations in Count One and to dismiss Count Two, and it is DENIED to the extent that it seeks dismissal of the alter ego allegations in Count One and to dismiss Count Three.

(2) The City's motion to dismiss Mammoet North's third-party complaint is GRANTED.

(3) New York Wheel's motion to dismiss Mammoet North's counterclaims is GRANTED to the extent that it seeks dismissal of Counts One and Four through Eight, but it is DENIED to the extent that it seeks dismissal of Count Ten.

(4) Mammoet North's motion for leave to amend its pleading and to add New York Wheel Mezz as a party is GRANTED.  Mammoet North shall file its amended pleading within **one week of the date of this Opinion and Order**.

The only remaining question is whether any party should be granted leave to amend to cure the deficiencies identified in its pleading above.  Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is ultimately "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  The Court declines to grant leave to amend in light of the fact that, with the possible exception of New York Wheel's claim for fraudulent inducement, the defects in the claims dismissed here are "substantive" and "better pleading will not cure" them.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  Under such circumstances, amendment would be futile, and leave to amend should not be granted.  *See id.* Moreover, also with the possible exception of New York Wheel's claim for fraudulent inducement, the parties do not request leave to amend.  *See, e.g.*, *Ritchie Capital Mgmt., LLC v.*

*Gen. Elec. Capital Corp.*, 821 F.3d 349, 351-52 (2d Cir. 2016) (per curiam) (holding that it was not an abuse of discretion to deny the plaintiffs an opportunity to amend their complaint where they "did not ask the district court for leave to amend").

New York Wheel does request leave to amend its fraudulent inducement claim in a footnote. *See* Pls.' MTD Opp'n 28 n.29. But an argument "relegated to a footnote . . . does not suffice to raise [an] issue." *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018). In any event, New York Wheel requests leave to amend only to cure any deficiency in its complaint's allegations regarding where the alleged misrepresentations were made — which is not a basis for the Court's decision. *See* Pls.' MTD Opp'n 28 n.29. New York Wheel does not suggest that, if it were given an opportunity to amend, it would be able to cure the deficiencies identified here.

Finally, many of the claims dismissed here, including the claim for fraudulent inducement, were subject to motions to dismiss at the time that this case was closed and, when it was reopened, the parties had an opportunity to draft new pleadings, with knowledge of what their opponents' arguments were likely to be. *See* ECF No. 67, at 5-10 (arguing that New York Wheel failed to state a claim for fraudulent inducement); ECF No. 100, at 7-10 (arguing that certain of the DBT's claims must be dismissed because the DBT did not comply with the change order procedure); ECF No. 167, at 3-12 (non-DBT defendants arguing that the fraudulent inducement claim must be dismissed to the extent that it is asserted against them); ECF No. 147, at 7-8 (arguing that the claim against the City fails because the Defendants failed to timely commence an Article 78 proceeding). In other words, the parties were already granted an opportunity to cure most, if not all, of the deficiencies found herein. The Court will not grant them another opportunity *sua sponte*.

Unless and until the Court orders otherwise, the parties shall file their answers to any remaining claims **within three weeks of the date of this Opinion and Order**.  By Order to be docketed separately, the Court will schedule an initial pretrial conference.

The Clerk of Court is directed to terminate Docket Nos. 229, 258, 261, and 266.

SO ORDERED.

Dated: August 21, 2020
New York, New York

_____
JESSE M. FURMAN
United States District Judge